# 25-0155-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————◆———————————

UNITED STATES ex rel. W. BENSON CHILES,
UNITED STATES ex rel. CHRIS MANTHEY,

*Plaintiffs-Appellants,*

ABC, UNITED STATES OF AMERICA, ex rel.,

*Plaintiffs,*

– v. –

COOKE INC., COOKE AQUACULTURE INC., COOKE OMEGA
INVESTMENTS INC., COOKE SEAFOOD USA INC., OMEGA PROTEIN
CORPORATION, OMEGA PROTEIN, INC., GLENN COOKE, BRET D.
SCHOLTES, BMO CAPITAL MARKETS CORP., ALPHA VESSELCO
HOLDINGS, INC., also known as Ocean Fleet Services, Inc., ALPHA
VESSELCO LLC., doing business as Ocean Harvesters, SETH GREGORY
DUNLOP, GREGORY LAWSON DUNLOP, MONTGOMERY DEIHL,

*Defendants-Appellees,*

DEF,

*Defendant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

BRENDON DEMAY
JACK L. MILLMAN
BRIAN T. GOLDMAN
HOLWELL SHUSTER & GOLDBERG LLP
*Attorneys for Plaintiffs-Appellants*
425 Lexington Avenue, 14th Floor
New York, New York 10017
(646) 837-5151

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ....................................................... 5

ISSUES PRESENTED....................................................................... 5

STATEMENT OF THE CASE.............................................................. 6

    I.    LEGAL BACKGROUND ........................................................ 6

    II.    FACTUAL BACKGROUND ..................................................... 7

        A.    United States Investment in Fisheries......................... 7

        B.    The Fraudulent Scheme. ........................................... 8

        C.    The False and Misleading Certifications. .................. 12

    III.  PROCEDURAL HISTORY ..................................................... 12

SUMMARY OF THE ARGUMENT ..................................................... 15

ARGUMENT ................................................................................. 15

    I.    Fish In Public Waters Are Property Under the FCA. ........................... 17

        A.    By Statute, Fish In Public Waters Are Property Owned by the States. ........................................................ 17

        B.    The FCA Applies to State Property ........................... 19

        C.    Fish In Federal Waters Are Federal Property ............ 19

        D.    The Government Holds All Sticks in the Bundle of Rights. .... 30

        E.    Cases About Federalism Are Inapposite.................... 34

i

F.     The Government's Interest, Even if Less than Ownership, Is Still a Property Interest. ..............................................42

II.    The Complaint Also States a Reverse False Claim. .............................45

III.   In the Alternative, the Court Should Grant Leave to Amend. ..............50

A.     The Government Has a Property Interest in Illegally Harvested Fish. ................................................................................51

B.     Appellants Properly Sought Leave to Amend. ........................55

CONCLUSION ......................................................................................59

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. BP Expl. & Prod. Inc.*,
    781 F. Supp. 2d 453 (S.D. Tex. 2011)............................................34

*Alabama v. Texas*,
    347 U.S. 272 (1954)...............................................................25

*Almeida v. Holder*,
    588 F.3d 778 (2d Cir. 2009) ............................................... 31, 32

*Arnold v. Mundy*,
    6 N.J.L. 1 (1821)....................................................................20

*Art & Antique Dealers League of Am., Inc. v. Seggos*,
    121 F.4th 423 (2d Cir. 2024) ..............................................26

*Att'y Gen. v. Consumers Power Co.*,
    508 N.W.2d 901 (Mich. Ct. App. 1993)........................................39

*Att'y Gen. v. Hermes*,
    339 N.W.2d 545 (Mich. Ct. App. 1983)............................... 39, 44

*Baldwin v. Fish & Game Comm'n of Montana*,
    436 U.S. 371 (1978)....................................... 34, 37, 43

*Carpenter v. United States*,
    484 U.S. 19 (1987) .................................................................42

*Carson v. Blazer*,
    1810 WL 1292 (Pa. 1810) .......................................................20

*Cleveland v. United States*,
    531 U.S. 12 (2000).............................................. 14, 54

*Coolidge v. Williams*,
    4 Mass. 140 (1808) ..............................................................20

*Corfield v. Coryell*,
    6 F. Cas. 546 (C.C.E.D. Pa. 1823).............................................20

*Dodd v. United States*,
    545 U.S. 353 (2005).................................................................17

iii

*Dolan v. City of Tigard*,
    512 U.S. 374 (1994)................................................................31

*Dunham v. Lamphere*,
    69 Mass. 268 (1855) ...........................................................21

*Gamble v. United States*,
    587 U.S. 678 (2019)..............................................................25

*Geer v. Connecticut*,
    161 U.S. 519 (1896)............................................... 22, 23, 38

*Griffith v. Conn*,
    2016 WL 1029331 (E.D. Ky. Mar. 14, 2016) .............................29

*Horne v. Dep't of Agriculture*,
    576 U.S. 350 (2015)..............................................................38

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979)..............................................................37

*Lacoste v. Dep't of Conservation of State of Louisiana*,
    263 U.S. 545 (1924)..............................................................23

*Leonard & Leonard v. Earle*,
    279 U. S. 392 (1929) ............................................................38

*Leonard v. Earle*,
    155 Md. 252 (1928) .............................................................38

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)..............................................................31

*Loper Bright Enters. v. Raimondo*,
    144 S.Ct. 2244 (2024)...........................................................47

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ........................................ 55, 57, 59

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)..............................................................31

*Los Rovell Dahda v. United States*,
    584 U.S. 440 (2018)..............................................................19

*Loughrin v. United States*,
    573 U.S. 351 (2014) .............................................................19

*Manchester v. Massachusetts*,
   139 U.S. 240 (1891)............................................................21

*Martin v. Waddell's Lessee*
   41 U.S. 367 (1842)............................................................20

*McCready v. Virginia*,
   94 U.S. 391 (1876)............................................................21

*Miller v. U.S. ex rel. Miller*,
   110 F.4th 533 (2d Cir. 2024) ............................................46

*Missouri v. Holland*,
   252 U.S. 416 (1920)............................................................22

*Mountain States Legal Found. v. Hodel*,
   799 F.2d 1423 (10th Cir. 1986) ................................... 38, 39

*Palila v. Hawaii Dep't of Land & Nat. Res.*,
   471 F. Supp. 985 (D. Haw. 1979), *aff'd*, 639 F.2d 495 (9th Cir. 1981)........44

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012) ..............................................51

*People v. Maikhio*,
   253 P.3d 247 (Cal. 2011) ...................................................44

*Pullen v. Ulmer*,
   923 P.2d 54 (Alaska 1996) ........................................... 43, 44

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986 (1984)............................................................30

*Shell Oil Co. v. Iowa Dep't of Revenue*,
   488 U.S. 19 (1988).............................................................26

*State v. Fertterer*,
   841 P.2d 467 (Mont. 1992)..................................................39

*State v. Gatts*,
   928 P.2d 114 (Mont. 1996)..................................................39

*Takahashi v. Fish & Game Comm'n*,
   334 U.S. 410 (1948).......................................................23, 37

*Tangier Sound Watermen's Assoc. v. Douglas*,
   541 F. Supp. 1287 (E.D. Va. 1982)....................................38

v

*The Abby Dodge*,
  223 U.S. 166 (1912)................................................................22

*Toomer v. Witsell*,
  334 U.S. 385 (1948)................................................................24

*Twombley v. City of Long Beach*,
  333 F.2d 685 (9th Cir. 1964) ...............................................25

*United States ex rel. Sequoia Orange Co. v. Oxnard Lemon Co.*,
  1992 WL 795477 (E.D. Cal. May 4, 1992) ..................................46

*United States v. Craft*,
  535 U.S. 274 (2002)................................................................31

*United States v. Bengis*,
  631 F.3d 33 (2d Cir. 2011) ...................................... 6, 51, 53, 54

*United States v. Bruce*,
  437 F. App'x 357 (6th Cir. 2011)............................................40

*United States v. California*,
  332 U.S. 19 (1947)............................................................ 23, 27

*United States v. California*,
  332 U.S. 804 (1947)................................................................24

*United States v. California*,
  447 U.S. 1 (1980)....................................................................24

*United States v. Constantin*,
  No. 6:19-CR-00345-01, 2020 WL 5807519 (W.D. La. Sept. 29, 2020).......52

*United States v. Gaines*,
  295 F.3d 293 (2d Cir. 2002) ...................................................32

*United States v. Long Cove Seafood, Inc.*,
  582 F.2d 159 (2d Cir. 1978) ............................................. 40, 41

*United States v. Louisiana*,
  339 U.S. 699 (1950)................................................................23

*United States v. Mason*,
  692 F.3d 178 (2d Cir. 2012) ...................................................19

*United States v. McNinch*,
  356 U.S. 595 (1958)......................................................... 17, 45

vi

*United States v. Monsanto,*
    491 U.S. 600 (1989)..........................................................46, 47, 49

*United States v. Neifert-White Co.,*
    390 U.S. 228 (1968)................................................................42, 49

*United States v. Oceanpro Indus., Ltd.,*
    674 F.3d 323 (4th Cir. 2012) ............................................51, 52, 53

*United States v. Pemco Aeroplex, Inc.,*
    195 F.3d 1234 (11th Cir. 1999) ..................................................48

*United States v. Robbins,*
    No. 2:22-CR-00012-GZS, 2023 WL 425178 (D. Me. Jan. 26, 2023)..........52

*United States v. State of Mich.,*
    471 F. Supp. 192 (W.D. Mich. 1979)...........................................35

*United States v. Texas,*
    339 U.S. 707 (1950).....................................................................23

*United States v. Wells Fargo,*
    943 F.3d 588 (2d Cir. 2019) .......................................................29

*United States v. Winkler,*
    2022 WL 17824064 (E.D.N.Y. Dec. 20, 2022)..............51, 52, 53

*Universal Health Services, Inc. v. United States,*
    579 U.S. 176 (2016)....................................................................53

*Utah Div. of State Lands v. United States,*
    482 U.S. 193 (1987)....................................................................25

*Wickard v. Filburn,*
    317 U.S. 111 (1942).....................................................................22

**Statutes**

16 U.S.C. § 1857...........................................................................52

16 U.S.C. § 1860.....................................................................52, 58

16 U.S.C. § 3373(a) .....................................................................47

16 U.S.C. § 742a ............................................................ 1, 30, 33, 42

28 U.S.C. § 1291 ......................................................................5

28 U.S.C. § 1331 ......................................................................5

31 U.S.C. § 3729 .............................................................. *passim*

31 U.S.C. § 3732 ......................................................................5

43 U.S.C. § 1301 .............................................................. *passim*

43 U.S.C. § 1311(a) ......................................................... *passim*

43 U.S.C. § 1314 ................................................................ 35, 36

46 U.S.C. § 12105(a) ...............................................................34

46 U.S.C. § 12113 .............................................................. 6, 31

46 U.S.C. § 12151 .......................................................... 6, 47, 50

46 U.S.C. § 50501(d) ................................................................6

Or. Rev. Stat. Ann. § 496.705 ...............................................45

Va. Code Ann. § 29.1-557 ......................................................52

**Regulations**

46 C.F.R. § 356.3 .....................................................................6

46 C.F.R. § 356.11 .......................................................... 6, 8, 11, 47

**Other Authorities**

2 Blackstone's Commentaries 14.............................................20

2 Bracton on the Laws and Customs of England 43, 166–67..................................20

Fraud Enforcement and Recovery Act of 2009, S. Rep. 111-10 (2009) .................58

*Property*, Black's Law Dictionary (12th ed. 2024) ...................................................42

Submerged Lands Act, H.R. Rep. No. 83-215 (1953), *reprinted in* 1953
    U.S.C.C.A.N. 1385 ................................................................................ 27–28

**INTRODUCTION**

Defendants lied to the United States government in an elaborate fraud. They committed fraud to get valuable natural resources worth millions and millions of dollars. Congress has declared the same resources Defendants took by fraud to be a "form of national wealth." 16 U.S.C. § 742a.

