# 25-0155-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————◆———————————

UNITED STATES ex rel. W. BENSON CHILES,
UNITED STATES ex rel. CHRIS MANTHEY,

*Plaintiffs-Appellants,*

ABC, UNITED STATES OF AMERICA, ex rel.,

*Plaintiffs,*

— v. —

COOKE INC., COOKE AQUACULTURE INC., COOKE OMEGA
INVESTMENTS INC., COOKE SEAFOOD USA INC., OMEGA PROTEIN
CORPORATION, OMEGA PROTEIN, INC., GLENN COOKE, BRET D.
SCHOLTES, BMO CAPITAL MARKETS CORP., ALPHA VESSELCO
HOLDINGS, INC., also known as Ocean Fleet Services, Inc., ALPHA
VESSELCO LLC., doing business as Ocean Harvesters, SETH GREGORY
DUNLOP, GREGORY LAWSON DUNLOP, MONTGOMERY DEIHL,

*Defendants-Appellees,*

DEF,

*Defendant.*

———————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF *AMICI CURIAE* NATURAL RESOURCES LAW AND PROPERTY LAW PROFESSORS IN SUPPORT OF PLAINTIFFS-APPELLANTS

ANDREW B. BREIDENBACH
THEODORA ORINGHER PC
*Attorneys for Amici Curiae
    Natural Resources Law and
    Property Law Professors*
1840 Century Park East, Suite 500
Los Angeles, California 90067-2120
(310) 557-2009
abreidenbach@tocounsel.com

# **TABLE OF CONTENTS**

**Page**

INTEREST OF *AMICI CURIAE* ............................................................1

PRELIMINARY STATEMENT ............................................................2

ARGUMENT ............................................................................5

    A.    States' Property Rights and Interests in Wildlife and Other
        Natural Resources Have Long Been Firmly Entrenched in
        American Law. ......................................................5

        1.    The Historical Roots of the Doctrine of Sovereign
              Ownership. ....................................................5

        2.    The Early American Experience and the
              "Republicanization" and "Federalization" of the
              Common Law Tradition of Sovereign Ownership. ..................6

    B.    The Doctrine of States' Ownership-In-Trust of Wildlife and
        Other Natural Resources Remains Vital and Consequential
        Today. .........................................................12

        1.    Douglas and Hughes Narrowed the State Ownership
              Doctrine Consistent With Modern Federalism Principles. .......13

        2.    The State Ownership Doctrine Remains Vital Today. .............20

        3.    Public Ownership Case Law in New York Demonstrates
              that the District Court's Reliance on *Long Cove Seafood*
              Was In Error. ..................................................24

CONCLUSION ..........................................................26

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Arnold v. Mundy*,
  6 N.J.L. 1 (1821) ................................................................ 7, 8, 10, 25

*Attorney General v. Hermes*,
  339 N.W. 2d 545 (Mich. Ct. App. 1983) ............................................23

*Center for Biological Diversity, Inc. v. FPL Group, Inc.*,
  166 Cal.App.4th 1349 (2008) ...........................................................24

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
  527 U.S. 666 (1999) .........................................................................15

*Douglas v. Seacoast Products, Inc.*,
  431 U.S. 265 (1977) ................................................................. passim

*Esplanade Properties, LLC v. City of Seattle*,
  307 F.3d 978 (9th Cir. 2002) ............................................................23

*Ex parte Maier*,
  37 P. 402 (Cal. 1894) .......................................................................11

*Geer v. Connecticut*,
  161 U.S. 519 (1896) ................................................................. passim

*Hughes v. Oklahoma*,
  441 U.S. 322 (1979) .................................................... 13, 14, 15, 17

*Kleppe v. New Mexico*,
  426 U.S. 529 (1976) ......................................................... 9, 12, 15

*Manchester v. Massachusetts*,
  139 U.S. 240 (1891) ................................................................. 3, 18

*Martin v. Waddell*,
41 U.S. (16 Pet.) 367 (1842) ........................................................ *passim*

*McCready v. Virginia*,
94 U.S. 391 (1876) ......................................................... 10, 11, 18

*Mitchum v. Foster*,
407 U.S. 225 (1972) .................................................................15

*Mountain States Legal Foundation v. Hodel*,
799 F.2d 1423 (10th Cir. 1986) .................................................. 18, 19

*National Audubon Society v. Superior Court*,
33 Cal.3d 419 (1983) ...............................................................23

*New York v. United States*,
505 U.S. 144 (1992) .................................................................16

*People v. Grucci*,
194 Misc. 2d 16 (App. Term, 2d Dep't 2002) ............................................ 25, 26

*Pierson v. Post*,
3 Cai. R. 175 (N.Y. Sup. Ct. 1805) ....................................................25

*Pullen v. Ulmer*,
923 P.2d 54 (Alaska 1996) ......................................................... 19, 22

*R.W. Docks & Slips v. State Dep't of Nat.,*
*Res.*, 628 N.W.2d 781 (Wis. 2001) ....................................................23

*State v. Bartee*,
894 S.W.2d 34 (Tex. App. 1995) .......................................................22

*State v. Chevron Corp.*,
No. PC-2018-4716, 2023 WL 3274138 (R.I. Super. Ct. Apr. 28, 2023) ............23

*State v. Couch*,
103 P.3d 671 (Or. Ct. App. 2004) .....................................................22

*State v. Fertterer*,
    255 Mont. 73 (1992) ........................................................... 19, 22

*State v. Hess Corp.*,
    161 N.H. 426 (2011) .................................................................23

*State v. Rodman*,
    59 N.W. 1098 (Minn. 1894)......................................................11

*Tangier Sound Watermen's Assoc. v. Douglas*,
    541 F. Supp. 1287 (E.D. Va. 1982) ..........................................19

*The Case of the Royal Fishery of Banne, 80 Eng. Rep. 540, 543 (K.B.) (1611)* .......5

*United States v. Bruce*,
    437 F. App'x 357 (6th Cir. 2011) .............................................23

*United States v. E. C. Knight Co.*,
    156 U.S. 1 (1895)......................................................................16