Relators filed a False Claims Act suit detailing the fraud. Because the natural resource is a valuable form of national wealth, by law it is available only to companies that are "controlled" by U.S. citizens. Defendants are a foreign company and its affiliates and conspirators. To create an illusion of compliance with the citizenship requirement, they set up a sham company in the name of a U.S. citizen. But that person was just a figurehead; he was in fact the inexperienced nephew of the foreign company's CEO, and he and his uncle had an agreement that the sham entity would be controlled by the foreign company. Then they falsely certified to the United States government that there was no agreement or understanding by which the foreign company would exercise control over the sham entity. The fraud worked. They successfully tricked the government into allowing them to take massive amounts of valuable natural resources from public lands.

The district court concluded that the natural resource Defendants took by fraud is not "property" under the False Claims Act (FCA). "Property" is defined as

1

"the rights in a valued resource," and property "'extend[s] to every species of valuable right and interest'." *Pasquantino v. United States*, 544 U.S. 349, 356 (2005) (quoting Black's Law Dictionary to interpret the statutory meaning of the word "property"); *Property*, Black's Law Dictionary (12th ed. 2024). The resource Defendants took by fraud is menhaden, an economically "valuable" fish that has been a staple commodity in the U.S. economy for hundreds of years. *Manchester v. Massachusetts*, 139 U.S. 240, 265 (1891).

The question is whether fish in public waters constitute "property." Congress has answered that question. Under the Submerged Lands Act, States have "title to and ownership of" all the "fish, shrimp, clams, oysters, crabs, lobsters, sponges, kelp, and other marine animal and plant life" in State waters. 43 U.S.C. §§ 1311(a)(1), 1301(e). That plain text is unambiguous. Congress enacted the statute specifically to codify the doctrine dating back to the founding of the Republic that States own the natural resources in their waters, including fish particularly, and to negate Supreme Court rulings that began suggesting otherwise. States also have all the sticks in the bundle of rights; they have the rights to exclude, use, possess, and transfer this valuable natural resource. And they exercise each of those rights. Accordingly, the fish that Defendants took by fraud from public waters are public property. And under the 2009 amendment to the FCA, the FCA applies when the Federal government manages the property of the

2

States, as the Federal government indisputably does here.  Thus, the FCA covers Defendants' fraud.

The court below dismissed the action without mentioning the Submerged Lands Act at all.  Instead of applying the statute, the district court cited inapposite case law regarding federalism.  But in those cases, it was admittedly "not significant" whether States' interest in fish ought to be characterized as property as opposed to something other than property.  Accordingly, those cases have regularly been understood as *not* answering the question whether the government has a property interest in animals on public lands.  Moreover, in civil suits by the government to recover "damages" resulting from unlawful fishing—the exact claims at issue here—both State and Federal courts have affirmed that the government has a property interest in fish in public waters.

The court below failed to apply the Submerged Lands Act as written and overextended inapposite cases regarding federalism that do not control here.  On de novo review, the ruling below should be reversed.

In addition, the complaint states a "reverse false claim" because Defendants lied to conceal or avoid their obligation to pay mandatory statutory penalties for their earlier unlawful fishing.  The court disagreed because the specific amount of the mandatory penalty is not fixed.  That conclusion contradicts the plain text of the FCA, which establishes liability even if the amount of the penalty is "not

3

fixed."  Moreover, the district court also incorrectly applied this Court's precedent regarding whether a penalty is mandatory or discretionary.  As this Court has explained, the question is whether the statute itself states that a penalty is mandatory or whether the statute states that the penalty is discretionary.  Here, the statute says the penalty is mandatory, and the statute contains no language converting the mandatory penalty into a discretionary one.  The district court's contrary reasoning—that even a mandatory statutory penalty is subject to prosecutorial discretion and is therefore discretionary—goes too far and leaves the reverse false claims provision with little to no effect.  On de novo review, this ruling also must be reversed.

Appellants respectfully request that the judgment be vacated and the order of dismissal reversed so that Defendants can be held accountable for their fraud.

## JURISDICTIONAL STATEMENT

The district court's jurisdiction rested on 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

This Court has jurisdiction under 28 U.S.C. § 1291. On January 3, 2025, the district court granted Defendants' motion to dismiss the Amended Complaint, denied Relators' request for leave to amend, and entered final judgment. (A-278, SPA-1.) Relators timely appealed. (A-300.)

## ISSUES PRESENTED

1. Does "property" under the False Claims Act include valuable natural resources in public lands and waters, where Congress has "recognized, confirmed, established, and vested in" the States "title to and ownership" of those natural resources, and where Congress has claimed "sovereign rights" in them as a "form of national wealth"?

2. Do fraudulent submissions to the United States government that concealed or avoided an obligation to pay a mandatory statutory penalty constitute a reverse false claim under 31 U.S.C. § 3729(a)(1)(G), where the statute does not provide that the mandatory penalties are discretionary?

3. Does "property" under the False Claims Act include the government's interests in the proceeds of unlawful activity that are subject to forfeiture, per this

Court's ruling in *United States v. Bengis*, 631 F.3d 33 (2d Cir. 2011), such that a claim under 31 U.S.C. § 3729(a)(1)(D) is valid?

## STATEMENT OF THE CASE

### I.    LEGAL BACKGROUND

The American Fisheries Act (AFA) imposes a citizenship requirement: any vessel that fishes commercially in U.S. waters must be owned *and controlled* by U.S. citizens.  46 U.S.C. § 12113(c)(1), (2); 46 U.S.C. § 50501(d).  Any "agreement," "understanding," "influence," "or any other means whatsoever" that would allow a foreign entity to exert de facto "control" over a U.S. vessel is illegal (the "Control Rule").  *Id.*; 46 C.F.R. §§ 356.3(e)(iv), 356.11(a)–(b).  Requests for approval to take fish from U.S. waters—including affidavits that certify compliance with the Control Rule—are presented to the U.S. Maritime Administration ("MARAD"), and then annually thereafter to the Coast Guard.

The Control Rule is the heart and soul of the privilege of commercial fishing in U.S. waters because the U.S.'s longstanding policy is to reserve U.S. fishery resources for U.S. citizens.  (A-90–A-91 (¶¶34–38).)  Accordingly, the AFA (a) requires MARAD to "rigorously scrutinize[]" citizenship affidavits to suss out foreign control; (b) imposes an affirmative duty to disclose "all relevant facts regarding vessel ownership and control"; and (c) imposes severe penalties for misleading the government about control.  §§ 12113(e), 12151(c).

6

## II.    FACTUAL BACKGROUND

### A.    United States Investment in Fisheries

The United States invests substantial resources in managing, preserving, protecting, and maintaining fish in U.S. waters.  (A-90 (¶34).)  Scores of individual fish stocks are intensively monitored and preserved by the Department of Commerce; multiple Regional Councils; interstate compacts acting under express grants of statutory authority from Congress; state, academic and non-profit organizations funded in part by the U.S. Government; and also by the Coast Guard and Maritime Administration.  (*Id.*)  Among other reasons that the Government monitors and invests heavily in fish is because the recreational and commercial fishing sectors are major sources of revenues and jobs.  (*Id.*)  For example, the striped bass fishery alone—one of the many species that relies on menhaden as a food source—contributes approximately $7 billion towards national GDP.  (*Id.*)

MARAD's enforcement of the AFA, including the Citizenship Requirement, is one aspect of the Government's management and protection of fish in U.S. waters, as eligibility to take fish from U.S. waters sits at the intersection of two long-standing domestic priorities: the commercial fishing industry and control of vessels that operate commercially in U.S. waters.  (*Id.* (¶35).)

**B.  The Fraudulent Scheme.**

This is a classic case of "figurehead fraud."  Defendant Cooke, Inc., is a foreign, family-run seafood conglomerate.  (A-79, A-83–A-86 (¶¶5, 15–22).)  In 2017, Cooke bought Omega Protein ("Omega"), a U.S. fishing company with dozens of vessels, for $500 million, making Omega a non-citizen under the AFA.  (A-79, A-84, A-97–A-100 (¶¶4, 18–19, 54–65).)  But they learned the AFA prohibited Cooke from acquiring the vessels, so Defendants created a supposedly independent domestic shell ("Alpha") to own them.  (A-101–A-104.)

Cooke and Omega could have chosen any U.S. citizen to be the nominal owner of the shell.  But instead of choosing an arms-length counterparty who would operate the shell independently, it just so happens they chose Seth Dunlop, a Cooke employee since he was 18 and the nephew of the Cooke CEO.  (A-86 (¶23).)  And they did not select Seth Dunlop for his vast expertise in vessel management.  Dunlop did not have sufficient experience in vessel management or fishing operations to run Alpha competently; he had a desk job in corporate business development with minimal if any duties at all, and minimal if not zero compensation.  (A-102 (¶70).)  Dunlop could not afford the $1 million he supposedly "contributed" to Alpha, and Cooke helped provide those funds, which is an "indici[um]" of illegal foreign control.  (A-102 (¶¶70, 72)); 46 C.F.R. § 356.11(b)(6).  Dunlop and his uncle the CEO already served together as the Vice

8

President and President, respectively, of several Cooke subsidiaries all at the same address as Alpha. (A-86–A-87 (¶¶22–23).) Dunlop kept his posts at Cooke for years after the Acquisition despite telling MARAD he would work full-time at Alpha, and in 2020 he destroyed evidence about it when caught. (A-120, A-128 (¶¶121, 146).)

To finance Cooke's acquisition of Omega, two Cooke entities co-issued $330 million in notes, underwritten by BMO Capital. (A-100 (¶63).) When confidentially raising $330 million from Wall Street, Defendants bragged that Dunlop was Cooke's "nephew" to *wink* to investors that Alpha would be managed for Cooke's benefit and that Cooke would thus be better able to repay the notes. (A-81, A-83, A-100, A-105–A-108 (¶¶10, 16, 63, 82–87).) The notes also included a draconian change-of-control provision allowing Cooke to hand-pick Dunlop's replacement if he no longer owned Alpha. (A-107 (¶86).)

After Cooke acquired Omega, Defendants executed the plan for Cooke and Omega to maintain control of Alpha. (A-109–A-111 (¶¶91–97).) Omega's longtime Vice President and head of operations, Monty Deihl, stayed on as an officer of Omega *and* Alpha, an impermissible dual role he continues. (A-87, A-105, A-109, A-120 (¶¶26, 80, 91, 120).) With Deihl never relinquishing de facto control, Cooke and Omega control Alpha's decisions about where to fish and who

9

to hire as employees, as well as every other material aspect of Alpha. (A-109–A-113 (¶¶92–95, 100).)