*United States v. Long Cove Seafood, Inc.*,
    582 F.2d 159 (2d Cir. 1978)........................................... 24, 25, 26

## Statutes

16 U.S.C. § 1811 .....................................................................12

31 U.S.C. § 3729(b)(2)...............................................................3

31 U.S.C. §§ 3729 ......................................................................2

42 U.S.C. § 1983 .....................................................................15

43 U.S.C. § 1301(a)(1), (2) ......................................................11

43 U.S.C. §§ 1311(a)(1), 1301(a)(2)........................................3, 4

Ala. Code § 9-11-81 (2001) .....................................................21

iv

Fed. R. App. P. 29(a)(2) ..........................................................................1

Idaho Code Ann. § 36-103(a) (2011).....................................................21

N.Y. Envtl. Conserv. L. 11-0105 ................................................... 25, 26

Ohio Code Rev. Ann § 1531.02...............................................................21

Pa. Const., art. I, § 27.............................................................................21

10 V.S.A. § 4081……………………………………………………….21

## **Other Authorities**

Dale D. Goble,
    *Three Cases / Four Tales: Commons, Capture, The Public Trust, and Property in Land*, 35 Envtl. L. 807 (2005) ..........................................................7

Deborah G. Musiker et al.,
    *The Public Trust and Parens Patriae Doctrines: Protecting Wildlife in Uncertain Political Times*, 16 Pub. Land L. Rev. 87 (1995)…………...………20

George Coggins,
    *Wildlife and the Constitution: The Walls Come Tumbling Down*, 55 Wash. L. Rev. 295 (1980).................................................................20

H.R. Rep. 83-215 reprinted in 1953 U.S.C.C.A.N. 1385 .......................10

Mary Christina Wood,
    *The Tribal Property Right to Wildlife Capital (Part I): Applying Principles of Sovereignty to Protect Imperiled Wildlife Populations*, 37 Idaho L. Rev. 1 (2000)..................................................................20

Maryland Sea Grant,
    *Ecosystem-Based Fisheries Management in Chesapeake Bay: Atlantic Menhaden*, University of Maryland, UM-SG-TS-2011-03 (March 2011) *available at* https://www.mdsg.umd.edu/sites/default/files/files/EBFM-Menhaden-Summary.pdf (last accessed March 20, 2025) ...................................3

Michael C. Blumm & Lucus Ritchie,
*The Pioneer Spirit and the Public Trust: The American Rule of Capture and State Ownership of Wildlife*, 35 Envtl. L. 673 (2005) ............................ 5, 6, 7, 12

Michael C. Blumm & Aurora Paulsen,
*The Public Trust in Wildlife*, 2013 Utah L. Rev. 1437 (2013) ...........................20

Oliver A. Houck,
*Why Do We Protect Endangered Species, and What Does That Say About Whether Restrictions on Private Property to Protect Them Constitute "Takings"?*, 80 Iowa L. Rev. 297 (1995)...........................................................20

Susan Morath Horner,
*Embryo, Not Fossil: Breathing Life into the Public Trust in Wildlife*,
35 Land & Water L. Rev. 23 (2000)...................................................................19

Susan J. Kraham & Lisa K. Perfetto,
*Scratching the Surface: Does New York's Public Trust Law Prevent Subsurface Access to Natural Gas Below Parkland in the Marcellus Shale?*,
19 Buff. Envtl. L.J. 43 (2012)...............................................................................5

# INTEREST OF *AMICI CURIAE*[1]

*Amici curiae*, whose names and affiliations are set forth in Addendum A, are nine professors of law who research, teach, and write about natural resources law, property law, and administrative law. Their scholarship analyzes the property rights and property interests States hold in wildlife and other natural resources within their borders, the related Public Trust Doctrine, and, more generally, the resource conservation efforts of the States and the Federal Government. *Amici* have published scores of relevant articles and a leading textbook, *The Public Trust Doctrine in Environmental and Natural Resources Law*. They have provided advice on those topics to governments and the National Academies of Science. Accordingly, *amici* have a strong interest in the proper application of those historical and jurisprudential concepts to the important circumstances of this case.

*Amici* believe that the district court's decision fails to recognize the substantial property rights States and the Federal Government historically had and today still have in wildlife in their lands and waters. For this reason, *amici* respectfully submit this brief in support of Appellants to provide the Court with greater detail about the historical development and current vitality of the "state ownership doctrine" in the United States. *Amici* intend to demonstrate that the fish at the center of this dispute

---

[1] All parties consented to the filing of this brief. Fed. R. App. P. 29(a)(2). No party's counsel authored this brief in whole or in part and no person or entity, other than *amici curiae* and their counsel, contributed money to fund it. *Id.*, 29(a)(4)(e).

1

are the property of someone—that is, of *all of us, the people of this Nation*—and that our State and Federal governments hold that valuable property in trust for our common benefit. The district court's denial of those substantial property rights overlooks two hundred years of American history and weakens Federal and State protections of our Nation's natural resources. *Amici* urge this Court to undo that error and reverse the decision below.

## PRELIMINARY STATEMENT

The underlying lawsuit arises under the False Claims Act, 31 U.S.C. §§ 3729 et seq. ("FCA"), alleging that the defendants made false, fraudulent claims to the Federal Government to obtain property. The district court granted the defendants' motion to dismiss for failure to state a claim. The district court's decision was not based upon any perceived deficiency with the plaintiffs' pleading of fraud. It was instead based solely upon the conclusion that the property obtained as a result of the defendants' allegedly false and fraudulent claim did not belong to the Federal Government or to any of the States. As stated by the district court, "no one" owns the property at issue and for that reason the plaintiffs' claims were dismissed with prejudice, without leave to amend.