One stark example involves the fiasco surrounding Omega's intentional violation of the cap on the fish harvest in the Chesapeake Bay (the "Bay Cap"). (A-109–A-111 (¶¶93–95.) Each year, the Atlantic States Marine Fisheries Commission (ASMFC) sets a cap on the number of menhaden that can be taken from the Chesapeake Bay. In the 2019 fishing season, Omega decided it didn't like the Bay Cap and didn't want to honor it. So Omega directed the Omega Vessels to breach the Bay Cap, which they did. In response to this violation, the Commissioner of the Virginia Marine Resources Commission (Virginia's fishing regulator) expressed his concern in a letter to "Monty Deihl" at "Omega Protein." Seth Dunlop and Alpha were not copied on that letter, even though Alpha is supposedly the entity doing the fishing and even though Seth Dunlop is supposedly the person controlling Alpha. The ASMFC issued a noncompliance finding and asked the Secretary of Commerce to impose a moratorium on the menhaden reduction fishery in the Chesapeake Bay.

Then, in response, Omega—not Alpha, and not Seth Dunlop—submitted a lengthy objection on Omega letterhead. The opening statement of Omega's letter states: "Omega Protein . . . is *the sole entity* impacted by the Chesapeake Bay reduction fishery cap." In Omega's own words, therefore, Omega is "the sole

10

entity impacted" by the Bay Cap even though Alpha is supposedly doing the fishing and then "selling" the fish it catches to Omega at a supposedly arms-length price. Omega then *claimed responsibility for the decision* to intentionally violate the Bay Cap: Omega, referring to itself as "the company," admitted that "[t]he company choose [sic]" to breach the Bay Cap. Omega defended its decision on the grounds that bad weather in the ocean left *Omega* "with hard choices" about where to deploy the Omega Vessels to fish. Omega made no mention of Alpha or of any involvement by Seth Dunlop in Omega's "hard choices" about where to fish—because Monty Deihl at Omega makes those choices, not figurehead Seth Dunlop, the inexperienced nephew of the Cooke CEO.

It continues to this day. Cooke and Alpha share law firms including K&L Gates, another of the indicia of improper foreign control. 46 C.F.R. § 356.11(b)(3). And although McGuireWoods's lobbying disclosures list its client as "Omega Protein," they provide a client contact with *an email address at Alpha*, strongly supporting the inference that Alpha and Omega are used interchangeably. (A-108, A-112 (¶¶89, 98).) Alpha did not have a website until—surely not a coincidence—the day Alpha filed its motion to dismiss, and the street address for Alpha listed on that webpage is a fake address on Omega land. (A-112 (¶99).)

These facts give rise to an overwhelming and inescapable inference that *Alpha is a front* and that Cooke and Omega control it.

11

### C.   The False and Misleading Certifications.

To fish in U.S. waters, Defendants falsely certified to the U.S. government that they complied with the Control Rule.  They expressly certified there was no "understanding" and "no means whatsoever" by which a foreign entity would "indirectly" exercise de facto "control" over the Omega Vessels.  (A-119, A-113–A-124 (¶¶117, 102–124).)  The submissions also failed to disclose the illegal agreement—the "understanding" that Cooke and Omega would control Alpha and the Omega Vessels, and that Dunlop and Alpha would not control them.  (A-117–A-118 (¶111).)  The statements were false and misleading because, in fact, "Defendants had a shared understanding and expectation that Cooke and Omega would have the ability to exert, and would in fact exert, de facto control over the Omega Vessels [and] Alpha" (A-119 (¶118)) and "understood that Seth Dunlop would cede de facto control" to Cooke, Omega, Deihl, and his uncle Glenn Cooke (A-126 (¶139)).

Each year between 2018 and 2024, Defendants submitted attestations falsely certifying that the Omega Vessels were not subject to improper foreign control and that nothing had changed on that score over the prior year.  (A-115–A-118.)

## III.   PROCEDURAL HISTORY

Relators filed an initial *qui tam* complaint on July 2, 2021 under seal.  (A-18.)  After the action was unsealed in 2024, the Alpha defendants, Cooke

12

defendants, and BMO each filed motions to dismiss on July 9, 2024. They argued:
(1) fishing licenses are not property; (2) Relators did not satisfy the FCA's
materiality requirement; (3) Relators failed to plead fraud with particularity; (4) the
conspiracy count should be dismissed due to the lack of an underlying violation
and lack of a conspiracy; and (5) the allegations regarding the participation of the
individual defendants and BMO were insufficient.

The following week, the Court issued an order permitting the Relators to file
an amended complaint. (A-75.) The order stated *inter alia* that "Relators will not
be given any further opportunity to amend the complaint *to address issues raised
by the motions to dismiss*." *Id.* (emphasis added).

Relators filed the Amended Complaint on July 30, 2024. (A-77.)

The Alpha defendants, Cooke defendants, and BMO each filed a second
motion to dismiss. Those motions raised similar arguments to those raised before.
Cooke also raised a new argument in a footnote: that in addition to fishing licenses
not being property under the FCA, "there is no property interest in wildlife or
fish." (A-216 n.3.) The court denied Defendants' prior motions to dismiss as moot
in light of the new motions. (A-235.)

Relators opposed the new motions. (A-236). Relators argued that fish in
public waters are property of the State and Federal governments under the FCA.
(A-246–A-258.) Relators also argued that even if the United States did not own

13

the fish at issue, it acted as a trustee or administrator of the fish, and this sufficed under the FCA. (A-257–A-258.) Relators argued in the alternative that fishing licenses are property. (A-259.) Separately, Relators argued Defendants were liable for a reverse false claim given their scheme to conceal or avoid mandatory statutory penalties for illegal fishing and fraudulent statements. (A-260–A263.) Relators also requested leave to amend the pleading. (A-262–A263.) Relators finally argued that Defendants' statements were false and material, and that each Defendant participated in the fraud. (A-263–A-276.)

The district court granted the motions. First, the district court held that fishing licenses could not be property. (A-283–A-288.) Second, the district court found that fish are not "'property' with the meaning of the FCA." (A-288.) The district the court concluded that a Federal or State claim of "ownership over wildlife does not mean that the [government] has a genuine property interest in wildlife." (A-291.) Third, the district court acknowledged that post-capture, the fish may be subject to forfeiture to the government if harvested illegally, but concluded this "cannot be sufficient to create a property interest for purposes of the FCA, as it would mean that virtually every regulatory violation would give rise to an FCA claim." (A-292.) The district court thus concluded that theory was "futile" and denied leave to amend the complaint to include such a claim. (A-298–A-299.) As to Relators' reverse false claim cause of action, the district court held

14

that the fact Defendants' fraudulent actions triggered "mandatory" penalties did not satisfy the FCA because, in the court's view, "the statutory penalties at issue here are discretionary," particularly because of "prosecutorial discretion." (A-294– A-298.) The court entered judgment. (SPA-1.)

Relators timely appealed. (A-300.)

## SUMMARY OF THE ARGUMENT

**I.** The fish Defendants took by fraud are "property" under the FCA.

*First*, the plain language of the Submerged Lands Act confirms that States have "title to and ownership of" "fish" within State waters. 43 U.S.C. §§ 1311(a)(1) & 1301(e). Other statutory provisions support this reading, such as provisions separating property rights from police powers. The Act codified judicial decisions recognizing that States owned fish and other natural resources in their waters. The district court failed to address the Submerged Lands Act.

The FCA applies to any property that the Federal government manages for another, such as the States. 31 U.S.C. § 3729(b)(2). The government indisputably plays such an administrative role, including by acting to protect fish in State waters.

*Second*, the Federal government also owns fish in federal waters, as confirmed by statutes like the Magnuson-Stevens Fishery Conversation and Management Act. 16 U.S.C. § 1811

15

*Third*, State and Federal governments have the "bundle of rights" associated with property with respect to fish.  Governments have the right to exclude individuals from fishing; the right to possess and use fish (such as for research); and the right to alienate fish, as the Submerged Lands Act recognizes.

*Fourth*, the district court's analysis of case law misses the mark because it misreads cases concerning the Federal government's power to regulate under the Commerce Clause.  Other courts have recognized the limited scope of those rulings.  No case overrules the Submerged Lands Act's plain language.

*Finally*, even if the government does not have traditional "ownership" in fish because it is not in the same position as the owner of captured wildlife, the fish are still government property given its substantial property interest in them.

**II.**  The Appellants also adequately alleged a reverse false claim based on Defendants concealing or avoiding an obligation to pay mandatory statutory penalties.  The lower court dismissed this claim on the ground that the amount of the statutory penalty is not fixed, but the plain text of the FCA establishes liability even when the amount of money at issue is "not fixed."  31 U.S.C. § 3729(a)(1)(G).

**III.**  Alternatively, the lower court erred in denying Relators leave to add a claim under 31 U.S.C. § 3729(a)(1)(D).  Illegally caught fish are treated as government property the moment they are caught, and Defendants unlawfully

16

retained the proceeds of their unlawful fishing. *See United States v. Bengis*, 631 F.3d 33, 38–40 (2d Cir. 2011).

## ARGUMENT

## I. FISH IN PUBLIC WATERS ARE PROPERTY UNDER THE FCA.

A false claim "normally connotes a demand for money or for some transfer of *public property*." *United States v. McNinch*, 356 U.S. 595, 599 (1958) (emphasis added). The Complaint alleges that the property at issue is fish: "As a result of their fraudulent scheme, Defendants have illegally harvested from United States waters many millions of dollars' worth of fish to which they are not entitled." (A-78 (¶1), A-82, A-113, A-118, A-119, A-125, A-130–A-133 (¶¶11, 102, 113, 116, 136, 156, 165).) Fish in State waters are unambiguously State property under the Submerged Lands Act. And as the lower court acknowledged, the Federal government manages the fisheries. That is enough under the FCA. 31 U.S.C. § 3729(a)(1)(A), (b)(2). And fish in Federal waters are property of the Federal government. That is also enough under the FCA.

### A. By Statute, Fish In Public Waters Are Property Owned by the States.

This Court "must presume that the legislature says in a statute what it means and means in a statute what it says there." *Dodd v. United States*, 545 U.S. 353, 357 (2005). Congress enacted a statute—the Submerged Lands Act of 1953—that unambiguously says that States have a property interest in fish in public waters.

17

That plain language controls here.  And the statutory structure and history confirm that plain meaning.

### 1.    *Plain Language*

The Submerged Lands Act confirms State ownership of fish and all other natural resources in State waters.  It states: "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, [are] recognized, confirmed, established, and vested in and assigned to the respective States."  43 U.S.C. § 1311(a)(1).  The phrase "natural resources" is defined to include "fish, shrimp, oysters," and other marine animals.  43 U.S.C. § 1301(e).  State waters are defined to include inland waters plus the sea extending out to at least three miles off a State's coastline.  43 U.S.C. § 1301(a)(1), (2).  Thus, under § 1311(a)(1), States have "title to and ownership of" all "fish" in their waters.

Given the clarity of this language, the Court should stop its analysis here.