The property at issue in this lawsuit is: fish; specifically, a species known as menhaden. Menhaden are commercially and ecologically invaluable. Called "the most important fish in the sea," menhaden are a vital link in the food chain. They

eat plankton and, in turn, serve as a rich food source (and bait) for many predator fish, as well as ospreys, bald eagles, dolphins, and whales. Without menhaden, entire ecosystems—and the economies that depend on those ecosystems—would collapse.[2] As our Supreme Court observed long ago, the "preservation" of menhaden, "although they are not used as food for human beings, but as food for other fish, which are so used, is for the common benefit." *Manchester v. Massachusetts*, 139 U.S. 240, 265 (1891).

Schools of menhaden are found in the Atlantic Ocean, the Chesapeake Bay, and other waters adjacent to the United States. Some are found within the 3-mile limit recognized as State waters, while others are found beyond 3 miles from shore and within the 200-mile limit controlled exclusively by the Federal Government.[3] Contrary to the holding of the district court, these precious fish are in fact owned by

---

[2] *Ecosystem-Based Fisheries Management in Chesapeake Bay: Atlantic Menhaden*, Maryland Sea Grant – University of Maryland, UM-SG-TS-2011-03 (March 2011), *available at* https://www.mdsg.umd.edu/sites/default/files/files/EBFM-Menhaden-Summary.pdf (last accessed March 20, 2025) ("[M]enhaden epitomize arguments in support of ecosystem-based fisheries management. Precautionary management that minimizes risk of collapse of the species will contribute to the well-being of the [Chesapeake] Bay, its fisheries, and water quality.").

[3] The 3-mile limit was established by the Submerged Lands Act of 1953. 43 U.S.C. §§ 1311(a)(1), 1301(a)(2). In this case, it does not matter whether the menhaden were taken from State or Federal waters. The FCA applies to false or fraudulent claims for property "whether or not the United States has title to the money or property." 31 U.S.C. § 3729(b)(2). The allegedly false claim was made to the Federal Government, which brings this case within the scope of the FCA.

"someone," namely *all Americans in common*. Consequently, our sovereigns—the Federal Government, and the States appurtenant to the waters in which the fish are found—hold title in the menhaden in trust for the people within their jurisdictions. American history and jurisprudence, from the founding of the Republic to the present day, confirm those sovereigns' substantial property rights and interests in fish and other wildlife, including menhaden. The Federal Submerged Lands Act, which codified the 3-mile limit, enshrines these property rights in the U.S. Code. That Act provides that the States have "title to and ownership of" all "fish, shrimp, clams, oysters, crabs, lobsters, sponges, kelp, and other marine animal and plant life" that are found within the 3-mile limit. 43 U.S.C. §§ 1311(a)(1), 1301(e).

The legal principle recognizing States' property rights and interests—whether directly or as trustee for their citizens—is variously called the "state ownership doctrine" or the "Public Trust Doctrine," among other names. However termed, many courts on many occasions throughout American history, from the early 1800s to the present, have applied the concept of State ownership in cases that concern publicly owned assets such as fish, wildlife, and navigable waters. The purpose of the doctrine is to ensure that the sovereign protects these public assets for the benefit of the people, so that they are not wasted, squandered, or stolen. In this case, the menhaden that were taken and sold by the defendants are protected under this long-

4

standing legal doctrine, which confirms that the menhaden are property held in trust by the States and Federal Government for their citizens.

## ARGUMENT

A. **States' Property Rights and Interests in Wildlife and Other Natural Resources Have Long Been Firmly Entrenched in American Law.**

### 1. The Historical Roots of the Doctrine of Sovereign.

The concept of sovereign ownership of natural resources dates to ancient times. The Institutes of Justinian, which codified Roman law, recognized a class of property known as *res communes*: "By the law of nature these things are common to all mankind—the air, running water, the sea, and consequently the shores of the sea." Susan J. Kraham & Lisa K. Perfetto, *Scratching the Surface: Does New York's Public Trust Law Prevent Subsurface Access to Natural Gas Below Parkland in the Marcellus Shale*?, 19 Buff. Envtl. L.J. 43, 47 (2012). English common law adopted this Roman-law concept through the Magna Carta, and over time it became a hallmark of American jurisprudence. *Id.*

English common law held that ownership of wildlife and fisheries was vested in the Crown, as a matter of royal prerogative. *See* Michael C. Blumm & Lucus Ritchie, *The Pioneer Spirit and the Public Trust: The American Rule of Capture and State Ownership of Wildlife*, 35 Envtl. L. 673, 679 (2005); *see also, e.g.*, *The Case of the Royal Fishery of Banne*, 80 Eng. Rep. 540, 543 (K.B.) (1611) ("[Every river] is a royal river, and the fishery of it is a royal fishery, and belongs to the king by his

prerogative"). As of the American Revolution, the Crown's power over wildlife was more than a regulatory one: for example, the king could decide "who could hunt and where," which effected "a positive allocation of property rather than simply regulati[on] [of] private conduct." Blumm & Ritchie, 35 Envtl. L. at 681 n.54.

> **2.** **The Early American Experience and the "Republicanization" and "Federalization" of the Common Law Tradition of Sovereign Ownership.**

Things were different in the American colonies and then our fledgling Republic. Endless expanses of untamed land and an abundance of wildlife fostered America's frontier spirit. With respect to rights to wildlife *as between private individuals*, England's restrictive approach gave way to an "unrestricted rule of capture" and a privilege against trespass. Blumm & Ritchie, 35 Envtl. L. at 691-92.

While the early Republic's vigorous capture rules encouraged exploration and productive use of America's vast frontier, it also contributed to the devastation of wildlife populations, like the bison, and the rapid extinction of many species—the passenger pigeon, Labrador Duck, and the Great Auk, to name a few. *See id.* Courts began to take notice of these tragedies to our commons, and through a series of decisions, modified the English concept of prerogative ownership into a more robust state ownership doctrine, also known as the public trust doctrine. America thus "republicaniz[ed]" the royal prerogative by taking the concept of ownership by a monarch and refashioning it as ownership by the people through their representatives

6

in government.  Dale D. Goble, *Three Cases / Four Tales: Commons, Capture, The Public Trust, and Property in Land*, 35 Envtl. L. 807, 831-32 (2005); *accord* Blumm & Ritchie, 35 Envt. L. at 693.  By the same token, America also *federalized* the doctrine.  That is, America imbued the concept of state ownership of wildlife with the principles of our federalism—a flexible, contested system of dual sovereignty.