### 2.    *Structure*

The structure of the Submerged Lands Act confirms the statute means what it says.  The Act carefully distinguishes between States' property interest and States' police powers.  While § 1311(a)(1) addresses property rights, § 1311(a)(2) establishes States' police power over the same natural resources, stating that "the right and power to manage, administer, lease, develop, and use the said lands and

natural resources all in accordance with applicable State law [is] recognized, confirmed, established, and vested in and assigned to the respective States." The provisions appear in separate clauses, confirming they are not synonymous or redundant, and they must have separate meaning and effect. *See United States v. Mason*, 692 F.3d 178, 182 (2d Cir. 2012).

Together, these provisions of the Submerged Lands Act establish that States own the marine animals in State waters, and that States also have police powers to regulate those animals. This "legislative structure thus reinforces the usual . . . understanding of the word[s]." *Loughrin v. United States*, 573 U.S. 351, 359 (2014).

"The statute means what it says." *Los Rovell Dahda v. United States*, 584 U.S. 440, 449 (2018). The language of Section 1311(a)(1) plainly provides that States have a property interest in the marine animals in their waters, including fish. The statute could not be more definitive: "title to and ownership of" all marine animals in State waters is "recognized, confirmed, established, and vested."

### 3. History

Congress enacted the unambiguous text of the Submerged Lands Act to codify into positive law the early decisions of American courts holding that States own the fish and other animals on public lands.

**a.** Early American courts resolving property disputes consistently held that fish in State waters were public property: "the property in the fish, and also of all tide waters, is in the public." *Coolidge v. Williams*, 4 Mass. 140, 144 (1808); *Carson v. Blazer*, 1810 WL 1292, at *13 (Pa. 1810) ("the right to fisheries in the [Susquehanna] river is vested in the state, and open to all"); *Arnold v. Mundy*, 6 N.J.L. 1, 71 (1821) ("common property," as a subset of "public property," includes "the fish, and the wild beasts," whose "title, strictly speaking, is in the sovereign") (citing 2 Blackstone's Commentaries 14, Vattel lib. i, 20); *Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823) (Washington, J., riding circuit) (regarding public waters, a "fishery, either as the right to it respects running fish, or such as are stationary, such as oysters, clams, and the like . . . belongs to all the citizens or subjects of the state. It is the property of all; to be enjoyed by them in subordination to the laws which regulate its use."); *Martin v. Waddell's Lessee*, 41 U.S. 367 (1842) (adopting *Arnold*).

These decisions apply the common law of England as stated not only by Blackstone but also by Henri Bracton. As Bracton wrote, civil society departed from the state of nature regarding animals: whereas in the state of nature, wild animals belong to no one, in civil society they "now belong to the [sovereign] by civil law." 2 Bracton on the Laws and Customs of England 43, 166–67. In light of all the above history, the doctrine that fish in public waters were government

property would have been prevailing at the time of the original False Claims Act, enacted in 1863.

Courts eventually began applying this property rule to disputes over State versus Federal power to regulate fish. For example, in *Dunham v. Lamphere*, 69 Mass. 268 (1855), the court held that a generally applicable State statute banning purse-seine fishing could apply to Federally licensed vessels. The court stated: "Like other valuable commodities, fish, [including both] swimming [as well] as shell fish, are susceptible of being property; and every such thing, . . . is considered as belonging to the nation that possesses the country, as forming part of the aggregate mass of its wealth; those not divided are called public property." *Id.* at 270 (citing Vattel, Bk. 1, §§ 234, 235). In *McCready v. Virginia*, 94 U.S. 391 (1876), the Supreme Court considered whether a State statute banning nonresidents from cultivating oysters in State waters violated the Privileges & Immunities Clause. The Court stated that the laws regarding "taking and cultivating fish" were "a regulation of the use by the people of their common property. The right which the people of the State thus acquire comes not from their citizenship alone, but from their citizenship and property combined. It is, in fact, a property right, and not a mere privilege or immunity of citizenship." *Id.* at 395.

The Supreme Court in 1891 applied *Dunham* and *McCready* to menhaden—the same fish Defendants took here. *Manchester*, 139 U.S. at 259–61; *see The*

*Abby Dodge*, 223 U.S. 166, 174–75 (1912) (applying *McCready* and *Manchester* to sea sponges, a type of marine animal). And in *Geer v. Connecticut*, 161 U.S. 519 (1896), the Court addressed whether a State statute preventing slain animals from being shipped out of State violated the Commerce Clause. In recognizing that "property in game" is founded "upon the principle of common ownership, and therefore . . . as subject to governmental authority," the Court concluded that there is "power or control lodged in the state [over wildlife], resulting from this common ownership," and that "[t]he common ownership imports the right to keep the property"—that is, the wildlife—"if the sovereign so chooses." *Id.* at 526, 530. Accordingly, the Court held, the statute was a constitutional exercise of State power as long as the fish were not objects of interstate commerce; under the commerce doctrine prevailing at the time, the Court found no substantial effect on interstate commerce. *Id.* at 530–32.

But then the Court took a broader view of Federal power over States. *See, e.g.*, *Wickard v. Filburn*, 317 U.S. 111 (1942). As part of that effort, the Court began to hold that States' interests in animals could not overcome Federal power, and accordingly the Court began to attack State authority by describing their property rights in animals using disparaging language, although the Court did not overrule cases like *McCready* and *Geer*. *See, e.g.*, *Missouri v. Holland*, 252 U.S. 416, 432–34 (1920) (holding that a treaty with Great Britain to limit hunting of

22

endangered birds superseded any power the States held under the Tenth
Amendment to exercise their property rights in birds on State lands) (explicitly
declining to overrule *Geer*, and stating that State power based on "title" to animals
was a "slender reed" that would snap under the weight of Federal power because
"[w]ild birds are not in the possession of anyone, and possession is the beginning
of ownership"); *Lacoste v. Dep't of Conservation of State of Louisiana*, 263 U.S.
545, 549 (1924) (citing *Geer* with approval); *Takahashi v. Fish & Game Comm'n*,
334 U.S. 410 (1948) (surveying the history of cases on State ownership of animals
and holding that States cannot use their property interests in violation of the Equal
Protection Clause).

**b.** Eventually the Court purported to strip States of their property rights. In
a set of three cases, the Court ruled that coastal States had no property rights
whatsoever in the first three miles of ocean extending outward from the coastline
(the "marginal sea"). *See Texas*, 339 U.S. 707; *United States v. Louisiana*, 339
U.S. 699 (1950); *United States v. California*, 332 U.S. 19 (1947). For example, in
*California*, the Court held that a coastal State "is not the owner of the three-mile
marginal belt along its coast," expressly concluding that the property rule of
*Manchester* applied to inland waters like bays but not the marginal sea. *California*,
332 U.S. at 38. The Court's decree stated that the "United States of America is
now, and has been at all times pertinent hereto, possessed of paramount rights in,

23

and full dominion and power over, the lands, minerals and other things underlying the Pacific Ocean [vis-à-vis the marginal sea].  The State of California has no title thereto or property interest therein." *United States v. California*, 332 U.S. 804, 805 (1947).  Instead of State ownership of those assets, "the United States owned" them. *United States v. California*, 447 U.S. 1, 3 (1980).

The Court applied *California* to disputes regarding marine animals.  In *Toomer v. Witsell*, 334 U.S. 385 (1948), the Court addressed a State statute that allowed residents to catch shrimp in the State's marginal sea but prohibited residents of other States from shrimping in those waters.  The Court held that the statute impermissibly discriminated against nonresidents and violated the Privileges & Immunities Clause. *Id.* at 402.  The Court then observed that it had held the prior Term in *California* that States had no ownership interest whatsoever in the marginal sea and that the ownership language in the Court's older cases "is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource." *Id.*  The Court chose *not* to overrule *McCready* but instead distinguish it on the ground that shrimp move but oysters don't, and on the ground that the first three miles of ocean were differently situated than inland waters.

24

**c.** Congress responded ***decisively***.  Congress enacted the Submerged Lands Act to undo the Court's decisions and to give States the property rights the Court concluded the States lacked.  43 U.S.C. § 1311(a)(1); *see Twombley v. City of Long Beach*, 333 F.2d 685, 687 (9th Cir. 1964) ("Congress dealt with the situation by the Submerged Lands Act.").

The Court promptly held the Submerged Lands Act was a constitutional exercise of Congress's power under the Property Clause.  *Alabama v. Texas*, 347 U.S. 272 (1954).  Indeed, the original understanding of the word "property" in the Property Clause was that fish in public waters are public property owned by the sovereign.  *See supra* at § I.A.3; *Utah Div. of State Lands v. United States*, 482 U.S. 193, 196 (1987) (the king's property interests passed to the colonies "as the sovereign successors to the English Crown"); *Gamble v. United States*, 587 U.S. 678 (2019) (looking to the original understanding of a clause in the Constitution to establish its meaning).

The plain text of the Submerged Lands Act overrides the analysis the Court had begun to employ, including each of the rationales employed in *Toomer*.  The Submerged Lands Act established the States' "title to and ownership" of all the "natural resources" in State waters and the marginal sea.  And by establishing title and ownership in a clause that is separate from the clause regarding regulatory power, the text and structure of the Submerged Lands Act unambiguously reject

25

the notion from *Toomer* that "ownership" is inherently synonymous with, or a "shorthand" for, the power to regulate. The plain text also eviscerates the arbitrary distinctions *Toomer* relied on. Whereas *Toomer* proposed a distinction between stationary and mobile natural resources, the statute rejects it, unambiguously vesting ownership in stationary and mobile natural resources alike: "oil, gas, and all other minerals, and fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine animal and plant life." 43 U.S.C. § 1301(e). And whereas *Toomer* proposed a distinction between inland waters and the first three miles of ocean, the plain text of the statute rejects that too, vesting ownership of the natural resources in both inland and marginal waters. § 1301(a)(1), (2).

    **d.** Lest there be any doubt, the Submerged Lands Act's legislative history confirms that the unambiguous plain text of the statute conveying "title to and ownership of" "fish" was intended to mean exactly what it says. *See Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19, 26–31 (1988) (examining context to "confirm [the Court's] textual reading" of the Outer Continental Shelf Lands Act, which was also enacted in 1953 in response to *California*); *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 432 (2d Cir. 2024) (looking to "legislative history to confirm our interpretation of the text"). In enacting the Submerged Lands Act, Congress considered 40 draft bills, held 14 formal hearings, amassed over 6,000 pages of testimony and exhibits, and passed the statute despite

26

President Truman's veto of an earlier version. H.R. Rep. 83-215, *reprinted in* 1953 U.S.C.C.A.N. 1385, 1387. The Act "merely fixes as the law of the land that which, throughout our history prior to the Supreme Court decision in the *California* case in 1947, was generally believed and accepted to be the law of the land; namely, that the respective States are the sovereign owners of . . . the natural resources within [State] waters." *Id.* at 1399 (citing *California*, 332 U.S. 19).

The statute specifically vests a *property* interest—Congress enacted the Submerged Lands Act to "confirm" "the traditional and long-accepted policy and practice that submerged lands within a State's boundary and all resources therein *belong in a proprietary sense to the States*." *Id.* at 1431 (emphasis added); *see id.* at 1425 ("the evidence conclusively shows that the national defense and the public interest will be served by confirming the long-asserted rights of the States to the property in question"). The Submerged Lands Act vests *property* rights specifically, not merely *regulatory* power; the statute provides "that title and ownership of lands beneath navigable waters within the boundaries of the respective States and of the natural resources therein be in the respective States. It provides *in addition to but also distinct from title and ownership that the rights and power to administer*" them are vested in the States as well. *Id.* at 1388–89. Indeed, the placement of ownership rights into § 1311(a)(1) and regulatory power

into a separate clause in § 1311(a)(2) was intended to convey that the clauses have separate meaning.