The seminal opinion in the development of the American state ownership doctrine is *Arnold v. Mundy*, 6 N.J.L. 1 (1821).  There, the Supreme Court of New Jersey held that under English common law, the navigable waters of a State and the lands submerged beneath them were "property … vested in the sovereign … not for [its] own use, but for the use of the citizens."  *Id.* at 77.  Air, water, the sea, wild animals—the Court acknowledged these are "common property" owned by the people; but because title to such property could not be "vested in all the people … according to the common law notion of title," the common law "place[s] common property in the hands of the sovereign power, to be held, protected, and regulated for the common use and benefit."  *Id.* at 71.  Consequently, the petitioners, successors in title to a royal grant to New Jersey's proprietors, did not have an exclusive privilege to take the State's oysters; the king's grant conferred only the power to hold New Jersey's submerged lands—and the oysters found there—for the benefit of the state's citizens, not for private gain.

In *Martin v. Waddell*, 41 U.S. (16 Pet.) 367 (1842), the U.S. Supreme Court adopted the principles set forth in *Arnold v. Mundy*. The Court held that a grant by the king "to an individual of an exclusive fishery" passed to the grantee not as private property but for the common use of the colony. *Id.* at 368. The Court observed that under English common law the "dominion and property in navigable waters, and in the lands under them [were] held by the king *as a public trust*." *Id.* at 411 (emphasis added). That public trust tradition survived American independence, albeit in a different form, one that reflects our republicanism *and* our federalism:

> When the Revolution took place, … the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, *subject only to the rights since surrendered by the Constitution to the general government*.

*Id.* at 410 (emphasis added).

*Martin* thus teaches that American common law not only *republicanized* the concept of state ownership-in-trust, but also *federalized* it by vesting ownership in the States but subject to paramount Federal powers. Subsequent Supreme Court decisions confirm that conception, not least *Geer v. Connecticut,* 161 U.S. 519 (1896). As *Geer* explains, States' broad property rights in wildlife are bounded by principles of republicanism and federalism: those rights must be exercised "as a trust for the benefit of the people … in their united sovereignty" and only "insofar as

8

[their] exercise may be not incompatible with, or restrained by, the rights conveyed to the Federal government by the Constitution." *Id.* at 528.

The Supreme Court made the very same point eighty years later, in *Kleppe v. New Mexico*, 426 U.S. 529 (1976)—just eleven months before *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265 (1977), which supposedly abolished the state ownership doctrine. In *Kleppe*, New Mexico challenged the Wild and Free-Roaming Horses and Burros Act of 1971, claiming the Federal Government did not have the power to control animals in Federal lands unless they were items in interstate commerce or causing damage to the public lands. The Court upheld the Act, reasoning that under the Property Clause of the Constitution, "Congress [has] the power to protect wildlife on the public lands, state law notwithstanding." *Id.* at 541. In response to the State's contention that the Act "wrongly infringed upon the State's traditional trustee powers over wild animals," *id.*, the Court did not say that no such property rights exist. Rather, the Court *conceded* that States "unquestionably" hold those rights, but also emphasized they "exist" within our system of federalism:

> Unquestionably the States have broad trustee and police powers over wild animals within their jurisdictions. But, as *Geer v. Connecticut* cautions, those powers exist only "insofar as [their] exercise may be not incompatible with, or restrained by, the rights conveyed to the Federal government by the Constitution."

*Id.* at 545 (quoting *Geer*, 161 U.S. at 528). Thus, *Kleppe*, like *Geer*, teaches that principles of federalism help to define—not eradicate—States' property rights in

wildlife. That is not controversial; that the rights of States are shaped by and often yield to the rights and powers of the Federal Government it is a basic tenet of our federalism.

Scores, indeed hundreds, of cases throughout the 19th and 20th Centuries applied the state ownership principles of *Arnold*, *Martin*, and *Geer* to conclude that States could and should exercise the powers and rights of an owner to preserve their wildlife and natural resources for the benefit of the public. As the House Committee on the Judiciary (working "in collaboration with" the Senate Judiciary Committee) put it in reporting on the proposed Submerged Lands Act, the state ownership doctrine was the "well-settled law of the land":

> Throughout our Nation's history the States have been in possession of and exercising all the rights and attributes of ownership in the lands and resources beneath the navigable waters within their boundaries…. That same belief was expressed in scores of Supreme Court opinions and in hundreds of lower Federal courts' and State courts' opinions. Similar beliefs were expressed in rulings by Attorneys General of the United States, the Department of the Interior, the War Department, and the Navy Department. Lawyers, legal publicists, and those holding under State authority accepted this principle as the well-settled law of the land.

H.R. Rep. 83-215, reprinted in 1953 U.S.C.C.A.N. 1385, 1415, 1417.

While courts did sometimes derive States' authority from the police power, most courts relied on the broader, historical concepts of property, title, trust, and sovereignty. In *McCready v. Virginia*, 94 U.S. 391 (1876), the Supreme Court

10

upheld a State law banning nonresidents from cultivating oysters in State waters based on a ringing endorsement of this ownership theory. The Court stated that laws regarding "taking and cultivating fish" were "a regulation of the use by the people of their common property. The right which the people of the State thus acquire comes not from their citizenship alone, but from their citizenship and property combined. It is, in fact, a property right, and not a mere privilege or immunity of citizenship." *Id.* at 395. In 1894, the Minnesota Supreme Court took a similar approach in upholding a law prohibiting possession and sale of certain game:

> We take it to be the correct doctrine in this country that the ownership of wild animals, so far as they are capable of ownership, is in the state, not as a proprietor, but in its sovereign capacity, as the representative and for the benefit of all its people in common.

*State v. Rodman*, 59 N.W. 1098, 1099 (Minn. 1894). The same year, the Supreme Court of California upheld a similar statute on the same grounds: "[t]he wild game within [California] belongs to the people in their collective sovereign capacity[.]" *Ex parte Maier*, 37 P. 402, 404 (Cal. 1894).