Recognizing State ownership of *fish* was a special aim. Congress found that fish are a valuable natural resource: "The fishing industry is one of the major industries in our country and represents an important source of our food supply and of our national income. . . . Regulations by many States are based upon the statutory declaration of the state's ownership of the waters and the fish in them." *Id.* at 1435. Congress decided that without the Submerged Lands Act, each State would be vulnerable to a Federal government that could "take all of its resources," including "oysters, clams, shrimp, crabs, saltwater-fish" and others. *Id.* at 1424. And Congress specifically endorsed *Martin*, *Manchester*, and *McCready* (discussed above) as examples of "settled law" on State ownership by "our most eminent jurists [and] lower Federal court jurists and State supreme court jurists as reflected by more than 200 opinions." *Id.* at 1428–29, 1435. Because the Court could theoretically "overrule [those] prior decisions laying down the inland-water rule," the Submerged Lands Act would prevent that outcome by "act[ing] to establish the law for the future." *Id.* at 1425.

## B. The FCA Applies to State Property.

Because the fish that Cooke took from State waters are State property, the complaint pleads a claim under the FCA because a false claim is actionable when

28

the Federal government acts as a trustee or administrator for State property. 31
U.S.C. § 3729(b)(2). In 2009, Congress amended the FCA specifically to ensure
that the FCA covered situations where the Federal government acts as a manager
or administrator of property owned by others. Under the amended definition of
"claim," the statute applies "whether or not the United States has title to the money
or property[.]" § 3729(b)(2)(A). This part of "[t]he text of the FCA is deliberately
broad." *United States v. Wells Fargo*, 943 F.3d 588, 602 (2d Cir. 2019).
Demonstrating that the United States has title to, or owns, the fish at issue is not
required for demonstrating that there is a claim. *See Griffith v. Conn*, 2016 WL
1029331, at *3 (E.D. Ky. Mar. 14, 2016).

Here, there is no dispute that the government plays just such an
administrator role, including by "monitor[ing] and invest[ing] heavily in fish" in
U.S. waters; by using the AFA's citizenship rule to bolster "the U.S. maritime
industry"; by passing and administering the AFA, the Magnuson-Stevens Act, and
countless other fishery statutes and regulations; by establishing the National
Oceanic & Atmospheric Administration, the National Marine Fisheries Service,
and many other agencies; by "devot[ing] significant resources to monitoring
compliance with" the Control Rule; and by "invest[ing] substantial resources in
managing, preserving, protecting, and maintaining fish in U.S. waters." (A-90, A-
123 (¶¶34–35, 131).)

29

### C.     Fish In Federal Waters Are Federal Property.

Further, Federal statutes support Federal ownership of fish in Federal waters. The Magnuson-Stevens Fishery Conversation and Management Act, enacted in 1976, provides that the United States "claims . . . sovereign rights . . . over all fish" in Federal waters.  16 U.S.C. § 1811.  At the time of enactment, "sovereign rights" was understood to include the sovereign's property interests.  *See United States v. Texas*, 339 U.S. 707, 719 (1950).  The Fish and Wildlife Act of 1956 further declares fish to be "a form of national wealth."  16 U.S.C. § 742a.  Accordingly, the United States holds a property interest in fish in Federal waters, while States hold a property interest in fish in State waters.

*      *      *

Despite being raised (A-250–A-251, A-252, A-254–A-255), the opinion below did not mention the Submerged Lands Act or any of these statutes.

### D.     The Government Holds All Sticks in the Bundle of Rights.

These statutes rely on the ordinary meaning of "property."  The word "property" must be employed not "in its vulgar and untechnical sense of the physical thing" but rather "in a more accurate sense to denote the group of rights inhering in . . . relation to the physical thing, as the right to possess, use and dispose of it."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984).  Property rights are a "'bundle of sticks'—a collection of individual rights which, in certain

30

combinations, constitute property." *United States v. Craft*, 535 U.S. 274, 278 (2002). This bundle includes "not only the right to actual possession of a thing, but also the right to exclude others from possessing it, the right to use it and receive income from its use, the right to transmit it to another, and the right to sell, alienate, waste, or even destroy it." *Almeida v. Holder*, 588 F.3d 778, 788 (2d Cir. 2009).

The government holds each of these rights with respect to fish in public waters:

*Right to exclude.* Take the right to exclude, which has "traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). That right is easily satisfied here. The AFA codifies into law an exclusionary regime: a vessel may "engage in the fisheries" *if, and only if,* the vessel is owned and controlled by U.S. citizens. 46 U.S.C. § 12113(b)(1), (c). When, as here, the government exercises its "right to exclude others from . . . using [its] property," *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005), it is deploying "one of the most essential sticks in the bundle of rights that are commonly characterized as property," *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994).

31

*Right to possess.*  Property law also focuses on a *right* to possess—not whether the property at issue is physically possessed.  *Almeida*, 588 F.3d at 788 (focusing on "right to actual possession of a thing").  Further, even "[t]o possess" something does not "mean that the [person] must hold it physically"; rather, "the power or intention to exercise control over it" is sufficient to establish possession.  *See United States v. Gaines*, 295 F.3d 293, 301 (2d Cir. 2002) (quotation marks omitted).

The government indisputably has a right to possess fish swimming in its waters.[1]  And the government indisputably *exercises* that right.  For example, government authorities frequently take fish from public waters for a variety of purposes, such as to collect data,[2] run population surveys,[3] and conduct scientific

---

[1] The government certainly has no lesser "right to possess" the fish in its waters than the oil under the surface.  And fish are obviously far easier to possess than oil.  The government's interest in oil beneath the surface of public lands "comfortably" states an FCA claim.  *See Abbott v. BP Expl. & Prod. Inc.*, 781 F. Supp. 2d 453, 457–58, 462 (S.D. Tex. 2011).

[2] NOAA Fisheries, *2023 Northeast Spring Bottom Trawl Survey Summary* (Nov. 19, 2024) (these "surveys are the longest running of their kind in the world.  They provide nearly 60 years of standardized data collected during a time of significant change in the ocean around us. . . .  All are critical data used in regional fish stock assessments"), *available at* https://tinyurl.com/mv6hrn8v (last visited Mar. 13, 2025).

[3] Virginia Institute of Marine Science, *A poor year for juvenile striped bass in Virginia waters in 2024* (Oct. 17, 2024), *available at* https://tinyurl.com/56fs8bet (last visited Mar. 13, 2025).

testing.[4]  Those government fish-collection activities help to preserve fish stocks for current and future generations and will further the government's conservation, public welfare, and economic goals.  In addition, the United States has largely decided to reserve this natural resource for the citizens of the United States, not non-citizens pretending to be citizens.  The government has reserved the "fish, shellfish, and wildlife resources of the Nation" for "outdoor recreation throughout the Nation" and for U.S. commerce, and Congress has declared that these natural resources "make a material contribution to our national economy and food supply, as well as a material contribution to the health, recreation, and well-being of our citizens . . . and that properly developed, such fish and wildlife resources are capable of steadily increasing these valuable contributions to the life of the Nation."  16 U.S.C. § 742a.

*Right to use.*  Additionally, the government has a right to use the fish swimming in its waters.  After granting "title" and "ownership," the Submerged Lands Act also expressly grants the "right" to "use" fish.  43 U.S.C. § 1311(a)(2).

---

[4] Virginia Marine Resources Commission, *Fisheries Management Division* (research fish anatomy to determine growth characteristics over time, "for stock assessment and fisheries management to support sustainable fisheries in Virginia and along the east coast of the United States"), *available at* https://tinyurl.com/2vejr56d (last visited Mar. 13, 2025).

And again, governments exercise this right to further conservation and economic policy as discussed above.

*Right to transmit or to alienate.* The government also has a right to transmit or to alienate the fish. Under the AFA, the United States may allow U.S. citizens to take fish from U.S. waters, as long as they do not lie to the government about the Control Rule. 46 U.S.C. § 12105(a).

When defendants defraud the government out of valuable natural resources on public lands, the FCA applies. *See Abbott*, 781 F. Supp. 2d at 457–58, 462.

### E.    Cases About Federalism Are Inapposite.

As noted, the opinion below did not mention the Submerged Lands Act. Instead, the district court relied on federalism cases regarding State versus Federal power. Those cases arose in a different context, and in that context, "[w]hether we describe [the State's] interest as proprietary or otherwise is not significant." *Baldwin v. Fish & Game Comm'n of Montana*, 436 U.S. 371, 392 (1978) (Burger, C.J., concurring). By contrast, here, it is significant whether the interest is proprietary. Accordingly, the cases the district court relied on do not answer the question here.

The first federalism case the district court relied on was *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265 (1977). There, the plaintiff challenged a Virginia law banning from State waters any commercial fishing vessels controlled by foreign

interests. The plaintiff was in compliance with the Federal licensing statute (which predated the AFA) but not the Virginia statute, so Virginia banned the plaintiff from fishing in Virginia waters. The plaintiff argued that the Federal statute preempted the State statute, while Virginia argued the statutes did not conflict. *Id.* at 271–72. After embarking on a detailed discussion of *Gibbons v. Ogden* and the Commerce Clause, the Court held that the Federal licensing statute was an exercise of Congress's commerce power, and therefore the Federal statute preempted the State statute. *Id.* at 271–83.

To evade that conclusion, Virginia contended in the alternative that the Federal licensing statute was impliedly repealed by the Submerged Lands Act, but the Court disagreed. The Court began by recognizing that "[t]he Submerged Lands Act *does give* the States 'title,' 'ownership,' and 'the right and power to manage, administer, lease, develop, and use' the . . . natural resources in [State] waters." *Id.* at 283–84 (emphasis added). But the Court observed that § 1314 contained a carveout providing that the commerce power is "paramount" to State ownership, and therefore nothing in the Submerged Lands Act could be read to repeal the Federal licensing statute by implication. *Id.* at 284. The Court in *Douglas* "*conceded*" that the State has "title" to fish under the Submerged Lands Act, but the State lost on commerce grounds. *See United States v. State of Mich.*, 471 F. Supp. 192, 275 (W.D. Mich. 1979) (emphasis added).

35

With the Submerged Lands Act unavailing due to the carve-out in § 1314, Virginia attempted to invoke a different source of law: "a number of this Court's decisions" like *Geer* that allowed States to "exclude federal licensees." 431 U.S. at 283. In response, the Court—no longer constrained by the text of the Submerged Lands Act—retreated to its pre-1953 view that "[a] State does not stand in the same position as the owner of a private game preserve and it is pure fantasy to talk of 'owning' wild fish, birds, or animals" until they are captured, and that what the Court really meant in cases like *Geer* was that States have a "police power" over animals, which is subservient to Congress's commerce power. *Id.* at 284.[5] The Court summed it up: "Under modern analysis, the question is simply whether the State has exercised its police power in conformity with the federal laws and Constitution." *Id.* at 285. In that discussion, the Court was not interpreting the Submerged Lands Act, which the Court had just determined was "of no avail." *Id.* at 283. Instead, the Court was discussing its own "decisions" and "cases." *Id.* at 283, 284. Accordingly, the discussion is not controlling here, where instead the text of the Submerged Lands Act controls.