Scores of statutes, too, unambiguously enshrined these principles of sovereign property ownership—conceptualized both as title and trust ownership—including sweeping Federal statutes that are dispositive to this case. In the Submerged Lands Act of 1953, Congress confirmed that the States hold "title to and ownership" of all the "natural resources" in State waters. 43 U.S.C. § 1301(a)(1), (2). And in 1976,

11

Congress confirmed that United States "claims . . . sovereign rights … over all fish" in *Federal* waters. 16 U.S.C. § 1811 (Magnuson-Stevens Fishery Conservation and Management Act of 1976).

Also in 1976, the U.S. Supreme Court treated States' substantial property rights in wildlife as a truism, stating that "[u]nquestionably the States have broad *trustee and* police powers over wild animals within their jurisdictions." *Kleppe*, 426 U.S. at 545 (emphasis added). Thus, the American state ownership tradition is consistent with doctrine's common law roots, which effected "a positive allocation of property rather than simply regulati[on] [of] private conduct." Blumm & Ritche, 35 Envtl. L. at 681 n.54. As *amici* demonstrate below, that tradition is alive and well today.

**B.    The Doctrine of States' Ownership-In-Trust of Wildlife and Other Natural Resources Remains Vital and Consequential Today.**

The district court below failed to recognize that States and the Federal Government have substantial property rights and interests in the wildlife within their jurisdictions. Instead, it held that "fish are not property," that "no one" owns the fish, and that, as a result, defendants obtained no "property" when they took menhaden via their allegedly false and fraudulent claim. Op. & Order at 6-7, 16. The district court based its decision primarily on a misreading of two U.S. Supreme Court decisions, *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265 (1977), and

12

*Hughes v. Oklahoma*, 441 U.S. 322 (1979). Contrary to the district court's ruling, those decisions did not abolish the state ownership doctrine, but instead clarified how modern federalism allocates certain of the doctrine's powers and prerogatives between State and Federal Governments. Subsequent court decisions and State action from around our country confirm that the doctrine is alive and well, notwithstanding dicta in *Douglas* and *Hughes*.

### 1. Douglas and Hughes Narrowed the State Ownership Doctrine Consistent With Modern Federalism Principles.

Ignoring hundreds of years of English and American law and tradition, the district court held that *Douglas* and *Hughes* "repudiated" the state ownership doctrine or at least relegated it to a typical police power. Op. & Order at 12. The district court got it wrong. To be sure, those decisions did take swipes at the state ownership doctrine, calling it "pure fantasy" and "a slender reed." *Douglas*, 431 U.S. at 284; *Hughes*, 441 U.S. at 334. But, as *amici* will demonstrate, that language was dicta that subsequent courts have taken with a grain of salt. A close, contextualized reading of *Douglas* and *Hughes* makes clear that those decisions did not abolish the historical, deeply entrenched state ownership doctrine. Instead, they narrowed its outer reaches to comport with modern federalism doctrine—an outcome entirely consistent with the longstanding recognition that Federal law influences the parameters of the state ownership doctrine in the United States.

The holdings of *Douglas* and *Hughes* are plain vanilla, spicy dicta notwithstanding. *Douglas* held, based upon the Commerce Clause and the Supremacy Clause, that Federal legislation that licensed foreign vessels to fish in Virginia's coastal waters preempted a State law prohibiting such vessels from obtaining commercial fishing licenses. 431 U.S. at 281-83. Two years later, *Hughes* held that the Commerce Clause invalidated an Oklahoma law that prohibited the export of minnows taken from the waters of the state. 441 U.S. at 325. In reaching that conclusion, *Hughes* "overruled" *Geer v. Connecticut*, 161 U.S. 519 (1896), which had concluded that the State could forbid the transport of game birds to out-of-state markets without violating the Commerce Clause. *Hughes*, 441 U.S. at 326. Thus, the holdings of *Douglas* and *Hughes* confirm the uncontroversial proposition that States' rights in wildlife are subject to modern Commerce Clause principles. *Hughes,* 441 U.S. at 355 ("[C]hallenges under the Commerce Clause to state regulations of wild animals should be considered according to the same general rule applied to state regulation of other natural resources.").

We say "uncontroversial" because the state ownership doctrine in the United States has always been bounded by principles of federalism—*Martin v. Waddell* said

14

so in 1842.[4]  But federalism is not a static concept.  "The contours of federalist doctrine"—that is, the allocation of powers and rights between the States and the Federal Government—"have changed over the course of our Nation's history" to suit a changing Nation.  *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 702 (1999) (Breyer, J., dissenting).[5]  Examples abound; Justice Breyer identifies the Louisiana Purchase, the Civil War, the New Deal, and the Supreme Court's civil rights decisions in the 1950s and 1960s as watershed events that required "federalist doctrines to change to reflect the Nation's changing needs (territorial expansion, the end of slavery, the Great Depression, and desegregation)."  *Id.*  Thus, federalist doctrine is a dynamic reflection of our Nation's ongoing history and tradition, and its application to a particular case will depend in part on historical context.

With that in mind, the holdings of *Geer*, *Douglas*, and *Hughes* are easily harmonized.  In 1896, *Geer* held that States could exclude native wildlife from interstate commerce.  The Court reasoned that such export restrictions "preserve …

---

[4]  *See Martin*, 41 U.S. at 367 (state's rights as owner-in-trust of wildlife are "subject only to the rights since surrendered by the constitution to the general government"); *accord Geer*, 161 U.S. at 528; *Kleppe*, 426 U.S. at 545.

[5]  *Cf. Mitchum v. Foster*, 407 U.S. 225, 242 (1972) (explaining that 42 U.S.C. § 1983, an 1871 civil rights statute permitting individuals to enjoin violations of federal law by States, was "a product of a vast transformation from the concepts of federalism that had prevailed in the late 18th century").