---

[5] The Court also stated in a footnote that the earlier "cases" discussed in this paragraph were "factually distinguishable" because either they did not raise statutory preemption issues or no conflict between State and Federal statutes existed. *Id.* at 285 n.21.

In other federalism cases the district court mentioned, the Court did not mention the Submerged Lands Act at all. Shortly after *Douglas*, the Court *upheld* a State hunting regulation under *Geer*; the Court expressly declined to overrule *Geer*, *McCready*, and *Corfield* and instead reaffirmed their "vitality." *Baldwin*, 436 U.S. at 386. In *Hughes v. Oklahoma*, 441 U.S. 322, 335 (1979), the Court overruled *Geer*'s Dormant Commerce Clause holding that State regulation of animal shipments did not affect commerce: "We now conclude that challenges under the Commerce Clause to state regulations of wild animals should be considered according to the same general rule applied to state regulations of other natural resources, and therefore expressly overrule *Geer*." *Hughes* was a federalism decision and did not overrule any law that States own their wildlife; if anything, *Hughes* expressly held that wild animals should be treated the "same" as "other natural resources," which of course would include oil and other natural resources that are consistently categorized as property. 43 U.S.C. § 1301(e).

None of those holdings controls the issue here either. None addressed the Submerged Lands Act. Moreover, like *Douglas*, the cases announced rules of federalism; the question whether States owned their animals was irrelevant because, even assuming States own their animals, States may not violate the Constitution or conflict with Federal power. *See Takahashi*, 334 U.S. at 420–21, *cited in Douglas*, 431 U.S. at 284–85. Whether to categorize the State's interest as

37

proprietary was immaterial—unlike here—so the federalism cases' importance is limited.  They should not be interpreted beyond the context in which they arose.

Indeed, in a property case that was *not* about federalism, the Supreme Court in 2015 relied on the principle that States own their animals.  *See Horne v. Dep't of Agriculture*, 576 U.S. 350 (2015).  There, the Court applied earlier decisions that a State may impose a tax on marine animals harvested from State waters because they "belonged to the State," and the harvesters "did not simply seek to sell their property; they sought to appropriate the State's."  *Id.* at 366–67 (citing *Leonard v. Earle*, 279 U.S. 392 (1929)).  The oysters were taken from "the state, as owner." *Id.* at 367 (quoting *Leonard v. Earle*, 155 Md. 252, 259 (1928)).

Because cases like *Douglas* and *Hughes* were focused on federalism, they did not overrule underlying law regarding State ownership of animals, and their language about State ownership of animals has been accurately identified as "dictum."  *Tangier Sound Watermen's Assoc. v. Douglas*, 541 F. Supp. 1287, 1293 (E.D. Va. 1982).  As the Tenth Circuit sitting *en banc* held, *Geer*'s analysis regarding State ownership of animals remains after *Hughes*: "It is well settled that wild animals are not the private property of those whose land they occupy, but are instead a sort of *common property* whose control and regulation are to be exercised 'as a trust for the benefit of the people.'"  *Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1426 (10th Cir. 1986) (en banc) (citing *Geer*, 161 U.S. at 528–29)

38

(emphasis added).  After citing *Geer*'s ownership ruling, Tenth Circuit sitting *en banc* specifically stated that *Geer* was "overruled on other grounds": "*Hughes* overruled *the narrow holding* of *Geer* by rejecting the view that a state, without violating the Commerce Clause of the Constitution, may prohibit the export of wildlife lawfully taken within the state."  *Id.* at 1426 & n.5 (emphasis added). Other courts take the same approach.  "[Here,] there are no Federal constitutional questions of interstate commerce, equal protection, or privileges and immunities; and as a result, *Hughes* is not controlling."  *State v. Fertterer*, 841 P.2d 467, 470 (Mont. 1992), *overruled on other grounds by State v. Gatts*, 928 P.2d 114, 120 (Mont. 1996).

To this day, outside the federalism context, courts recognize State ownership of marine animals.  For example, in a case virtually indistinguishable from the present case—where the defendant engaged in unauthorized fishing—the court concluded that the State could sue the defendant in "a civil action for damages" for "the wrongful appropriation of fish."  *Att'y Gen. v. Hermes*, 339 N.W.2d 545, 549–50 (Mich. Ct. App. 1983) (distinguishing *Hughes*); *see Att'y Gen. v. Consumers Power Co.*, 508 N.W.2d 901, 902 (Mich. Ct. App. 1993).  In another case involving unauthorized fishing, the Sixth Circuit held that "the states have a property interest" in the marine animals "taken from Tennessee and Alabama

waters," and the States were "entitled to compensation for their loss." *United States v. Bruce*, 437 F. App'x 357, 367 (6th Cir. 2011).

In ruling that *Douglas* and *Hughes* apply outside the federalism context, the decision below invites the Court to depart from the Supreme Court's ruling in *Horne* and to split with the *en banc* Tenth Circuit. There is no need to decide whether to do so, however, because this appeal should be resolved by holding that the Submerged Lands Act means what it says. If the Court does consider the issue, the Court should align with *Horne*, the Tenth Circuit, and all the other authorities discussed above.

Finally, the district court relied on another case that is inapposite for several reasons, and if anything, it supports Appellants. *United States v. Long Cove Seafood, Inc.*, 582 F.2d 159 (2d Cir. 1978).

To begin, that case did not address the Submerged Lands Act, which squarely applies here.

Moreover, in *Long Cove*, the statute at issue, as well as the facts, were nothing like the situation here. There, the government contended that the defendants committed larceny *from the State* even if the defendant harvested clams from *privately held lands* after receiving *permission* from the landowner. *Id.* at 164. In support of that tortured theory, the government argued the State owned all wildlife by statute, but that is not what the statute said. In fact the statute said the

40

State owned wild animals "*except*" those "held in private ownership." *Id.* The

court determined the clams were held in private ownership (*id.*), so, as the statute

says, the State held no ownership interest. That has nothing to do with the issue

here, which concerns public waters, not private land. Moreover, the statute further

*specifically stated* that, when clams are taken with the landowner's *permission*, the

State's interest is merely regulatory. *Id.*[6] As discussed earlier, the Submerged

Lands Act says the opposite. (*See supra* § I.) *Long Cove* does not support

Defendants.

   If anything, the decision supports *Appellants*. After rejecting the

government's argument regarding privately held lands, the court went on to

address a theory that the government could have, but chose not to, proceed on.

The court said that if the clams had instead been taken from lands belonging to a

town, and in violation of town regulations regarding clam harvesting, then that

*would* be sufficient to establish larceny. *Id.* at 165–66. *That is Appellants'*

*argument here.*

---

[6] The court also mentioned the issue of liability to private citizens for damage by
wildlife, but that is an issue of sovereign immunity or takings jurisprudence, not an
issue of property law.

41

**F.    The Government's Interest, Even if Less than Ownership, Is Still a Property Interest.**

The Supreme Court has recognized that property is "defin[ed]" as "'extend[ing] to every species of valuable right and interest'." *Pasquantino*, 544 U.S. at 356 (quoting Black's Law Dictionary). "Property" is further defined as "the rights in a valued resource." *Property*, Black's Law Dictionary (12th ed. 2024). It is also defined as "[a]ny external thing over which the rights of possession, use, and enjoyment are exercised." *Id.* These definitions comfortably cover the governmental interest in fish in public waters.

The order below leads to untenable results. Fish are a valuable natural resource. They are in public waters. Congress has declared them a "form of national wealth." 16 U.S.C. § 742a. They are worth millions and millions of dollars. They are a massive driver of the U.S. economy. Foreign interests lie to the U.S. government to take them for profit. Yet somehow they are not "property" under the FCA. That cannot be squared with the FCA. The FCA "was intended to reach all types of fraud, without qualification, that might result in financial loss" to the public, and "the Court has consistently refused to accept a rigid, restrictive reading" of the FCA. *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

A tangible, valuable item can be property even if it is not "susceptible of ownership and dominion in the absolute sense." *Carpenter v. United States*, 484

42

U.S. 19, 26 (1987). Therefore, even taking *Douglas*'s dictum about ownership at face value, the Complaint still states a valid claim under the FCA. It does not matter that the government is not "in the same position as the owner of a private game preserve," *Douglas*, 431 U.S. at 283, because "private" ownership is not necessary to state a claim here. Even in the absence of "conventional" ownership, "it is also clear that the States have a *substantial proprietary interest*—sometimes described as 'common ownership,'—in the fish and game within their boundaries." *Douglas*, 431 U.S. at 287–88 (Rehnquist, J., concurring) (emphasis added). The Court in *Baldwin* described this interest as a "special interest in wildlife," not merely a regulatory power. *See* 436 U.S. at 387; *see also id.* at 392 (Burger, C.J., concurring) (stating that, as the opinion recognizes, the state ownership "doctrine is not completely obsolete. It manifests the State's special interest in [wildlife].").

Even if "the state does not own wildlife in precisely the same way that it owns ordinary property[,] this does not answer the question of whether the state's interest in wildlife is such that it can be appropriately characterized as state property subject to appropriation." *Pullen v. Ulmer*, 923 P.2d 54, 59 (Alaska 1996). Wildlife drive a state's "economy and revenue base" and are "valuable *assets* . . . . The fact that other aspects of ownership may not be present in the state's legal relationship to its wildlife does not change this conclusion." *Id.* at 59 (emphasis added). The court "held that the state's interest in salmon migrating in

43

state and inland waters is *sufficiently strong to warrant characterizing such salmon as assets of the state* which may not be appropriated by initiative." *Id.* at 61 (emphasis added). "The importance of preserving such a national resource [as wild animals] may be of such magnitude as to *rise to the level of a federal property interest*." *Palila v. Hawaii Dep't of Land & Nat. Res.*, 471 F. Supp. 985, 995 n.40 (D. Haw. 1979) (emphasis added), *aff'd*, 639 F.2d 495 (9th Cir. 1981). The "vital nature of a state's interest in protecting its natural resources, including the wildlife within the state, from depletion and potential unavailability for future generations . . . is *quite distinct* from the state's ordinary" police power. *People v. Maikhio*, 253 P.3d 247, 260–61 (Cal. 2011) (emphasis added).

A sovereign's interest in its animals is correctly treated as a property interest for purposes of the FCA. This interest captures the common-sense notion that when a sovereign has been defrauded out of valuable natural resources and national wealth, the sovereign's interest in pursuing all remedies against the fraudsters outweighs any trivial distinctions based on the type of natural resource that was taken. *See, e.g.*, *Abbott*, 781 F. Supp. 2d at 462 (denying motion to dismiss where the complaint invoked "the FCA to recover the value of the oil and gas (and the associated penalties) from BP, claiming that BP fraudulently obtained that oil and gas from the government"); *Hermes*, 339 N.W.2d at 549–50 (upholding State's suit for damages to fish resulting from unauthorized taking of

44

fish); Or. Rev. Stat. Ann. § 496.705(1), (4) (providing a civil cause of action for "damages for the unlawful taking [of animals] that are the property of the state, [and such] civil damages shall be in addition to other penalties prescribed by the wildlife laws for the unlawful taking or killing of wildlife").  States' interest in fish, after all, bears the hallmarks of all the sticks in the bundle of property rights. (*See supra* § I.D.)  When a State's valuable natural resources—its assets—are taken by fraud, the State's property rights are implicated, including under the FCA. *See Neifert-White*, 390 U.S. at 232.