15

a valuable food supply" for the States' owners-in-common while only "remotely and indirectly affect[ing]" interstate commerce. 161 U.S. at 534. Thus, *Geer*'s privileging of the States reflected then-pervasive concerns with the depletion of natural resources and extinction of wildlife, as well as budding *Lochner*-era limits on the Commerce Clause.[6] Eighty years later, in the late 1970s, federalism looked entirely different—not least because the Great Depression had rendered obsolete (or inconvenient) *Lochner*-era attitudes about economic liberty and policy, thus ushering in "the New Deal era, in which the [Supreme] Court recognized the enormous growth in Congress' power under the Commerce Clause." *New York v. United States*, 505 U.S. 144, 207 (1992) (White, J., concurring in part). Indeed, *Douglas* invokes that precise historical context to justify its decision. *See* 431 U.S. at 282 n.18 ("We are confident that Congress, in the midst of the New Deal legislative program, broadly construed its powers under the Commerce Clause at this time."). Frankly, the federalism questions resolved in *Douglas* and *Hughes* were easy ones in the 1970s; by then, Congress' expansive Commerce Clause authority

---

[6] *Lochner* was decided in 1905, but the *Lochner* era is generally understood to have begun by 1895, with *United States v. E. C. Knight Co.*, 156 U.S. 1 (1895). There, the Court ruled that manufacturing was not subject to congressional regulation of interstate commerce because manufacturing is a "local" activity that "affects [commerce] only incidentally and indirectly." *Id.* at 12.

obviously prohibited State interference with interstate commerce, even if wildlife was involved.

In sum, there is nothing in the specific Commerce Clause holdings of either *Douglas* or *Hughes* that compels the district court's erroneous conclusion that those decisions effectively abolished the state ownership doctrine. *Douglas* and *Hughes* simply applied modern federalism principles to determine the scope of the doctrine—just as *Martin* and *Geer* called for, and just as the Supreme Court had done only a few months prior in *Kleppe*. *See supra*, Part A.2 & n.4. The Court's broader pronouncements deriding the doctrine as "pure fantasy" are pure dicta.[7]

Indeed, *Hughes* itself seemed to acknowledge as much. After overruling *Geer*, *Hughes* somewhat sheepishly conceded that "[a]t the same time, the general rule we adopt in this case makes ample allowance for preserving, in ways not inconsistent with the Commerce Clause, the legitimate state concerns for conservation and protection of wild animals underlying the 19th century legal fiction of state ownership." 441 U.S. at 335-36. That is not novel; it essentially paraphrases the Court's pronouncement, back in 1842, that the property rights of the States, as

---

[7] As a corollary to this, *Douglas* also did not override Congress' confirmation in the Submerged Lands Act that States hold title to and ownership of fish in their waters. *Douglas*' condescending dicta regarding States' title ownership as a "19th Century legal fiction" was in reference to the State "'ownership' language of [cited] cases"— an overzealous aspect of the Court's federalism analysis, not an interpretation of the Submerged Lands Act. *Douglas*, 431 U.S. at 284.

owners-in-trust of their natural resources, are "subject only to the rights since surrendered by the Constitution to the general government." *Martin*, 41 U.S. at 367. And in *Douglas*, Justice Rehnquist, concurring in part, took care to emphasize that the majority opinion should not be read to disturb the Court's precedents recognizing States do have substantial property interests in their wildlife that are not simply incidental to their police powers:

> True enough, the States do not "own" [wildlife] in any conventional sense of that term… But it is also clear that the States have a substantial proprietary interest— sometimes described as "common ownership"—in the fish and game within their boundaries… The precedents of this Court, none of which are disputed today, … are consistent in recognizing that the retained interests of States in such common resources … are of substantial legal moment… Barring constitutional infirmities, only a direct conflict with the operation of federal law—such as exists here—will bar the state regulatory action [taken pursuant to these substantial interests].

431 U.S. at 288-89 (citing, e.g., *McCready v. Virginia*, 94 U. S. 391 (1877); *Manchester v. Massachusetts*, 139 U. S. 240 (1891); *Geer v. Connecticut*, 161 U. S. 519 (1896)).

Numerous courts have recognized that *Douglas* and *Hughes* are precedential only for their federalism holdings, not for their cynical musings about the state ownership doctrine. The Tenth Circuit, sitting *en banc* in 1986, cited *Geer* with approval for the proposition that "wild animals are … a sort of common property [controlled by the State] as a trust for the benefit of the people." *Mountain States*

18

*Legal Foundation v. Hodel*, 799 F.2d 1423, 1426 (10th Cir. 1986). It deemed *Geer* overruled "on other grounds"—namely, on federalism grounds and only as to *Geer*'s "narrow holding" that the Commerce Clause did not prohibit states from interfering with interstate trade in lawfully captured wildlife. *Id.* at 1426 & n.5. In 1992, the Montana Supreme Court similarly reaffirmed the State's substantial property rights in wildlife, notwithstanding *Hughes*:

> There is no federal constitutional issue or other federal question presented in the present case. As a result, the holding in *Hughes* is not controlling here…. We hold that Montana has an ownership interest in wild game held by it in its sovereign capacity for the use and benefit of the people.

*State v. Fertterer*, 255 Mont. 73, 79-80 (1992).

Other decisions are in accord. *See, e.g.*, *Pullen v. Ulmer*, 923 P.2d 54, 60 (Alaska 1996) (concluding that nothing in *Hughes*' Commerce Clause holding "indicated any retreat from the state's public trust duty discussed in *Geer*"); *Tangier Sound Watermen's Assoc. v. Douglas*, 541 F. Supp. 1287, 1306 (E.D. Va. 1982) (identifying much of *Douglas*' language as "dictum" and noting "the lack of any substantial support for an expansive reading of [it]"). So is substantial scholarly commentary.[8]

---

[8] *See, e.g.*, Susan Morath Horner, *Embryo, Not Fossil: Breathing Life into the Public Trust in Wildlife*, 35 Land & Water L. Rev. 23, 40 (2000) ("*Hughes* … overruled *Geer* to the extent Geer held that state 'ownership' in wildlife allowed it the right to

## 2. The State Ownership Doctrine Remains Vital Today.

*Douglas* and *Hughes* were federalism decisions that did not overrule the state ownership-in-trust doctrine. As such, those decisions did not end States' assertions of substantial property rights in their natural resources. To the contrary, State constitutions and statutes, Federal and State court decisions, and State enforcement actions confirm that the state ownership doctrine retains its historical vitality to this day.