## II. THE COMPLAINT ALSO STATES A REVERSE FALSE CLAIM.

Defendants are also liable for a reverse false claim, which occurs when someone knowingly "conceals" or "avoids or decreases an obligation to pay" money or return property.  31 U.S.C. § 3729(a)(1)(G).  Liability under this provision arises when the defendant avoids "an established duty, whether or not fixed, arising from a" statute, contract, or other specified source.  § 3729(b)(3).

Each year, Alpha submitted citizenship attestations falsely certifying that the Omega Vessels were not subject to improper foreign control and that nothing had changed on that score over the prior year.  (A-117.)  Those false certifications were key to Defendants' scheme because they covered up illegal fishing conducted the prior year.  In doing so, Defendants "conceal[ed]" or "avoid[ed] or decrease[d] an obligation" to pay mandatory statutory penalties under the AFA for their illegal

45

fishing and fraudulent statements. Thus, under the plain text of the statute, those facts state a reverse false claim. *See United States ex rel. Sequoia Orange Co. v. Oxnard Lemon Co.*, 1992 WL 795477, at *8 (E.D. Cal. May 4, 1992).

In assessing a fraudulent attempt to "conceal" an "obligation to pay" a monetary penalty, courts have differentiated between penalties that are "established" because they are mandatory by statute, and penalties that are not mandatory by statute. *See Miller v. U.S. ex rel. Miller*, 110 F.4th 533, 547 (2d Cir. 2024) (citing *United States v. Monsanto*, 491 U.S. 600, 607 (1989)).

In *Miller*, this Court looked to *Monsanto*, where the Supreme Court held that a statute providing that a defendant "shall forfeit" certain items imposed a mandatory penalty. 491 U.S. at 607 ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory . . . ."). This Court contrasted that "mandatory" statute with the statute at issue in *Miller*, in which Congress "*explicitly*" granted the agency discretion to forgo a penalty. 110 F.4th at 547 (emphasis added); *id.* at 544 (duty is not "established" when "a statute gives an agency the ability to decide whether to impose a civil penalty for a violation of the law"). Thus, whether the FCA applies depends on whether a duty to pay a penalty is mandatory by statute, or whether the existence of the duty itself is discretionary by statute. *See id.* at 547; § 3729(b)(3).

The penalties that Defendants fraudulently tried to avoid are, *by statute*, mandatory.  The AFA states twice that anyone who violates the statute "is liable" for a monetary penalty for concealing a material fact or making a false representation about compliance with the Control Rule.  46 U.S.C. §§ 12151(c), (a)(1).  The phrase "is liable" is present-tense and is not contingent, so the penalty is mandatory, and liability is "established."  *See Monsanto*, 491 U.S. at 607.

By contrast, the statute does *not* say a violator "*may* be assessed a civil penalty," which might imply that the penalty is discretionary.  16 U.S.C. § 3373(a) (emphasis added) (illegal animal trafficking).  Here, like the statute in *Monsanto*— and unlike the statute in *Miller*—the AFA contains no language that "explicitly" converts the mandatory penalty into a discretionary one.[7]

--------

[7] The district court cited certain regulations (A-296–A-297), but the cited provisions are inapposite, and a regulation cannot make a penalty discretionary when Congress has declared it is mandatory.  *See Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2273 (2024).  For example, 46 C.F.R. § 356.11(d) says MARAD will try to help non-citizens comply with the Control Rule, not that MARAD may waive noncompliance with the Control Rule.  Moreover, that regulation expressly states that MARAD's willingness to work with a vessel owner applies only if "there is no verifiable evidence of fraud."  Here, the mandatory penalty applies once fraud has occurred (46 U.S.C. § 12151(c)), so any discretion this regulation might envision goes out the window once a vessel owner commits fraud, as Defendants did here.

The district court erred in reasoning that a reverse false claim unavailable because the exact amount of the statutory penalty is not fixed and is subject to prosecutorial discretion. (A-296–A-298.) That conclusion is incorrect for several reasons.

*First*, the text of the FCA forecloses it. The reverse false claim provision applies regardless of whether the amount of money at issue is fixed or "not fixed." 31 U.S.C. § 3729(b)(3) ("whether or not fixed"); *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999) (reverse false claim upheld where obligation exists, but amount is uncertain). The FCA thus delineates between liability and damages. If liability is established by statute, then the reverse false claim provision applies, even though damages (the amount of the penalty) is "not fixed." Here, the statute establishes liability: anyone who lies to the government "is liable" to pay. Under the "whether or not fixed" clause, it is irrelevant whether the amount of the penalty is fixed or is uncertain.[8]

*Second*, it is inconsistent with the Supreme Court's ruling in *Monsanto*, which this Court relied on in *Miller*. In *Monsanto*, the Supreme Court held that the statutory language at issue ("shall forfeit") was mandatory, even though of course

---

[8] The statute provides that the mandatory penalties are capped, meaning the cap is a limitation on damages. 46 U.S.C. § 12151(c) (mandatory penalty of "not more than $100,000" per day of fishing).

whether or not something is actually forfeited will always depend on background prosecutorial discretion authorized elsewhere in the U.S. Code. *See* 491 U.S. at 607–13.

*Third*, the "prosecutorial discretion" theory proves too much. *Every* established obligation to pay—whether it comes from a statute, contract, or other source, and where the quantum of damages is fixed or not fixed—depends on the wronged party taking action to enforce it. Prosecutorial discretion cannot preclude a reverse false claim—the text of the statute does not support such a narrow construction. 31 U.S.C. § 3729(a)(1)(G). Moreover, foreclosing liability if an obligation requires taking steps to enforce it turns the statute on its head. The statute imposes liability on anyone who "conceals" an obligation to pay money, and of course the goal of concealing an obligation is to prevent the government from enforcing it. The statute creates liability *precisely because* the government must act to enforce it the obligation. The prosecutorial discretion theory simply goes too far, and it is inconsistent with the Supreme Court's reminder that the FCA "was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government," and that "the Court has consistently refused to accept a rigid, restrictive reading" of the statute. *Neifert-White*, 390 U.S. at 232.

In light of *Miller*, the meaning of the "whether or not fixed" clause in the statute is plain: when only the *amount of the penalty* depends on discretion, the

49

FCA applies; when the *existence of liability itself* depends on discretion, the FCA does not apply. Here, the AFA establishes liability—a vessel owner who lies to the government "is liable." That mandatory liability stands in contrast with other statutes that say a violator "may be liable." Defendants transferred the Omega Vessels to a sham company run by a figurehead and lied to the government each year to avoid the mandatory penalties for their earlier misconduct, even though the amount of the penalties was "not fixed." § 3729(b)(3). Defendants' repeated fraud "conceal[ed]" or "avoid[ed] or decreas[ed] an obligation" to pay the government millions of dollars in mandatory penalties. 31 U.S.C. § 3729(a)(1)(G); 46 U.S.C. § 12151(c). The FCA covers this fraud.

## III. IN THE ALTERNATIVE, THE COURT SHOULD GRANT LEAVE TO AMEND.

Alternatively, the district court should have granted Appellants' request for leave to add a cause of action under 31 U.S.C. § 3729(a)(1)(D).[9] That provision covers anyone who "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property." *Id.* This clause creates liability for intentionally failing to deliver government property to the government.

_____

[9] If this Court finds in favor of Appellants on the property issue above (*see supra* § I), then the Court need not address the following issue.

50

**A.     The Government Has a Property Interest in Illegally Harvested Fish.**

Although the district court denied leave under Rule 15 to plead this claim because the district court concluded it was futile (A-298–A-299), that conclusion is reviewed de novo, and it was error.  *E.g.*, *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012) (because "the denial was based on an interpretation of law, such as futility, [this Court] review[s] the legal conclusion de novo").  The district court's conclusion contradicts the decisions reached by every other court to consider the question, including this Court.

When a fisherman engages in unlawful fishing, the illegally caught fish are immediately treated as government property the moment they are caught because they are subject to seizure and sale by the government.  *See United States v. Bengis*, 631 F.3d 33, 38–40 (2d Cir. 2011); *United States v. Oceanpro Indus., Ltd.*, 674 F.3d 323, 331–32 (4th Cir. 2012) (recognizing that States had a cognizable property interest in illegally caught fish, and that such interest vested at the moment the fish were caught) (applying *Bengis* to fish caught in Virginia); *United States v. Kokell*, No. 16-cr-595 (JFB), Dkt. 32 (E.D.N.Y. Aug. 24, 2017) (Bianco, J.); *United States v. Winkler*, No. 21-cr-217 (JMA), 2022 WL 17824064, at *1–2 (E.D.N.Y. Dec. 20, 2022) (stating the court "finds highly persuasive Judge Bianco's decision" and "finds [*Bengis*] to be highly persuasive, if not controlling, on this question") (applying *Bengis* to Federal law); *United States v. Winkler*, No.

51

21-cr-217 (JMA), Dkt. 160 (E.D.N.Y. Jan. 6, 2025); *United States v. Robbins*, No. 2:22-CR-00012-GZS, 2023 WL 425178, at *10 (D. Me. Jan. 26, 2023); *United States v. Constantin*, No. 6:19-CR-00345-01, 2020 WL 5807519, at *3 (W.D. La. Sept. 29, 2020).

Cooke's fishing was illegal, and State and Federal governments have a property interest in any fish Cooke caught and retained. Cooke's fishing was "unlawful" under 16 U.S.C. § 1857(2)(A)–(B). And Virginia (where Cooke does most of its fishing) has a property interest in fish caught illegally. *Oceanpro Indus.*, 674 F.3d at 331–32; Va. Code Ann. § 29.1-557. So does the U.S. government. *Winkler*, 2022 WL 17824064, at *1–2; 16 U.S.C. § 1860. Under the FCA, Cooke's knowing retention of illegally caught fish deprived the government of its property interest in the commodity and deprived the government of further "uses" of it, such as sale. 31 U.S.C. § 3729(a)(1)(D).

Departing from all the above cases, the district court held that forfeiture "cannot be sufficient to create a property interest for purposes of the FCA" because "the *Bengis* court stressed that the [fishing regime at issue] was 'a regulatory scheme.'" (A-292.) That is incorrect.

The district court's reasoning cannot be squared with *Bengis*, *Oceanpro*, *Kokell*, or *Winkler*. In *Bengis*, this Court held that although lawful fishing is part of a regulatory scheme, the government's interest in seizing and selling the

52

illegally harvested fish for *money* is an "economic interest" that "goes beyond a mere regulatory interest in administering the fishing activities in its waters." *Bengis*, 631 F.3d at 39. Accordingly, the government's "entitlement to the revenue from the lobsters that were taken illegally does constitute 'property.'" *Id.* at 40. The Fourth Circuit, agreeing with *Bengis*, likewise specifically *rejected* the argument that the government's interests "result from [their] regulatory interests, not their proprietary interests." *Oceanpro Indus.*, 674 F.3d at 332. The same is true in *Winkler*: "the Court finds—as in *Bengis* and *Kokell*—that the government's interest in the fish goes beyond a mere regulatory interest in administering the fishing activities in its waters." *Winkler*, 2022 WL 17824064, at *1–2 (agreeing with Judge Bianco, who "roundly rejected" the contrary argument in *Kokell*).