Presently, "sovereign ownership of wildlife [is] recognized in full by forty-eight states." Michael C. Blumm & Aurora Paulsen, *The Public Trust in Wildlife*, 2013 Utah L. Rev. 1437, 1466 & n.204 (2013) (collecting constitutional provisions, statutes, and cases); *id.*, App. A & B (collecting statutes). Many States declare

---

interfere with interstate commerce…. *Hughes* did not disturb the public trust in wildlife."); Deborah G. Musiker et al., *The Public Trust and Parens Patriae Doctrines: Protecting Wildlife in Uncertain Political Times*, 16 Pub. Land L. Rev. 87, 93-94 (1995) ("*Hughes* preserved the sovereign ownership analysis set forth in *Geer*."); Mary Christina Wood, *The Tribal Property Right to Wildlife Capital (Part I): Applying Principles of Sovereignty to Protect Imperiled Wildlife Populations*, 37 Idaho L. Rev. 1, 60 (2000) (*Hughes* "neither overruled the sovereign trusteeship underlying the doctrine nor precluded its use in other contexts … not conflict[ing] with the Constitution"); George Coggins, *Wildlife and the Constitution: The Walls Come Tumbling Down*, 55 Wash. L. Rev. 295, 321 (1980) (after *Hughes*, *Geer* has "continuing relevance" and "the State remains the trustee [of wildlife] for the people"); Oliver A. Houck, *Why Do We Protect Endangered Species, and What Does That Say About Whether Restrictions on Private Property to Protect Them Constitute "Takings"?*, 80 Iowa L. Rev. 297, 311 n.77 (1995) ("The trust analogy was not overruled in *Hughes* and remains the most accurate expression of this state interest.").

wildlife and natural resources to be the "property of the state." *E.g.*, Idaho Code Ann. § 36-103(a) (2011) ("All wildlife, including all wild animals, wild birds, and fish, within the state of Idaho, is hereby declared to be the property of the state of Idaho."). Other States claim "ownership" of and/or "title" in those resources. *E.g.*, Ala. Code § 9-11-81 (2001) ("The title ownership to all fish in the public fresh waters of the state of Alabama is vested in the state for the purpose of regulating the use and disposition of the same in accordance with the provisions of the laws of this state and regulations based thereon."). Other States specifically acknowledge the public trust. Pa. Const., art. I, § 27 ("Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people."). And some State statutes blend all these concepts together into one full-throated assertion of broad property rights in their wildlife and natural resources. *E.g.*, Ohio Code Rev. Ann. § 1531.02 ("The ownership of and the title to all wild animals in this state, not legally confined or held by private ownership legally acquired, is in the state, which holds such title in trust for the benefit of all the people.").[9]

---

[9] *See also, e.g.*, 10 V.S.A. § 4081 ("[T]he fish and wildlife of Vermont are held in trust by the State for the benefit of the citizens of Vermont and shall not be reduced to private ownership. The State of Vermont, in its sovereign capacity as a trustee

Judicial decisions since *Douglas* and *Hughes* likewise recognize that the States act as trustees with respect to fish and other public resources, with duties to protect and preserve this special form of public property. *E.g.*, *State v. Bartee*, 894 S.W.2d 34, 42-43 (Tex. App. 1995) ("[T]he legislature has declared that all wild animals are property of the people of this state, [and] ha[s] entrusted a state agency with the power and responsibility to do so … as a trust for the benefit of the people and not as a prerogative for the advantage of the government or for the benefit of private individuals."); *Pullen*, 923 P.2d at 60 ("[T]he public trust responsibilities imposed on the state by the provisions of article VIII of our constitution compel the conclusion that fish occurring in their natural state are property of the state for purposes of carrying out its trust responsibilities."); *State v. Couch*, 103 P.3d 671, 676 (Or. Ct. App. 2004) (title to migratory fish in the navigable waters of the state "is held by the state, in its sovereign capacity in trust for all its citizens"); *Fertterer*, 255 Mont. at 79-80.

Especially meaningful here are recent decisions recognizing that States can maintain civil actions for damages for infringement of their property rights in natural resources, including wildlife. For example, the Sixth Circuit held that Alabama and Tennessee could seek "compensation for the[] loss" caused by unauthorized fishing

---

for the citizens of the State, shall have ownership, jurisdiction, and control of all of the fish and wildlife of Vermont.").

"in their waters," because "the states have a property interest" in their marine animals. *United States v. Bruce*, 437 F. App'x 357, 367 (6th Cir. 2011). Similarly, in *Attorney General v. Hermes*, 339 N.W. 2d 545, 550 (Mich. Ct. App. 1983), the court held that the State's status as "public trustee" for public resources such as fish was "of sufficient stature to support a civil action for damages," which in that case was the tort of conversion. *See also State v. Hess Corp.*, 161 N.H. 426, 429-30 (2011) (state lawsuit against gasoline refineries and chemical manufacturers for contaminating state groundwater, seeking damages for the resulting costs of testing water for public safety, remediating the harm, and providing alternative public water supply); *State v. Chevron Corp.*, No. PC-2018-4716, 2023 WL 3274138, at *1 (R.I. Super. Ct. Apr. 28, 2023) (similar).[10] So important and powerful are these rights that private individuals can sue to enforce them when the State does not, through suits against the delinquent State administrator. *See, e.g.*, *National Audubon Society v. Superior Court*, 33 Cal.3d 419, 452 (1983) (holding that private plaintiffs "can rely on the public trust doctrine in seeking reconsideration of the allocation of the waters of the Mono Basin," and that "any member of the general public … has

---

[10] The concept of state ownership-in-trust also provides states with substantive defenses to civil actions, including takings claims. *E.g.*, *Esplanade Properties, LLC v. City of Seattle*, 307 F.3d 978, 980 (9th Cir. 2002) (affirming city's refusal to allow construction of residences on an elevated platform above tidelands because the public trust doctrine vitiated any entitlement by the owner to build there); *accord R.W. Docks & Slips v. State Dep't of Nat. Res.*, 628 N.W.2d 781, 791 (Wis. 2001).

standing to raise a claim of harm to the public trust"); *accord Center for Biological Diversity, Inc. v. FPL Group, Inc.*, 166 Cal.App.4th 1349, 1365 (2008) (private parties may sue to enforce State's ownership rights in wildlife).