The district court's other rationale for refusing to follow *Bengis* is unavailing. The court below reasoned that if forfeiture-and-sale-for-money creates a property interest, then "virtually every regulatory violation would give rise to an FCA claim," even though under the materiality decision in *Universal Health Services, Inc. v. United States*, the FCA is not meant to punish regulatory violations that are immaterial. (A-292 (quoting 579 U.S. 176, 194 (2016).) For several reasons, that hyperbole is a non-sequitur, and it does not justify departing from *Bengis*.

53

*First*, it is simply not true that "virtually every regulatory violation" leads to FCA liability, for the obvious reason that not every regulatory violation or instance of forfeiture involves a wrongdoer who "knowingly" deprived the government of its property as required under the FCA. 31 U.S.C. § 3729(a)(1)(D). Defendants did not innocently commit a vanilla regulatory violation, fess up, and return the proceeds; instead, they covered it up so they could keep the millions of dollars' worth of fish they took by fraud. The question under *Bengis* is solely whether the "property" element is satisfied; all the other elements of an FCA claim (such as knowledge) must still be established to give rise to FCA liability. Where, as here, a defendant "defraud[s] the state of any [property] to which the State was entitled by law," the interest at stake is more than merely an ordinary regulatory violation. *See Bengis*, 631 F.3d at 39 (quoting and distinguishing *Cleveland v. United States*, 531 U.S. 12, 22 (2000)).

*Second*, when determining whether "property" is at stake, the plain text of the FCA applies to "money or property" and does not distinguish between money or property arising from seizure as opposed to some other fashion.

*Finally*, it is unreasonable to suggest it is unfair for Defendants to face FCA liability for lying to the government to keep the proceeds of their unlawful conduct. In both *Winkler* and *Kokell*, the court easily applied *Bengis* in a *criminal* case, demonstrating that illegal fishing is no garden-variety regulatory matter. If

54

the *Bengis* rule is good enough to send a blue-collar fisherman on Long Island to **30 months in prison** for lying about catching a few too many flounder, it is good enough to cover Defendants' multimillion-dollar white-collar fraud. *See Winkler*, 2:21-cr-00217, Dkt. 143.

Defendants cannot have it both ways. Fish are a valuable natural resource, and the government has a property right in fish, either when they are in public waters (*see supra* § I) or once they are caught illegally. The claim under 31 U.S.C. § 3729(a)(1)(D) is not futile. The district court should have granted leave to add it.

### B. Appellants Properly Sought Leave to Amend.

The standard for amending under Rule 15 is permissive. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). In denying leave under Rule 15, the district court also observed that it had "previously granted Relators leave to amend the Complaint to cure the deficiencies raised in Defendants' first motions to dismiss and expressly warned that they would 'not be given any further opportunity' to do so." (A-298–A-299.) It is not evident that this contributed to the decision to deny leave to amend on the ground of futility, but to the extent that it did, it should be reversed. *See Loreley*, 797 F.3d at 189–91 (2d Cir. 2015) (reversing denial of leave to amend when the district court improperly advised the plaintiff that no further amendment would be permitted). That is because the proposed amendment responded to *new* arguments

55

that Defendants *did not raise* in their "first motions to dismiss." And the district

court never advised Appellants they would be denied an opportunity to amend in

response to the new arguments in Defendants' second motions to dismiss.

After Defendants filed motions to dismiss on July 9, 2024, the district court

issued its order noted above, and Appellants complied, amending the complaint on

July 30, 2024. (A-75, A-77.) Defendants filed a second round of motions to

dismiss. The district court did not advise Appellants they would not be given an

opportunity to amend in response to new arguments raised in the second round of

motions. (A-235.) Appellants then opposed the motions and requested in the

alternative leave to amend to add a claim under § 3729(a)(1)(D), explaining that

the claim was valid under *Bengis*.

Appellants' proposed amendment responds to two *new* developments that

occurred *after* the district court issued its "warning" and *after* the Amended

Complaint was filed.

First, the proposed amendment responds to an argument that Defendants

raised *for the first time* in their second motions to dismiss. Specifically, although

no Defendant raised the point in its initial motion, Cooke's second motion argued

in a footnote that fish in the water are not property but become property when they

are caught. (A-216 n.3.) The proposed amendment responds to that point by

arguing that—if Cooke is correct that fish are property once caught—then once

56

Cooke caught fish, the government had a property interest in those fish under *Bengis*. But the district court never advised Appellants that they would not be able to amend in response to a new argument raised for the first time in the new motions. (A-235.) Therefore the district court's reference to its earlier, outdated warning was not justified. *See Loreley*, 797 F.3d at 189–91.

As an independent basis for seeking leave to amend, the proposed amendment also responds to a change in law in this Circuit. One week *after* Appellants amended their complaint to add a reverse false claim, this Court decided *Miller*, which addressed a crucial question of first impression: "We have not previously considered when a duty is 'established'" under § 3729(a)(1)(G). 110 F.4th at 544. When adding a reverse false claim in July 2024—before *Miller* was decided—Appellants believed in good faith that the *Bengis* doctrine would state a claim under § 3729(a)(1)(G), and Appellants intended to pursue that claim. But after *Miller* announced the meaning of "established" in this Circuit for the first time, Appellants determined in good faith that a claim under *Bengis* would be a better fit under § 3729(a)(1)(D).[10] Therefore Appellants sought leave to add a

_____

[10] It may not be necessary to submit a brief-within-a-brief about why Appellants did *not* make an argument, but because the district court admonished Appellants for not explaining in greater detail the relationship between *Miller* and the request to add a claim under § 3729(a)(1)(D) (A-298), Appellants briefly set forth the

claim under § 3729(a)(1)(D) on the authority of *Bengis*. (A-262–A-263.) The district court had never given Appellants any indication that they would not be allowed to amend their complaint in response to Defendants' arguments under § 3729(a)(1)(G) that by definition were not made in "Defendants' first motions to dismiss." And the district court certainly did not advise Appellants that they would not be allowed to amend in response to the Second Circuit speaking for the first time on an issue raised by the pleading.

---

argument here in an abundance of caution. Liability under § 3729(a)(1)(G) for avoiding an obligation arises when the defendant avoids "an established duty, whether or not fixed, arising from a" statute. § 3729(b)(3). The phrase "whether or not fixed" modifies the word "duty." In other words, the "duty" itself may be fixed or may be "not fixed"—the duty may include a contingent duty that has not yet arisen. That un-fixed duty, or contingent obligation, would include a duty to comply with any forfeiture proceeding "established" by statute (for example, the statutory forfeiture in *Bengis*). Read as a whole, the statute imposes liability on anyone who "avoids" a contingent obligation that might not occur, such as a forfeiture, where the forfeiture is imposed by statute. As applied here, Defendants covered up their earlier unlawful fishing to "avoid" a possible "obligation" to comply with a "duty" to forfeit illegally harvested fish under 16 U.S.C. § 1860. That reading aligns with the Senate Report accompanying the law, which states that the new "definition of 'obligation' expressly includes contingent, non-fixed obligations," not merely a "fixed obligation." S. Rep. 111-10 at 14. The definition was intended to cover any "relationship between the Government and a person that results in a duty to pay the Government money" or property, *id.*, which would include forfeiture under *Bengis*. Appellants believe in good faith that, in the world before *Miller* was decided, that is the best reading of the statute, although it might not have carried the day. Although *Miller* might still permit such a claim, the *Bengis* doctrine now fits more naturally under § 3729(a)(1)(D).

58

\*　　\*　　\*

This Court in *Loreley* cast doubt on approaches like the one the district court took here. *Loreley*, 797 F.3d at 190. In *Loreley*, the district court "presented Plaintiffs with a Hobson's choice: agree to cure deficiencies not yet fully briefed and decided or forfeit the opportunity to replead. Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." *Id.* Here, the district court advised Appellants that they must amend in response to the points raised in the *first* motions to dismiss, but the district court never advised Appellants that they would lose an opportunity to amend in response to a new argument and a change in law. There might be circumstances in which an amend-now-or-never order might be appropriate. But in the specific circumstances here, Appellants respectfully submit that the way the district court wielded such an order was unduly harsh and was not justified.

### CONCLUSION

This Court should vacate, reverse, and remand.


Date: March 13, 2025


Respectfully submitted,

59

*/s/ Brendon DeMay*

Brendon DeMay
Jack L. Millman
Brian T. Goldman
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Ave
New York, New York
T: 646-837-5167
E: bdemay@hsgllp.com

*Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I, Brendon DeMay, hereby certify that on March 13, 2025, I caused the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF System. I further certify that the above document was served on all parties by the Court's CM/ECF system.


**Signature:** <u>/s/ *Brendon DeMay*</u>               **Date:** March 13, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

This motion complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) as modified by this Court's Local Rule 32.1(a)(4)(A) because this brief contains 13,960 words, excluding the partes of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2016, in Times New Roman style, 14 point font.

**Signature:** <u>/s/ *Brendon DeMay*</u>               **Date:** March 13, 2025

i

**TABLE OF CONTENTS**
**SPECIAL APPENDIX**

**Page**

Judgment, dated January 3, 2025...............................   SPA-1

SPA-1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
UNITED STATES OF AMERICA, ex rel. et al.,

Plaintiffs,

    -against-                              21 **CIVIL** 5743 (JMF)

<u>**JUDGMENT**</u>

COOKE INC. et al.,

Defendants.

------------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated January 3, 2025, Defendants' motions to dismiss must be and are GRANTED, and Relators' Amended Complaint is dismissed in its entirety. The only remaining question is whether Relators should be granted leave to amend once again. Although leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend," McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007). Contending that "Second Circuit law on reverse false claims changed after the Complaint was filed (Miller)," Relators seek leave to amend to add a count under Section 3729(a)(1)(D) of the FCA, which applies to any person who "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property." 31 U.S.C. § 3729(a)(1)(D); see Rels.' Oppn 18. The Court denies Relators' request. For one thing, Relators do not explain how or why the Second Circuit's decision in Miller which construed only the FCA's reverse false claims provision suggests that they should be permitted to bring a new claim under an entirely different provision. That is especially so where, as here, the Court previously granted Relators leave to amend the Complaint

SPA-2

to cure the deficiencies raised in Defendants' first motions to dismiss and expressly warned that they would "not be given any further opportunity" to do so. See ECF No. 43; see also, e.g., Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P., 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013) (providing that a plaintiff's "failure to fix deficiencies in its previous pleadings is alone sufficient ground to deny leave to amend sua sponte" (citing cases)). In any event, it is well established that a district court may deny leave to amend where amendment would be futile. See, e.g., Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000). And that is the case here, as any claim under Section 3729(a)(1)(D) would fail for the same reason as Relators' claims under Sections 3729(a)(1)(A) and 3729(a)(1)(B) namely, the lack of "property or money" within the meaning of the FCA. Judgment is entered in Defendants' favor; accordingly, the case is closed.

**Dated:** New York, New York

      January 3, 2025

                                          **TAMMI M. HELLWIG**

                                          _____
                                          **Clerk of Court**

**BY:**                          K. Mango

                                          _____
                                          **Deputy Clerk**