The doctrine of State ownership of wildlife and other natural resources remains an entrenched and consequential foundation of our statutory and common law. In legal effect, the doctrine is neither fantasy nor fiction.

**3. Public Ownership Case Law in New York Demonstrates that the District Court's Reliance on *Long Cove Seafood* Was In Error.**

The district court's decision—that "no one" owns the menhaden in State and Federal waters—also erroneously relied on *United States v. Long Cove Seafood, Inc.*, 582 F.2d 159 (2d Cir. 1978). That reliance is representative of the errors in the district court's decision.

*Long Cove* was a narrow opinion that addressed a criminal prosecution under the National Stolen Property Act. There, this Court stated that "[a]s a general rule, wild fish, birds and animals are owned by no one," but immediately after saying it, the Court identified the language as dictum that did not apply. *Id.* at 164. The Court instead concluded that the "animals" at issue—wild clams on private property— were in fact "owned by the owner of the land in which they are found." *Id.* at 164. Because the claims were privately owned, and the private landowners had consented

to the taking, the government in *Long Cove* obviously could not prove that larceny had been committed *from the State*.

Therefore, *Long Cove* does not apply where the issue concerns animals on public lands or in public waters. That circumstance—the circumstance of this case—is addressed by the Submerged Lands Act and by the state ownership doctrine. New York State court decisions after *Long Cove* confirm that, where public lands and waters are at issue, the State does own its wildlife:

> Since [private ownership of clams] is not the situation here, *the ownership of the clams is vested in the State* and they are therefore a proper subject of regulation by the State.

*People v. Grucci*, 194 Misc. 2d 16, 18 (App. Term, 2d Dep't 2002) (citing N.Y. Envtl. Conserv. L. 11-0105) (emphasis added).

The decision below illustrates the danger of relying upon dictum. The "general rule" of capture described in *Long Cove* was followed by most American courts in the early years of the Republic. *See Pierson v. Post*, 3 Cai. R. 175 (N.Y. Sup. Ct. 1805). But that was the rule courts applied to disputes between private parties about a given capture, not broader disputes involving the sovereign's interests. In the latter circumstances, the common law rule was that wildlife was owned by the State in trust for the people in common. Decisions such as *Arnold v. Mundy*, 6 N.J.L. 1 (1821), and *Martin v. Waddell*, 41 U.S. (16 Pet.) 367 (1842), articulated these principles of a public trust. *See supra*, Part A.2. Fish and other

25

wild animals were not owned by "no one," but instead by the respective States, in trust for the benefit of the people. In New York, that principle is codified by statute, ECL 11-0105, which unequivocally provides that the State of New York "owns all fish" in State waters and which, as *Grucci* shows, continues in force and effect to this day.

The dictum in *Long Cove* stating that as a "general rule … no one" owns fish or other wildlife has no application here. The district court in this case erred by basing its decision upon that dictum, and upon the dicta of *Douglas* and *Hughes*.

## CONCLUSION

Based upon the foregoing, *amici* respectfully request that the decision below be reversed. The district court's holdings that "fish are not property" and that "no one" owns the fish in question are wrong as a matter of law: centuries of American law and history confirm that the menhaden are the property of the sovereigns in whose waters they swim.

DATED:  March 20, 2025

Respectfully submitted,

Theodora Oringher PC

By:/s/ Andrew B. Breidenbach

Andrew B. Breidenbach
1840 Century Park East, Suite 500
Los Angeles, California 90067-2120
(310) 557-2009
abreidenbach@tocounsel.com

*Attorney for Amici Curiae*
*Natural Resources Law and Property*
*Law Professors*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because it contains 6,556 words, calculating by the word processing system used in its preparation, and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface suing Microsoft Word in Times New Roman 14-point font.

Dated:  March 20, 2025                              Respectfully submitted,

                                                                    THEODORA ORINGHER PC

                                                                    By:  */s/ Andrew B. Breidenbach*
                                                                          Andrew B. Breidenbach

                                                                          *Attorney for Amici Curiae*
                                                                          *Natural Resources Law and*
                                                                          *Property Law Professors*

# ADDENDUM A[*]

**Hope Babcock**
Professor Emerita
Georgetown University Law Center

**Michael C. Blumm**
Professor of Law
Jeffrey Bain Faculty Scholar
Lewis and Clark Law School

**John C. Dernach**
Emeritus Professor of Law
Founding Director, Environmental Law and Sustainability Center
Widener University, Commonwealth School of Law

**Patrick Parenteau**
Professor of Law Emeritus
Senior Fellow for Climate Policy
Vermont Law School

**Alison Rieser**
Professor Emerita
University of Maine School of Law

**Steven E. Roady**
Senior Lecturing Fellow, Duke University School of Law
Professor of the Practice of Marine Science and Conservation, Duke University Nicholas School of the Environment

**Erin Ryan**
Associate Dean for Environmental Programs
Elizabeth C. and Clyde W. Atkinson Professor
Florida State University College of Law

---

[*] *Amici curiae* appear in their individual capacities; institutional affiliations are provided here for identification purposes only.

1

**Mary Wood**
Philip H. Knight Professor of Law
Faculty Director, Environmental and Natural Resources Law Center
University of Oregon School of Law

**Edward A. Zelinsky**
Morris and Annie Trachman Professor of Law
Yeshiva University, Benjamin N. Cardozo School of Law