# 25-155

In the

## United States Court of Appeals
### For the Second Circuit

UNITED STATES EX REL. W. BENSON CHILES AND CHRIS MANTHEY,

*Plaintiffs-Appellants,*

v.

COOKE INC., COOKE AQUACULTURE INC., COOKE OMEGA INVESTMENTS, INC., COOKE SEAFOOD USA, INC., OMEGA PROTEIN CORPORATION, OMEGA PROTEIN, INC., GLENN COOKE, BRET D. SCHOLTES, BMO CAPITAL MARKETS CORP., ALPHA VESSELCO HOLDINGS, INC., ALPHA VESSELCO LLC, SETH GREGORY DUNLOP, GREGORY LAWSON DUNLOP, AND MONTGOMERY DEIHL,

*Defendants-Appellees.*

On Appeal from the U.S. District Court for the Southern District of New York
Honorable Jesse M. Furman
Case No. 1:21-cv-05743-JMF

## RESPONSE BRIEF OF APPELLEES

David J. Pivnick
MCGUIREWOODS LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601
T: (312) 750-3585

Michael J. Podberesky
Grace Greene Simmons
MCGUIREWOODS LLP
888 16th Street N.W.
Suite 500
Washington, D.C. 20006
T: (202) 857-1700

Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27601
T: (919) 755-6688
jellis@mcguirewoods.com

*Counsel for Cooke Inc., Cooke Aquaculture Inc., Cooke Omega Investments Inc., Cooke Seafood USA Inc., Omega Protein Corporation, Omega Protein, Inc., Glenn Cooke, and Bret D. Scholtes*

*Additional Counsel Listed Inside Cover*

Robert Silverblatt
Andrew McCanse Wright
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
T: (202) 778-9132
T: (202) 778-9387
rob.silverblatt@klgates.com
andrew.wright@klgates.com

*Counsel for Alpha VesselCo LLC, Alpha VesselCo Holdings, Inc.,
Seth Gregory Dunlop, Gregory Lawson Dunlop, and Montgomery Deihl*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee Alpha VesselCo, LLC (d/b/a Ocean Harvesters) is wholly owned by Ocean Fleet Services, Inc. (f/k/a Alpha VesselCo Holdings, Inc.). No public corporation owns 10 percent or more of Ocean Harvesters' stock.

Defendant-Appellee Ocean Fleet Services has no parent corporation, and no public corporation owns 10 percent or more of its stock.

Defendant-Appellee Cooke Inc. is owned 87.65% by Cooke Family Inc., and no public corporation owns 10 percent or more of its stock. Cooke Family Inc. has no parent corporation with a controlling interest, and no public corporation owns 10 percent or more of its stock. Several corporations, trusts, and individuals own shares in Cooke Family Inc. But Glenn Cooke, in his individual capacity, is the only person that owns any voting shares, and a family trust is the only entity that owns any participating shares.

Defendant-Appellee Cooke Aquaculture Inc. is owned by Cooke Inc., and no public corporation owns 10 percent or more of its stock.

i

Defendant-Appellee Cooke Omega Investments Inc. is owned by Cooke Aquaculture Inc., and no public corporation owns 10 percent or more of its stock.

Defendant-Appellee Cooke Seafood USA, Inc. is owned by Cooke Inc., and no public corporation owns 10 percent or more of its stock.

Defendant-Appellee Omega Protein Corporation is owned by Alpha HoldCo. Inc., and no public corporation owns 10 percent or more of its stock. Alpha HoldCo Inc. is owned by Cooke Omega Investments Inc., and no public corporation owns 10 percent or more of its stock.

Defendant-Appellee Omega Protein, Inc. is owned by Omega Protein Corporation, and no public corporation owns 10 percent or more of its stock.

Dated: April 17, 2025

Respectfully submitted,

*/s/ Jonathan Y. Ellis*

| | |
|---|---|
| Robert Silverblatt | Jonathan Y. Ellis |
| Andrew McCanse Wright | MCGUIREWOODS LLP |
| K&L GATES LLP | 501 Fayetteville Street |
| 1601 K Street, NW | Suite 500 |
| Washington, DC 20006 | Raleigh, NC 27601 |
| T: (202) 778-9132 | (919) 755-6688 |
| T: (202) 778-9387 | jellis@mcguirewoods.com |
| rob.silverblatt@klgates.com | |
| andrew.wright@klgates.com | |

ii

*Counsel for Alpha VesselCo LLC,*
*Alpha VesselCo Holdings, Inc., Seth*
*Gregory Dunlop, Gregory Lawson*
*Dunlop, and Montgomery Deihl*

Michael J. Podberesky
Grace Greene Simmons
McGuireWoods LLP
888 16th Street N.W.
Suite 500
Washington, D.C. 20006
T: (202) 857-1700
mpodberesky@mcguirewood.com
gsimmons@mcguirewoods.com

David J. Pivnick
McGuireWoods LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601
T: (312) 750-3585
dpivnick@mcguirewoods.com

*Counsel for Cooke Inc., Cooke*
*Aquaculture Inc., Cooke Omega*
*Investments Inc., Cooke Seafood*
*USA Inc., Omega Protein*
*Corporation, Omega Protein,*
*Inc., Glenn Cooke, and Bret D.*
*Scholtes*

iii

# TABLE OF CONTENTS

**Page**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ......................... i

TABLE OF AUTHORITIES ................................................................ vi

INTRODUCTION .............................................................................. 1

STATEMENT OF THE ISSUES ....................................................... 3

STATEMENT OF THE CASE ........................................................... 3

    A.    The American Fisheries Act ................................................ 3

    B.    The Fishing Licenses ......................................................... 6

    C.    The Original Complaint ..................................................... 8

    D.    The Amended Complaint ................................................... 11

SUMMARY OF THE ARGUMENT ................................................... 15

ARGUMENT .................................................................................... 18

I.    The District Court Correctly Found that Defendants Did Not
Submit Any False "Claim" For "Property" ................................... 19

    A.    No Defendant submitted any "claim" to the government
for fish.............................................................................. 19

    B.    Even if Defendants had made a "claim" for fish, wild
fish are not government "property" under the False
Claims Act ........................................................................ 24

        1.    Wild fish are not government property because the
government does not possess them ........................... 25

        2.    The government's power to regulate the taking
of wild fish is not a property interest ......................... 27

        3.    Neither the Submerged Lands Act nor the
Magnuson-Stevens Act converts wild fish into
government property.................................................. 37

        4.    The government does not own wild fish under the
"bundle of rights" or partial-ownership theory ........... 45

II.    The District Court Correctly Found that Relators Did Not
Plead a Reverse False Claim ...................................................... 48

iv

III.  The District Court Rightly Denied Relators Leave to Amend
      Their Complaint Another Time ...................................................56

      A.   Relators offer no good reason for failing to raise their
           newest theory in the first or second complaint ...................57

      B.   Relators' further amendment would be futile ......................61

CONCLUSION ..........................................................................................67

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. BP Expl. & Prod. Inc.*,
781 F. Supp. 2d 453 (S.D. Tex. 2011) ...........................................34-35

*Am. Textile Mfrs. Institute, Inc. v. The Limited, Inc.*,
190 F.3d 729 (6th Cir. 1999) ..............................................................52

*Baldwin v. Fish & Game Comm'n of Mont.*,
436 U.S. 371 (1978)...................................................................27-30

*Carpenter v. United States*,
484 U.S. 19 (1987)............................................................................46

*United States ex rel. Clausen v. Lab'y Corp. of Am., Inc.*,
290 F.3d 1301 (11th Cir. 2002)..........................................................20

*Cleveland v. United States*,
531 U.S. 12 (2000)...................................................................23-24, 46

*Coolidge v. Williams*,
4 Mass. 140 (1808) ...........................................................................27

*Corfield v. Coryell*,
6 F. Cas. 546 (C.C.E.D. Pa. 1823) (Washington, J.)..........................27

*Dookeran v. Mercy Hosp. of Pittsburgh*,
281 F.3d 105 (3d Cir. 2002) .........................................................22-23

*Douglas v. Seacoast Prods., Inc.*,
431 U.S. 265 (1977)................. 6, 14, 25-27, 29-31, 33, 39, 40-41, 46-47

*Dunham v. Lamphere*,
69 Mass. 268 (1855) .........................................................................27

*United States ex rel. Foreman v. AECOM*,
19 F.4th 85 (2d Cir. 2021).....................................................49, 57, 61

*Geer v. Connecticut,*
  161 U.S. 519 (1896)................................................. 26-28, 31-32, 34, 36

*United States ex rel. Grynberg Prod. Corp. v. Kinder Morgan*
  *CO2 Company, L.P.*, 491 F. Supp. 3d 220 (N.D. Tex. 2020) ............. 64

*Heckler v. Chaney,*
  470 U.S. 821 (1985)............................................................. 52

*Horne v. Dep't of Agric.,*
  576 U.S. 351 (2015)........................................................ 31-32

*Hughes v. Oklahoma,*
  441 U.S. 322 (1979)........................................... 13, 27, 31-33, 36, 46-47

*United States ex rel. Kasowitz Benson Torres LLP v. BASF*
  *Corp.*, 929 F.3d 721 (D.C. Cir. 2019) .......................... 48, 51, 53, 61, 65

*Kim v. Kimm,*
  884 F.3d 98 (2d Cir. 2018) .................................................. 57

*Lanahan v. County of Cook,*
  41 F.4th 854 (7th Cir. 2022) .................................... 61-63, 66

*Leonard & Leonard v. Earle,*
  279 U.S. 293 (1929)..................................................... 32-33

*Leonard v. Earle,*
  141 A. 714 (Md. Ct. App. 1928) ........................................ 33

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo*
  *Securities, LLC*, 797 F.3d 160 (2d Cir. 2015) ................................60-61

*Luce v. Edelstein,*
  802 F.2d 49 (2d Cir. 1986) ................................................. 59

*Manchester v. Massachusetts,*
  139 U.S. 240 (1891)....................................................... 39-40

*McCready v. Virginia,*
  94 U.S. 391 (1876)...................................................... 31, 39

vii

*Miller v. United States ex rel. Miller*,
110 F.4th 533 (2d Cir. 2024)...............................49, 50-51, 53-56, 58-60

*Missouri v. Holland*,
252 U.S. 416 (1920).........................................................25-27, 30, 39

*United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 196 F. Supp. 3d 436 (D. Del. 2016)...........................54

*Mountain States Legal Found. v. Hodel*,
799 F.2d 1423 (10th Cir. 1986)......................................................33-34

*MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*,
66 F.4th 77 (2d Cir. 2023)...................................................................58

*United States ex rel. Nathan v. Takeda Pharms. N.A., Inc.*,
707 F.3d 451 (4th Cir. 2013)...............................................................22

*Newdow v. Peterson*,
753 F.3d 105 (2d Cir. 2014) ...............................................................29

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
587 U.S. 601 (2019).............................................................................42

*Pierson v. Post*,
3 Cai. R. 175 (N.Y. 1805) ...................................................................26

*Rainwater v. United States*,
356 U.S. 590 (1958).............................................................................22

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007) ...............................................................10

*United States ex rel. Schneider v. JPMorgan Chase Bank, N.A.*, 878 F.3d 309 (D.C. Cir. 2017)................................................50-51

*United States ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023)......................................................................22, 66

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996)...............................................................................29

*United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033 (5th Cir. 2016).....................................56

*United States ex rel. Solano v. Barton & Assocs., Inc.*, No. 20-cv-11231, 2024 WL 1346532 (D. Mass. Mar. 29, 2024)...........................................................................66

*Tangier Sound Watermen's Assoc. v. Douglas*, 541 F. Supp. 1287 (E.D. Va. 1982) .............................30-31

*Toomer v. Witsell*, 334 U.S. 385 (1948)..............................27-28, 30, 34

*Tripathy v. McKoy*, 103 F.4th 106 (2d Cir. 2024)................................24

*United States v. Bengis*, 631 F.3d 33 (2d Cir. 2011) ...............................61-62, 64

*United States v. Bornstein*, 423 U.S. 303 (1976).............................................22

*United States v. California*, 332 U.S. 19 (1947).................................................42

*United States v. Long Cove Seafood, Inc.*, 582 F.2d 159 (2d Cir. 1978) ........................ 13-14, 26-27, 29, 32, 41-42

*United States v. McNinch*, 356 U.S. 595 (1958).............................................21-23

*United States v. Monsanto*, 491 U.S. 600 (1989).............................................55

*United States v. Neifert-White Co.*, 390 U.S. 228 (1968).............................................21

*United States v. Oceanpro Indus., Ltd.*, 674 F.3d 323 (4th Cir. 2012).............................64

*United States v. Rivera*, 55 F.3d 703 (1st Cir. 1995) .................................20

ix

*United States v. Wells Fargo & Co.,*
    943 F.3d 588 (2d Cir. 2019) ............................................................ 48

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
    579 U.S. 176 (2016) ................................................................ 20, 63

*Utah Native Plant Soc'y v. United States Forest Serv.,*
    923 F.3d 860 (10th Cir. 2019) ........................................................ 34

*Wisconsin Bell, Inc. v. United States ex rel. Heath,*
    145 S.Ct. 498 (2025) ............................................................... 20-22

## Statutes

12 U.S.C. § 1818(i)(2)(A) .................................................................... 54

12 U.S.C. § 1818(i)(2)(B) .................................................................... 54

12 U.S.C. § 1818(i)(2)(C) .................................................................... 54

12 U.S.C. § 1818(i)(2)(F) .................................................................... 55

12 U.S.C. § 1818(b)(1) ....................................................................... 55

16 U.S.C. § 1811 ............................................................................. 45

16 U.S.C. § 1860 ............................................................................. 64

16 U.S.C. § 3374 ............................................................................. 64

18 U.S.C. § 3663 ............................................................................. 64

18 U.S.C. § 3663A ............................................................................ 64

19 U.S.C. § 1304(i) .......................................................................... 50

21 U.S.C. § 853(a) ........................................................................... 55

28 U.S.C. § 2461(c) .......................................................................... 64

31 U.S.C. § 3729(a) .......................................................................... 54

31 U.S.C. § 3729(a)(1)(A) ..................................................................... 9

31 U.S.C. § 3729(a)(1)(D) .................................................... 57, 66

31 U.S.C. § 3729(a)(1)(G) .................................................... 11, 49

31 U.S.C. § 3729(b)(2) ....................................................... 10, 20

31 U.S.C. § 3729(b)(2)(A) ........................................................ 48

31 U.S.C. § 3729(b)(3) ............................................................. 50

43 U.S.C. § 1311(a)(1) .............................................................. 38

43 U.S.C. § 1337 ........................................................................ 34

43 U.S.C. § 1353(a)(1) .............................................................. 34

46 U.S.C. Ch. 121 ....................................................................... 6

46 U.S.C. § 3318 ....................................................................... 51

46 U.S.C. § 12102(a) ................................................................... 3

46 U.S.C. § 12103(b) ................................................................... 3

46 U.S.C. § 12113(c)(1) ............................................................... 4

46 U.S.C. § 12113(c)(2)(A) ........................................................... 4

46 U.S.C. § 12113(c)(2)(B) ........................................................... 4

46 U.S.C. § 12113(e)(1) ............................................................... 5

46 U.S.C. § 12113(e)(3) ............................................................... 5

46 U.S.C. § 12113(h) ................................................................... 6

46 U.S.C. § 12139(a) ................................................................. 53

46 U.S.C. § 12140(a) ................................................................. 53

46 U.S.C. § 12151 ..................................................................... 37

46 U.S.C. § 12151(a) ................................................................... 6

xi

46 U.S.C. § 12151(a)(1)..................................................... 51, 54

46 U.S.C. § 12151(a)(2)........................................................ 54

46 U.S.C. § 12151(b).............................................................. 6

46 U.S.C. § 12151(c) ..................................................... 6, 51, 54

46 U.S.C. § 11303................................................................ 51

46 U.S.C. § 14702 ............................................................... 51

46 U.S.C. § 50501 ................................................................. 4

New York Environmental Conservation Law § 11-0105........................ 41

Pub. L. 81-66, 63 Stat. 70 (1949)............................................. 36

Pub. L. 81-721, 64 Stat. 467 (1950)........................................... 36

Pub. L. No. 77-539, 56 Stat. 267 (1942) .................................... 36

Va. Code Ann. § 28.2-400 .................................................... 36

**Rules and Regulations**

46 C.F.R. § 67.21(a) ............................................................. 6

46 C.F.R. § 356.5(c) .............................................................. 5

46 C.F.R. § 356.5(h) .............................................................. 5

46 C.F.R. § 356.11(a)(1) .......................................................... 4

46 C.F.R. § 356.11(a)(2) ......................................................4-5

46 C.F.R. § 356.11(a)(3) .......................................................... 4

46 C.F.R. § 356.11(d) ............................................................. 5

46 C.F.R. § 356.13(a)(1) .......................................................... 5

46 C.F.R. § 356.13(a)(3) .......................................................... 5

46 C.F.R. § 356.13(a)(5) ............................................... 5

46 C.F.R. § 356.13(a)(6) ............................................... 5

46 C.F.R. § 356.13(a)(7) ............................................... 5

46 C.F.R. § 356.15(a) .................................................. 5

46 C.F.R. § 356.15(d) .................................................. 7

46 C.F.R. § 356.17(a) .................................................. 5

46 C.F.R. § 356.41 ..................................................... 4

46 C.F.R. § 356.43 .................................................. 4, 7

46 C.F.R. § 356.45 ..................................................... 4

46 C.F.R. § 356.49 .................................................... 53

Fed. R. Civ. P. 15(a)(2) ............................................. 58

4 Va. Admin. Code 20-1270-35 ..................................... 36

4 Va. Admin. Code 20-1270-70 ..................................... 36

**Other Authorities**

Sir William Blackstone, 2 *Commentaries on the Laws of England* 403 (R.L. Burn 9th ed. 1783) .............................. 26

*Demand* (def. 1b), *Merriam-Webster* ................................ 20

H.R. Rep. 83-215 (1953) .......................................... 43, 44

John S. Adams, *The Right of a Landowner to Oil and Gas in His Land*, 63 U. Pa. L. Rev. 471, 472 (1915) ..................... 35

*Liable* (defs. 1-2), *Black's Law Dictionary* (12th ed. 2024) ..... 51

*License* (def. 1), *Black's Law Dictionary* (12th ed. 2024) ....... 23

MARAD, *Citizenship Affidavit Template for Corporations*, https://tinyurl.com/4jr54a23 .................................... 5

*Present* (def. 2), *Merriam-Webster* ........................................................ 20

*Request* (def. 1), *Merriam-Webster* ...................................................... 20

S. Rep. No. 83-133 (1953) ........................................................................ 44

Senate Com. Comm., A Legis. Hist. of the Fishery
    Conservation and Mgmt. Act of 1976 (U.S. Gov. Printing
    Off. Oct. 1976) ..................................................................................... 45

*Submerged Lands Act: Hearing on S. J. Res. 13, S. 294, S.*
    *107, S. 107 Amendment, and S.J. Res. 18 Before the*
    *Comm. on Interior and Insular Affairs*, 83rd Cong. 73
    (1953) .................................................................................................... 44

## INTRODUCTION

This case concerns Relators' allegation that Defendants have violated the citizenship requirement of the American Fisheries Act (AFA), which requires commercial fishing vessels in the U.S. to be owned and controlled by U.S. citizens. Because there is no private right of action under the AFA, Relators have attempted to cram their allegations into a claim of fraud under the False Claims Act (FCA)—through an ever-evolving set of theories. The very documents that Relators reference in their complaint disprove their allegations. But even accepting their allegations as true here, the FCA is not an all-purpose antifraud statute that can provide Relators the end-around they seek, as evidenced by the fact that every new theory Relators trot out runs afoul of binding precedent and fails to satisfy the most basic elements of an FCA claim.

Relators first accused Defendants of submitting a false claim for property through an application for a fishing license. But it's black-letter law that a license is not "property" in the hands of the government, so much so that Relators have now abandoned that theory. In the face of a motion to dismiss, Relators thus pivoted in their briefing to accuse Defendants of taking government property by unlawfully harvesting fish.

1

But Defendants never submitted any "claim" to the government for fish—an indisputable and dispositive point that Relators never even attempt to address here, let alone allege in the complaint. And, in any event, the idea that wild fish would qualify as government "property" is one that the Supreme Court long ago labeled "pure fantasy." Try as they might, Relators' efforts to make it a reality are unpersuasive.

Continuing the theme, Relators thus recast their claim yet again, arguing that Defendants have wrongfully avoided an obligation to pay civil penalties (for purportedly violating the AFA) that no federal agency has sought to impose. But as this Court recognized just last year, private parties are under no "obligation" to impose discretionary civil penalties on themselves, and this theory provides no sounder basis to deputize Relators to enforce the AFA. Finally, when all else failed, Relators offered one last twist on their theory, claiming that Defendants have somehow failed to "deliver" fish to the government that they claim are unlawfully harvested and thus subject to forfeiture. But, of course, private parties have no more obligation to forfeit property that has not been demanded than they do to tender self-imposed civil penalties. And even if this creative theory had any merit, after two complaints and two

2

motions to dismiss, Relators simply raised it too late and without any good reason for that delay. This Court should thus affirm the district court's dismissal of the amended complaint with prejudice.

## STATEMENT OF THE ISSUES

1.    Did the district court correctly hold that Relators failed to state a cognizable "claim" for "property" for fishing licenses or fish?

2.    Did the district court correctly hold that Relators failed to allege a cognizable reverse false claim where the government has not imposed any civil penalties for Defendants to pay?

3.    Did the district court properly deny Relators leave to add a futile conversion claim that they could have but did not include in their first or second complaint?

## STATEMENT OF THE CASE

### A.    The American Fisheries Act

For commercial fishing vessels to operate in U.S. waters, they must be "issued a certificate of documentation with an endorsement"—in other words, a fishing license. 46 U.S.C. § 12102(a). Under the American Fisheries Act of 1998, these fishing licenses may only be issued to U.S. citizens. *Id.* § 12103(a)-(b). "A vessel owned by an entity is eligible for a

3

fishery endorsement only if at least 75 percent of the interest in the entity, at each tier of ownership and in the aggregate, is owned and controlled by citizens of the United States." *Id.* § 12113(c)(1); *see id.* § 50501.

This citizenship requirement does not prohibit non-citizens from having any role in the fishing vessel. A U.S. citizen must be the one to "direct the business of the entity," to limit or replace the CEO or leadership, and to "direct the transfer, operation, or manning of a vessel." *Id.* § 12113(c)(2)(A). But non-citizens may still "participate" in running the vessel in various ways. 46 C.F.R. § 356.11(a)(1), (3); *accord* 46 U.S.C. § 12113(c)(2)(B). Non-citizens can serve as minority shareholders in the vessel and can exercise "[s]tandard rights," such as being able to veto a sale that would dispose of all the entity's assets. 46 C.F.R. § 356.11(a)(2). Non-citizens can help manage U.S. vessels. *Id.* § 356.41. They can enter into long-term and exclusive contracts to buy all of a U.S. vessel's catch. *Id.* § 356.43. And they can advance funds to U.S. vessels for a season's catch. *Id.* § 356.45.

Fishing licenses are issued by the United States Coast Guard, with input from the United States Maritime Administration (MARAD) for

4

larger vessels.  46 U.S.C. § 12113(e)(1).  Each year, a large fishing vessel must "file a statement of citizenship setting forth all relevant facts regarding vessel ownership and control" with MARAD.  *Id.*; *accord* 46 C.F.R. §§ 356.5(c)-(d), 356.13(a)(1), 356.17(a); *see* MARAD, *Citizenship Affidavit Template for Corporations*, https://tinyurl.com/4jr54a23.  As part of their applications, vessels must submit their articles of incorporation, bylaws, and financing agreements, and must identify any operating or management agreements and any exclusive purchase or sale agreements.  46 C.F.R. § 356.13(a)(2), (5)-(7).  These statements are "rigorously scrutinized" by MARAD's Citizenship Approval Officer.  46 U.S.C. § 12113(e)(3).  And that Officer has the power to request any "additional material" required "to clarify or support the evidence of U.S. citizenship."  46 C.F.R. §§ 356.5(h), 356.11(d).

Once MARAD finds that the vessel satisfies the citizenship requirement, *id.* § 356.15(a), the Coast Guard then includes the fishery endorsement in the vessel's documentation.  App. 96, ¶ 50.  At that point, the vessel is allowed to fish in coastal waters.  The license "entitles a vessel to employment in the fisheries," and "entitles a vessel to land its

5

catch, wherever caught, in the United States."  46 C.F.R. § 67.21(a).  The vessel, of course, remains subject to other federal and state regulations.

If a vessel does not meet the citizenship requirement, the government may "revoke" the vessel's fishing license.  46 U.S.C. § 12113(h).  The government also has the option to impose civil penalties, or to seize a vessel and its equipment.  *Id.* § 12151(a)(1), (b), (c).  Enforcement for larger vessels, however, is left to MARAD; there is no private right of action to enforce the AFA's citizenship requirement or its potential penalties.  *See* 46 U.S.C. Ch. 121.

## B.    The Fishing Licenses

Defendant Cooke Inc. is a family-owned Canadian seafood company.  App. 83, ¶ 15.  Defendant Omega Protein, Inc. (together with Defendant Omega Protein Corporation, "Omega") operates processing facilities for menhaden, App. 78-79, ¶¶ 3-4, a small, "inedible but commercially valuable" fish that can be "processed and used" for various purposes, including fish oils and "poultry and animal feed," *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 269 n.3 (1977).  Cooke purchased Omega in 2017, with Defendant BMO Capital Markets Corp. providing financing for the acquisition.  App. 89, ¶ 29.

6

At the time of the acquisition, Omega owned and operated a fleet of fishing vessels. To comply with the AFA's citizenship requirements, Omega spun off its fleet of vessels into a new company, Defendant Alpha VesselCo, LLC, which now does business as Ocean Harvesters. App. 85, ¶ 20. Omega then sold that vessel-owning company to Alpha VesselCo Holdings, Inc., which is also known as Ocean Fleet Services, Inc. App. 80, ¶ 7; App. 85, ¶ 20. Ocean Fleet Services is 20% owned by Omega (and by extension, Cooke) and 80% owned by Defendant Seth Dunlop, a U.S. citizen. Dunlop is related by marriage to the Cooke family, and he previously worked at Cooke. App. 86-87, ¶ 23. Omega has an exclusive, 10-year agreement to purchase all menhaden caught by Ocean Harvesters, with options to renew for up to 5 additional 5-year terms, as explicitly permitted under MARAD's regulations. App. 103, ¶ 75; 46 C.F.R. § 356.43; Supp. App. 169 (informing MARAD of this agreement); Supp. App. 237 (sharing agreement with MARAD).

Before the acquisition, the parties sought and obtained approval for this ownership arrangement from MARAD's Citizenship Approval Officer. 46 C.F.R. § 356.15(d); App. 80-81, ¶ 8. Defendants detailed the proposed ownership arrangement to the Citizenship Approval Officer,

explaining that Dunlop would own 80% of Ocean Fleet Services, that he was "related by marriage to one of the three family members that control Cooke," and that he had "provided strategic advice for the last 5 years in the development of the global fishing operations of the Cooke family as an employee of a Cooke entity." Supp. App. 227. Defendants disclosed this to MARAD, first in seeking initial approval and then again for final approval. *See* Supp. App. 167, 174.

Defendants also submitted a citizenship affidavit from Dunlop, identifying himself as Ocean Fleet Service's CEO and 80% owner, and identifying his father, Gregory Dunlop, as the secretary, treasurer, and director. Supp. App. 240. MARAD reviewed the arrangement and found that "the fishing industry vessels concerned would continue to be eligible for documentation with fishery endorsements." Supp. App. 180.

## C. The Original Complaint

Relator Chris Manthey is a "professional investigator and researcher" of "corporate executives." App. 82, ¶ 12. Relator W. Benson Chiles "works in the fisheries management industry" and "occasionally receives non-public information regarding corporations operating in the U.S. commercial fishing industry." *Id.* ¶ 13. Neither Relator purports to

8

have ever worked for any of the Defendants, or to have any first-hand knowledge of the entities' operations or ownership structure.

Relators sued Defendants, alleging on "information and belief" that Defendants had violated the AFA's citizenship requirement. Because the AFA has no private right of action, Relators fashioned their suit as an action under the FCA, which prohibits the submission of false claims to the federal government for money or property. 31 U.S.C. § 3729(a)(1)(A). Relators alleged that Defendants created Ocean Fleet Services to serve as a U.S. shell company while the Canadian entity Cooke exercised control over the operations. App. 77-78, ¶ 1. And Relators accused Defendants of concealing this ownership and control from the federal government to obtain fishing licenses for Ocean Harvesters' vessels. *Id.* This, Relators asserted, amounted to presenting a false claim and conspiring to do so. App. 130-31, ¶¶ 152-57.

The government investigated these allegations for over two years and declined to intervene. Supp. App. 1-2. MARAD has not initiated any enforcement proceedings against Cooke, Omega, Ocean Fleet Services, or Ocean Harvesters, and Ocean Harvesters' vessels continue to receive citizenship approval from MARAD. *See* App. 115-17, ¶ 110.

9

Defendants moved to dismiss Relators' complaint. Attaching the exchange between Defendants and MARAD's Citizenship Approval Officer, Defendants explained that MARAD in fact had been informed of the precise relationship that Relators incorrectly asserted Defendants fraudulently withheld. Supp. App. 34-86, 118-34; *see Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (explaining that in a motion to dismiss a complaint for fraudulent omissions, the court may consider public records or documents "integral to the complaint" "to see whether or not those facts were disclosed").

Defendants also argued that Relators failed to state a claim as a matter of law. The FCA requires the submission of a "claim," defined as "any request or demand … for money or property." 31 U.S.C. § 3729(b)(2). And, as Defendants argued, Relators had failed to identify any cognizable "request or demand" for "property" under the FCA. *See, e.g.,* Supp. App. 87-117. In lieu of filing an opposition, the district court gave Relators the option to file an amended complaint, but admonished that "Relators will not be given any further opportunity to amend the complaint to address issues raised by the motions to dismiss." App. 75.

10

### D.    The Amended Complaint

Relators filed an amended complaint.  App. 139-201.  Remarkably, Relators did not meaningfully modify their presentment claim or their allegations of fraud, even though they now had the full exchange between Defendants and MARAD's Citizenship Approval Officer disproving Relators' allegations.  *See, e.g.,* App. 77-78, ¶ 1 (continuing to allege that Defendants "concealed from MARAD" that Dunlop was a "long-time Cooke employee and the Cooke CEO's nephew").  Relators did add a new reverse-false-claim count, however, alleging that Defendants had knowingly avoided an obligation to transmit money or property owed to the government.  31 U.S.C. § 3729(a)(1)(G).  Specifically, Relators alleged that Defendants had engaged in conduct that warranted civil penalties but failed to tell the government, thus depriving the government of those un-imposed civil penalties.

Defendants once again moved to dismiss, arguing that Relators still had not alleged a "claim" for "property."  *See, e.g.*, App. 212-16.  The district court agreed and dismissed the amended complaint with prejudice.  In the amended complaint, Relators had alleged that Defendants lied to MARAD to obtain fishing licenses—the purported

11

"claim" for government "property." *See* App. 113-29, ¶¶ 102-50. Specifically, as Relators pitched it, Ocean Fleet Services and Ocean Harvesters allegedly had submitted citizenship affidavits to MARAD, failing to disclose the familial connections between them and Cooke and falsely certifying that they would not be controlled by a non-citizen. App. 114-15, ¶¶ 105-07. In response to these allegedly false certifications, so Relators' theory goes, MARAD found that the vessels operated by Ocean Harvesters were eligible for fishing licenses. App. 115, ¶ 108. And in the following years, Ocean Fleet Services and Ocean Harvesters allegedly continued to falsely certify that the citizenship status remained the same in renewing the fishing licenses. App. 115-18, ¶¶ 109-11.

The district court found that this license-as-property theory failed as a matter of law. The court explained that the government issuing a license does not amount to the government parting with any "property" for purposes of the FCA. App. 284. A license allows a party to "engag[e] in pursuits that private actors may not undertake without official authorization." App. 286 (internal quotation marks omitted). But the issuance of the license is not a "commercial transaction[] with an expectation [for the government] to profit from the harvested fish." *Id.*

12

(internal quotation marks omitted). "The Government does not conduct the fishing itself, does not hold permits for that prerogative, and is not selling fishing permits in the ordinary commercial sense." App. 287 (internal quotation marks and alterations omitted).

In the motion-to-dismiss briefing, Relators thus pivoted to a new theory, that the fish caught by Ocean Harvesters counted as the "property." App. 246. The district court dismissed this fish-as-property theory too. The court first questioned whether Relators had sufficiently pled this theory, noting that "their Amended Complaint does not make pellucid their theory that the 'property' at issue was the fish that Defendants harvested." App. 288 n.2. The amended complaint repeatedly alleged that "Defendants have presented or caused to be presented to MARAD hundreds of *fishery endorsement applications*." App. 118, ¶ 112 (emphasis added). But it made no similar allegation about any "claim" presented to MARAD for the fish themselves.

The district court then rejected this theory on the merits. Relying on the Supreme Court's decisions in *Douglas v. Seacoast Products, Inc.*, *supra*, and *Hughes v. Oklahoma*, 441 U.S. 322 (1979), and this Court's decision in *United States v. Long Cove Seafood, Inc.*, 582 F.2d 159 (2d Cir.

13

1978), the district court explained that "wildlife such as fish" do not "qualify as property" for purposes of the FCA. App. 289. The government certainly has a "regulatory" interest in wildlife, but wildlife are not government "property." App. 290. "Wild fish, birds and animals are owned by *no one*," and "[p]roperty rights in them are obtained by reducing them to possession." *Id.* (quoting *Long Cove Seafood*, 582 F.2d at 163). To conclude otherwise is "pure fantasy." *Douglas*, 431 U.S. at 284.

The district court also rejected the reverse-false-claim theory. As the court explained, unless and until a government entity finds a violation and imposes civil penalties, there is no "obligation" to pay those potential penalties under the FCA. App. 294-98. So Defendants had not failed to pay money due to the government by allegedly violating the AFA's citizenship requirements and then not proactively offering those penalties to the government.

Finally, Relators requested leave to add a new conversion claim in a second amended complaint, this time alleging that Defendants had failed to deliver government property by not returning to the federal government the fish that were purportedly harvested unlawfully. App. 262. The district court denied leave to amend. As the court explained,

14

this proposed conversion claim "would fail for the same reason as Relators' [other] claims … — namely, the lack of 'property or money' within the meaning of the FCA." App. 299. Moreover, the court reasoned, Relators had already had one opportunity to amend the complaint to allege a cognizable theory, yet they offered no satisfactory explanation for why they had failed to raise this theory earlier. App. 298-99. This appeal followed.

## SUMMARY OF THE ARGUMENT

I. The district court rightly dismissed Relators' presentment claim. Relators allege that Defendants fraudulently obtained wild menhaden by submitting false citizenship affidavits to MARAD. To state a presentment claim, a plaintiff must plausibly allege the Defendants made a "claim" for government "property." Relators' claim fails on both grounds.

A. No Defendant submitted any "claim" to the federal government for wild menhaden. Under the FCA, a "claim" is a direct demand for the federal government to immediately part with property. No Defendant submitted any request to the government for wild menhaden, and the government does not directly hand over any fish. At most, Ocean

15

Harvesters requested a fishing license, but a request for a license to obtain an item does not amount to a demand that the government immediately hand over that item.

B. In any event, wild menhaden are not "property" of either the States or the federal government. Wild animals are owned by no one—not even governments—until reduced to possession, as the Supreme Court and this Court have long held. Of course, governments retain broad power to regulate the taking of wild animals, but that power to regulate does not turn on (or into) ownership of wild animals. Older court cases that speak of "ownership" were simply participating in a legal fiction, where the State's purported "ownership" stood in for the State's power to regulate.

The Submerged Lands Act participates in this legal fiction. The Act purports to grant States "ownership" of wild animals and natural resources off the coast of the States, but as the Supreme Court has explained, that language simply affirms that the States, as opposed to the federal government, have the primary authority to regulate those coastal waters. The Magnuson-Stevens Act similarly affirms the federal government's power to regulate commercial fishing in its waters.

16

Finally, wild animals do not count as government "property" under any other theory of partial ownership, like the bundle of rights. Relators fail to identify any FCA cases adopting such an amorphous conception of "property," and applying those theories here mistakes the government's power to regulate for a property interest.

II. The district court also correctly dismissed Relators' reverse-false-claim count. Relators allege that Defendants defrauded the government by engaging in conduct that triggered potential civil penalties and not affirmatively paying those penalties. But as this Court held just last year, there is no "obligation" to pay civil penalties until a federal agency has found a violation and imposed those penalties. Relators attempt to distinguish between "mandatory" and "discretionary" civil penalties. Even assuming such a distinction exists, the potential civil penalties here are discretionary. MARAD has broad discretion to investigate and find violations of the AFA's citizenship requirement, and broad discretion to impose a penalty, or none at all.

III. Last, the district court properly denied Relators' leave to amend to add a conversion claim. Repackaging their reverse-false-claim theory, Relators sought to allege that Defendants fraudulently failed to deliver

17

the harvested menhaden to the government. The district court appropriately denied that request. Relators had the opportunity to add this claim in their amended complaint, and they have no good reason for failing to do so, beyond that they did not brainstorm this conversion claim until confronted with the legal deficiencies in their other claims. Besides, this conversion claim fails on the merits for many of the same reasons as Relators' other claims. Menhaden are not government "property" "used or to be used" by the government. Nor do Defendants have any obligation to "deliver" any menhaden to the government unless and until the government seeks to forfeit or seize those menhaden.

## ARGUMENT

Congress chose not to provide a private right of action to enforce the AFA's citizenship requirement. To evade that limitation, Relators have offered a variety of ever-shifting theories attempting to cram the citizenship requirement into the FCA. None of these theories are viable as a matter of law. Relators have failed to identify any "claim" for "property," any "obligation" to pay money to the government, or any requirement to "deliver" property for "use" by the government. This

18

Court should thus affirm the district court's order dismissing the complaint with prejudice.

## I. The District Court Correctly Found that Defendants Did Not Submit Any False "Claim" For "Property."

On appeal, Relators have abandoned their theory that Defendants submitted a false "claim" to the government for fishing licenses. Instead, Relators go all in on their novel theory that the "property" here is wild fish caught by Ocean Harvesters. But no Defendant ever submitted any "claim" for fish to the government. Ocean Harvesters catches those fish itself under a government license expressly permitting it to engage in that conduct. And even if any Defendant had somehow submitted a "claim" for fish, wild fish are not government "property" under the FCA, as the district court correctly held.

### A. No Defendant submitted any "claim" to the government for fish.

The district court correctly concluded that wild fish are not government "property." But Relators' complaint suffers from a more fundamental flaw, as no Defendant ever submitted a "claim" for wild fish to the government. *See* Supp. App 354-55.

Core to the FCA is a claim to the government. "The False Claims Act is not an all-purpose antifraud statute, or a vehicle for punishing

19

garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016) (internal quotation marks and citation omitted). Instead, "[t]he FCA protects government funds and programs by imposing civil liability on any person who knowingly presents a false or fraudulent '*claim*'[.]" *Wisconsin Bell, Inc. v. United States ex rel. Heath*, 145 S.Ct. 498, 502 (2025) (emphasis added). Liability under the FCA attaches "not to the underlying fraudulent activity," or even "to the government's wrongful payment, but to the '*claim* for payment.'" *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995) (emphasis added). "The submission of a claim is thus not … a ministerial act, but the *sine qua non* of a False Claims Act violation." *United States ex rel. Clausen v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (internal quotation marks omitted).

A "claim" is "any request or demand, whether under a contract or otherwise, for money or property" that "is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2). A "request" is "the act … of asking for something." *Request* (def. 1), *Merriam-Webster*. A "demand" is "something claimed as due or owed." *Demand* (def. 1b), in *id.*. And to "present" something means "to give or

20

bestow [it] formally" upon another. *Present* (def. 2), in *id.*; *see Wisconsin Bell*, 145 S.Ct. at 505 (looking to "ordinary meaning" in construing the elements of a "claim"). To make a claim to the government, then, a party must make a formal ask for the government to surrender money or property.

Key to a "claim" is that the demand for money or property must require the government "*immediately* to part with money" or property. *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968) (emphasis added). A submission that could result in the party receiving money or property from the government sometime in the "future" is insufficient. *United States v. McNinch*, 356 U.S. 595, 598-99 (1958). For instance, an application to the government for credit insurance is not a "claim," as the government does not immediately disburse any funds, but rather "simply contracts … to reimburse the lending institution in the event of future default." *Id.* Likewise, an application to designate a hospital as a clinical center does not count as a "claim" because "[e]ven if the application [is] accepted … no money … [is] paid to" the hospital; rather, "[t]he application [i]s simply the first step in a process that ultimately might [lead] … to the authorization of the payment of federal funds to" the

21

hospital. *Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105, 109 (3d Cir. 2002).

Put simply, a "claim" is a direct and immediate "call upon the government fisc." *United States ex rel. Nathan v. Takeda Pharms. N.A., Inc.*, 707 F.3d 451, 454 (4th Cir. 2013). Examples include reimbursement requests submitted to the federal E-rate program for telecommunications services, *Wisconsin Bell,* 145 S.Ct. at 501-02; bills for payment to Medicare and Medicaid programs, *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 744-45 (2023); invoices submitted for parts for government radios, *United States v. Bornstein*, 423 U.S. 303, 307 (1976); and applications for loans from the government, *Rainwater v. United States*, 356 U.S. 590, 591 (1958).

Defendants here do not present any direct and immediate "call upon the government" for wild fish. No request is sent to any federal agency for fish, and no agency delivers any fish to Ocean Harvesters, the only Defendant that operates fishing vessels. The government does not run a fish farm. Menhaden swim wild in giant schools in the ocean. And neither MARAD nor the Coast Guard is in the business of taking purchase orders for those fish.

22

The only thing that any Defendant requests from the government is the fishing *license* obtained by Ocean Harvesters.  But requesting the *opportunity* to harvest fish is fundamentally different than making a claim for fish.  Once the government has issued the fishing license, it suffers no "immediate financial detriment" or deprivation of property. *McNinch*, 356 U.S. at 599.  The vessel may have a federal fishing license, but it still must actually go out and catch the fish.

The application (or claim) for a fishing license is, in other words, "simply the first step in a process" for the vessel to obtain fish, *Dookeran*, 281 F.3d at 109, not a claim for fish itself.  And as the district court properly held, a fishing license does not count as government "property." App. 283-88.  "[A] license is not 'property' in the government regulator's hands." *Cleveland v. United States*, 531 U.S. 12, 20 (2000).  It is simply "[a] privilege granted by" the government "to do some act … that would otherwise be impermissible." *License* (def. 1), *Black's Law Dictionary* (12th ed. 2024).  In *Cleveland*, the government issued gaming licenses but did not own and operate any slot machines of its own.  531 U.S. at 15, 23. Similarly, the government here "does not conduct [fishing] operations itself, it does not hold [fishing] licenses to reserve that prerogative, and

23

it does not 'sell' [fishing] licenses in the ordinary commercial sense." *Id.* at 23. The government's "interest in licensing" commercial fishing vessels "implicates the Government's role as sovereign," not any role "as property holder." *Id.* at 23-24. And having failed to contest that proposition in their opening brief, Relators have forfeited any argument to the contrary. *See Tripathy v. McKoy*, 103 F.4th 106, 118 (2d Cir. 2024).

In sum, Ocean Harvesters applied for and received fishing licenses from the government. That is the only conceivable "claim" that Defendants could have submitted. But a license itself is not government "property." Nor does the application for a license amount to a demand or request for the fish themselves. Because Relators have been unable to identify any "claim" for money or property, their presentment claim was properly dismissed on that ground alone.

## B. Even if Defendants had made a "claim" for fish, wild fish are not government "property" under the False Claims Act.

Relators' failure to identify any claim for fish means their extended discussion of whether fish constitute "property" for purposes of the FCA can be disregarded. But even if Relators had identified a "claim" for wild fish, their presentment claim would still fail because wild fish are not the

24

"property" of the state or federal governments. That argument is, as the Supreme Court has explained, "pure fantasy." *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 284 (1977). As a result, the district court correctly rejected Relators' contention as "foreclosed by binding precedent." App. 283. States and the federal government have broad authority to manage and regulate commercial fishing. But the power to regulate the taking of wildlife does not mean that the government "owns" the wildlife, such that wild menhaden count as government "property" under the FCA.

### 1. Wild fish are not government property because the government does not possess them.

"As a general rule, wild fish, birds and animals are owned by no one." *United States v. Long Cove Seafood, Inc.*, 582 F.2d 159, 163 (2d Cir. 1978). Property demands possession. And thus "[p]roperty rights in [wild animals] are obtained by reducing them to possession." *Id.*

This rule applies just as much to the government as private parties. As the Supreme Court has explained, "[w]ild birds are not in the possession of anyone; and possession is the beginning of ownership." *Missouri v. Holland*, 252 U.S. 416, 434 (1920). "Neither the States nor the Federal Government, any more than a hopeful fisherman or hunter,

25

has title to these creatures until they are reduced to possession by skillful capture." *Douglas*, 431 U.S. at 284; *accord Geer v. Connecticut*, 161 U.S. 519, 539 (1896) (Field, J., dissenting) (emphasis added), *majority op. overruled by Hughes v. Oklahoma*, 441 U.S. 322 (1979).

This core principle of property law traces its roots to the English common law. As Blackstone explained, "all mankind had by the original grant of the creator a right to pursue and take any fowl or insect of the air, any fish or inhabitant of the waters, and any beast or reptile of the field." Sir William Blackstone, 2 *Commentaries on the Laws of England* 403 (R.L. Burn 9th ed. 1783). The government can impose certain limits on reducing these wild animals to property. *See id.* And the government can itself reduce wild animals to possession and so own them. *See id.* But until those wild animals are reduced to possession, they are owned by no one, not even the State. *Id.*

In American law, this principle has been settled at least as far back as *Pierson v. Post*, 3 Cai. R. 175 (N.Y. 1805)—the case about two hunters chasing the same fox that has been foundational reading in first-year property-law classes for generations. *See id.* at 177 (explaining that "property in" "an animal feræ naturæ" "is acquired by occupancy only").

26

*accord Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823) (Washington, J.); *Dunham v. Lamphere*, 69 Mass. 268 (1855). And it has been reiterated in case after case from both this Court, *see Long Cove*, 582 F.2d at 163, and the Supreme Court, *see Hughes*, 441 U.S. at 334-35; *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 386 (1978); *Douglas*, 431 U.S. at 284; *Toomer v. Witsell*, 334 U.S. 385, 402 (1948); *Holland*, 252 U.S. at 434.

### 2. The government's power to regulate the taking of wild fish is not a property interest.

Fighting this foundational principle, Relators insist that States own the wild fish that pass through their waters—and always have—because they have been recognized as "public property." Br. 20. But Relators confuse a State's authority to *regulate* fish with *ownership*.

a. Wild animals are "public property" only in the sense that they are owned by no one, and thus the State protects and regulates them for the public benefit. *See, e.g., Coolidge v. Williams*, 4 Mass. 140, 144 (1808) ("Towns … may own the soil of the flats, …. but the property in the fish … is in the public."). To be sure, in discussing this regulatory power, early cases often phrased that power in terms of state "ownership" of or "title" in wild animals. *See, e.g., Geer*, 441 U.S. 519. Relators seize on

27

this language. But as the Supreme Court explained decades ago—in a case involving non-citizens harvesting menhaden, no less—this "ownership" language is and always has been a "legal fiction" used as a stand-in for the State's ability to *regulate* the taking of wild animals for the public benefit. *Douglas*, 431 U.S. at 284.

As the Court clarified, a "State does not stand in the same position as the owner of a private game preserve and it is *pure fantasy* to talk of 'owning' wild fish, birds, or animals." *Id.* (emphasis added). Any language suggesting that a State "owns" wild animals "must be understood as no more than a 19th-century legal fiction expressing the importance to its people that *a State have power to preserve and regulate the exploitation of an important resource*." *Id.* (internal quotation marks omitted) (emphasis added); *see Toomer*, 334 U.S. at 402 ("The whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource."); *Baldwin*, 436 U.S. at 386 (reiterating that claims of government ownership of wildlife are "no more than 19th-century legal

28

fiction") (quoting *Douglas*, 421 U.S. at 284); *accord Long Cove Seafood*, 582 F.2d at 163.

Relators dismiss the Supreme Court's repeated statements as nonbinding dicta. *Cf.* Br. 38. Even if the Supreme Court's statements were dicta, that dicta would be entitled to "great deference" in this Court. *Newdow v. Peterson*, 753 F.3d 105, 108 n.3 (2d Cir. 2014). But, in fact, the premise that governments do not own wildlife was not dicta. It was "necessary to" the Court's reasoning and holdings in each of these cases. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996).

In *Holland*, for example, Missouri tried to avoid enforcement of the Migratory Bird Treaty Act within its borders by asserting "title to migratory birds" in the State. 252 U.S. at 434. The Supreme Court rejected that argument, explaining that "[t]o put the claim of the State upon title is to lean upon a slender reed," for "[w]ild birds are not in the possession of anyone; and possession is the beginning of ownership." *Id.* In *Douglas*, Virginia tried to avoid preemption of its state fishing license regime by arguing that because "the States 'own' the [wild] fish" in their waters, "they can exclude federal licensees." 431 U.S. at 283. The Court rejected that defense by rejecting its premise, explaining that Virginia

29

did not actually own those wild fish. *Id.*[1] And the Court's rejection of the property theory was equally critical to overturning the state ban on out-of-state shrimpers in *Toomer*, 334 U.S. at 399-403, and upholding the state hunting regime in *Baldwin*, 436 U.S. at 385-86.

Lest there be any doubt, in *Hughes*, the Court explicitly overruled *Geer*, the leading Supreme Court case adopting the "legal fiction" that the State "'owned' in common all wild animals within the State." 441 U.S. at 326. The *Hughes* Court reiterated the "artificiality" of that fiction, *id.* at 332, and affirmed the position of the *Geer* dissenters that "[n]either the States nor the Federal Government … has title to these creatures until they are reduced to possession by skillful capture," *id.* at 334-35 (quoting *Douglas*, 431 U.S. at 284, in turn quoting *Geer*, 161 U.S. at 539-40 (Field, J., dissenting)); *see Geer*, 161 U.S. at 539 (Field, J., dissenting) (rejecting

---

[1] Relators muster a single district court case that offhandedly refers to this language in *Douglas* as dicta. *Tangier Sound Watermen's Assoc. v. Douglas*, 541 F. Supp. 1287, 1293 (E.D. Va. 1982). Not only is that case not binding on this Court, but it is wrong, as explained above. The basis for *Tangier Sound*'s comment was the observation that the Supreme Court in *Baldwin* favorably cited certain state ownership cases. *Id.* at 1294. *Baldwin* did favorably cite those cases, but only for the proposition that States have broad power to regulate natural resources. *See* App. 290.

that "the state possesses a property in its wild game … where the state has never had the game in its possession or under its control or use").

b. Relators' other efforts to escape these binding precedents are also unpersuasive. Relators cannot avoid their holdings on the ground that they involved issues of federalism. *Cf.* App. 254; *Amicus* Br. 14. For one, the cases on which Relators rely *also* arise primarily in the federalism context. *See, e.g., Geer*, 161 U.S. at 521, *overruled by Hughes*, 441 U.S. at 326; *McCready*, 94 U.S. 391. More to the point, nothing about the federalism context makes the fundamental principle stated in these cases irrelevant to the FCA. Indeed, this Court has already relied on the property-law discussions in these cases outside the federalism context. *See Long Cove*, 582 F.2d at 163; *see also Hughes*, 441 U.S. at 334 (readily concluding that *Toomer*'s reasoning in a challenge under the Privileges and Immunities Clause "is equally applicable to" a Commerce Clause challenge).

The Supreme Court's use in *Horne v. Dep't of Agriculture*, 576 U.S. 351 (2015), of the "legal fiction" likewise provides no support for Relators' assertion of government ownership. In *Horne*, the government required private raisin growers to hand a significant portion of their yearly crop

31

to the government, free of charge.  *Id.* at 355.  The growers argued that this constituted an unconstitutional taking.  *Id.* at 361.  Trying to avoid this conclusion, the government framed its regulation as a permissible "condition" on engaging in raisin growing, rather than a taking of raisins.  For support, the government cited *Leonard & Leonard v. Earle*, 279 U.S. 392 (1929), upholding a Maryland law requiring that oyster shuckers receive a license and return at least 10% of the used shells to the State.  *Id.* at 395.

*Horne* distinguished *Leonard* by explaining that privately grown raisins were "the fruit of the growers' labor," while "the oysters, unlike raisins, were 'feræ naturæ' that belonged to the State under state law." *Horne*, 576 U.S. at 367.  The oyster packers did not deny that harvesting these wild oysters was a "privilege," and that Maryland had the power "to impose a privilege tax."  *Id.* at 366-67.  So, unlike the raisin growers, the Court observed, "[t]he oyster packers did not simply seek to sell their property; they sought to appropriate the State's."  *Id.* at 367.

The Supreme Court's passing reference to oysters as state property did not implicitly overturn *Douglas*, *Toomer*, *Baldwin*, and *Hughes*.  The *Horne* Court simply distinguished *Leonard* on its own terms, borrowing

32

its outdated language of "ownership" as a stand-in for the State's power to regulate the taking of wild animals. It was the State's "control" over such "public things," not any property interest, that made harvesting oysters a "privilege" in a way that growing raisons on private land was not. *See id.* at 367 ("Raisins are not like oysters: they are private property—the fruit of the growers' labor—not public things subject to the absolute control of the state.") (internal quotation marks omitted); *Leonard v. Earle*, 141 A. 714, 716 (Md. Ct. App. 1928) (using ownership language to affirm Maryland's power to regulate the taking of wild animals, including oysters).

Nor can Relators find help from other non-binding decisions. Most importantly, this Court faces no risk of creating a split with the Tenth Circuit by following Supreme Court precedent. In *Mountain States Legal Foundation v. Hodel*, 799 F.2d 1423 (10th Cir. 1986) (*en banc*), the Tenth Circuit held that damage caused from wild horses and burros did not constitute a taking by the government. Relators read *Hodel* to affirm that *Geer* remains good law and that States own the wildlife within their borders. Br. 38. But *Hodel* says the exact opposite.

33

As the Tenth Circuit explained, "[n]either state nor federal authority over wildlife is premised upon any technical 'ownership' of wildlife by the government." *Hodel*, 799 F.2d at 1426. "Although older decisions sometimes referred to government 'ownership' of wildlife, that language has been deemed 'a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.'" *Id.* (quoting *Toomer*, 334 U.S. at 402); *accord Utah Native Plant Soc'y v. United States Forest Serv.*, 923 F.3d 860, 870-71 (10th Cir. 2019) (reaffirming this reasoning in holding that Utah was not liable for damage caused by goats it released into the wild, as the State "did not own the goats").

Relators also find no help in *Abbott v. BP Expl. & Prod. Inc.*, 781 F. Supp. 2d 453 (S.D. Tex. 2011). There, the defendant competed for an oil and gas lease. The government makes these leases available to the "highest responsible qualified bidder or bidders by competitive bidding." 43 U.S.C. § 1337. And the government retains rights to "royalties or net profit shares, or both," and designates oil and gas as a substitute for currency in the payment of those amounts. *Id.* § 1353(a)(1). The district court held in that context that the FCA covers misrepresentations "that

34

a lessee submits in seeking the right to drill for or develop oil on a federal … lease." *Abbott*, 781 F. Supp. 2d at 462.

That reasoning has no application here. Oil, gas, and minerals, unlike wildlife, are considered the property of the owner of the land. *See* John S. Adams, *The Right of a Landowner to Oil and Gas in His Land*, 63 U. Pa. L. Rev. 471, 472 (1915). And the federal government exercises its rights in that property through leases to private parties. By contrast, wildlife is owned by no one until reduced to possession. *See* pp. 25-27, *supra*. And the federal government treats certificates of documentation with fishery endorsements not as commercial transactions with an expectation to profit from the harvested fish, but as standard regulatory licenses. Applicants pay only a nominal fee of $133 for a certificate of documentation, plus $12 for a fishery endorsement. App. 286. Licensees pay nothing at all for the fish they harvest. This lack of a per-fish charge is fundamentally inconsistent with any notion that the government views itself as parting with property in the form of fish and stands in stark contrast to the lease payments, royalties, and profit shares in *Abbott*.

c. To be clear, affirmance would not leave the country's natural resources unprotected. *Cf. Amicus* Br. 22-24. The government need not

35

own wildlife to regulate, conserve, and protect it. While there are "legitimate state concerns for conservation and protection of wild animals," there is "ample allowance" to vindicate those interests. *Hughes*, 441 U.S. at 335-36; *see id.* at 338 ("The overruling of *Geer* does not leave the States powerless to protect and conserve wild animal life within their borders.").

The comprehensive regulatory scheme governing menhaden illustrates this. Virginia issues licenses for harvesting menhaden, and imposes criminal penalties for unlawful takings. *See* Va. Code Ann. § 28.2-400; 4 Va. Admin. Code 20-1270-35, 20-1270-70. Menhaden fishing is also regulated at the federal level by the Atlantic States Marine Fisheries Commission (ASMFC) and the Gulf States Marine Fisheries Commission (GSMFC), management authorities created by congressionally approved interstate compacts. *See* Pub. L. No. 77-539, 56 Stat. 267 (1942), *as amended by* Pub. L. 81-721, 64 Stat. 467 (1950); Pub. L. 81-66, 63 Stat. 70 (1949). On top of all that, as this case illustrates, MARAD and the Coast Guard oversee a federal licensing regime, and they have an array of tools, including scrutiny of transactions, imposition of conditions on the operations of vessels to

36

prevent citizenship violations, and the assessment of substantial penalties on a daily basis in the event of noncompliance. *See, e.g.*, 46 U.S.C. § 12151.

The issue in this case is not whether governments can regulate wild fish. They can and do. If Relators' baseless allegations had any merit, there would be no shortage of tools to address the issue. But the power to regulate is not ownership, which would be required to turn wild fish into government "property" under the FCA. And Relators cannot use the FCA to superintend the decisions of federal and state officials tasked with managing the sprawling regulatory regime related to commercial fishing and vessel citizenship.

### 3. Neither the Submerged Lands Act nor the Magnuson-Stevens Act converts wild fish into government property.

In the district court, the battle focused on this overwhelming weight of authority from the Supreme Court and this Court. With little to say in response, Relators focus their efforts elsewhere on appeal, mainly arguing that Congress enacted two statutes, the Submerged Lands Act and the Magnuson-Stevens Act, that purportedly converted wild fish into

37

state and federal property in state and federal waters, respectively.[2] Relators argue that, in those Acts, Congress "over[rode] the" Supreme Court's analysis in *Holland*, *Toomer*, and the like. Br. 25. Relators offer no support for the premise that Congress has unfettered power to turn public resources into government property. But either way, these statutes do no such thing.

a. The Submerged Lands Act states that "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters," are "recognized, confirmed, established, and vested in and assigned to the respective States." 43 U.S.C. § 1311(a)(1). Contrary to Relators' assertion, precedent, context, and history confirm that § 1311(a)(1) reflects the same legal fiction of the early federalism cases. In other words, it merely confirms the States' regulatory authority over

---

[2] Relators fault the district court for not thoroughly discussing the Submerged Lands Act. Br. 15. But Relators dedicated only a few lines to the Act in their briefing below. *See* App. 250-51, 254-55. Having failed to develop their statutory argument below, Relators cannot blame the district court for not expressly referencing the Act in rejecting their claims.

wild fish within their waters. It does not convert them into "property" that can be the basis of a false claim under the FCA.

We know this because the Supreme Court squarely held as much in interpreting the Submerged Lands Act 50 years ago in *Douglas*. There too, the appellant "argu[ed] that the Submerged Lands Act … recognize[s] that the States have a title or ownership interest in the fish swimming in their territorial waters," and that as a result of that Act, "the States 'own' the fish." 431 U.S. at 283. The Court rejected that argument both under the Commerce Clause, *id.* at 283-84, and as a matter of property law, *id.* at 284-85. In holding that "[n]either the States nor the Federal Government" has formal title to wild animals, the Court explained that the Submerged Lands Act merely participates in that "legal fiction" that phrases the state power to regulate in terms of "ownership." *Id.* at 284; *see id.* at 282, n.16, 283 n.20 (cabining its past cases that used this legal fiction, including *McCready*, 94 U.S. 391, and *Manchester v. Massachusetts*, 139 U.S. 240 (1891)). Relators suggest that the rejection of the state-ownership theory pertained only to the Court's analysis of prior case law and not to the interpretation of the Submerged Lands Act, but that is manifestly inaccurate; the term "pure fantasy" to

39

describe state ownership comes directly after the express textual discussion of the Act and *before* the Court transitioned to an analysis of the older precedent. *Id.* at 284.

Justice Rehnquist's partial concurrence makes this pellucidly clear. Justice Rehnquist disagreed with certain reasoning of the Court on the Commerce Clause but *not* as to state ownership of fish. "True enough," he expressed, "the States do not 'own' free-swimming creatures within their territorial limits in any conventional sense of that term." *Id.* at 287 (Rehnquist, J., concurring in part). The language of the Submerged Lands Act does not change that, he explained, because Congress, in "convey[ing] title and ownership to such land and ownership," "could not reasonably" have been "refer[ring] to free-swimming fish *which are incapable of such ownership.*" *Id.* at 290 (emphasis added). Relators are simply wrong in insisting that *Douglas* "was not interpreting the Submerged Lands Act." Br. 36.

This Court reached the same conclusion as *Douglas* in interpreting a near-identical state statute in *Long Cove.* There, a New York statute provided that the "State of New York owns all fish, game, wildlife, shellfish, crustacea and protected insects in the state, except those legally

40

acquired and held in private ownership." *Long Cove*, 582 F.2d at 164 (quoting N.Y. Environ. Conservation Law § 11-0105). Asking whether the statute should be interpreted to mean that "New York has asserted a true ownership interest in wildlife," this Court said: "We think not." *Id.* at 165. New York may claim title to wild animals, but that claim "is solely for the purpose of *regulating and controlling their use and disposition*," not for "claim[ing] a right of possession." *Id.* (internal quotation marks omitted) (emphasis added). This holding applies with equal force to the indistinguishable "ownership" and "title" language in the SLA.[3]

Contrary to Relators' puzzling assertion, it makes no difference that the *Long Cove* court hypothesized that a town could have a property interest in the type of wild clams at issue there. *Cf.* Br. 41 (citing *Long Cove*, 582 F.2d 165-66). That hypothetical had nothing to do with the court's interpretation of New York's equivalent to the Submerged Lands Act. It rested instead on the court's observation that, unlike roaming

---

[3] *Amici* cite a laundry list of other state laws with similar language. *See Amicus* Br. 21. What they do not cite is any authority reflecting that such laws should be interpreted to create property interests, as distinct from the "legal fiction" interpretations given to the Submerged Lands Act and New York law.

41

wild animals (like fish), clams and other "sedentary" mollusks "do not roam to any significant degree" and so are "deemed to be in the possession of the owner, if any, of the land in which they are found," including towns that "hold their lands 'in private as distinguished from public ownership.'" *Id.* at 164-65 (citation omitted). That is emphatically *not* "Appellants' argument here." Br. 41 (emphasis omitted).

The historical context of the Submerged Lands Act confirms that the Act was intended only to enshrine the States' regulatory authority. In *United States v. California*, 332 U.S. 19 (1947), and related decisions, the Supreme Court held that the "Federal Government has exclusive jurisdiction over the entire continental shelf." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 606 (2019). "After these decisions, Congress divided jurisdiction over the shelf" by enacting the Submerged Lands Act, "which ceded to the coastal States offshore lands within a specified distance of their coasts." *Id.* But turning back the clock on the *California* decision by enshrining state regulatory rights over the marginal sea is a far cry from upending foundational principles of property law and decreeing that States actually *own* the wild animals moving through their shores.

42

Relators' attempt to divine a different conclusion from the Act's legislative history is unavailing. *See* Br. 26-28 (citing H.R. Rep. 83-215 (1953)). Even if the legislative history were crystal clear, it could not overcome the Supreme Court's binding interpretation of the Act. But in any event, the legislative history, including the passages Relators highlight, only confirms that the focus of the Act was to divide regulatory power between the States and the federal government, not to decree that wild animals in those waters are now state property. *See* H.R. Rep. 83-215, at 2 (explaining that the Act is intended to end "the interminable litigation over" coastal lands and their resources between "the Federal and State Governments").

Relators latch onto one sentence that says that the Act is intended to "confirm" "the traditional and long-accepted policy and practice that submerged lands within a State's boundary and all resources therein belong in a *proprietary* sense to the States." H.R. Rep. 83-215, at 47 (emphasis added). But this sentence refers only to the States' *powers* as compared to the federal government's. *See id.* (arguing that "[i]t is not in the public interest that administration and control of submerged lands be transferred from the states to the federal government").

43

Not a single passage cited by Relators refers to wild fish as government property, rather than discussing the States' power to regulate their capture by others. In fact, other portions of the legislative history refute Relators' reading. *See, e.g.*, S. Rep. No. 83-133, at 6 (1953) ("This wealth has been created through [the States'] *control of the taking*, within the boundaries of the States, of various forms of marine life, such as fish, oysters, shrimp, sponges, kelp and others[.]") (emphasis added); *Submerged Lands Act: Hearing on S. J. Res. 13, S. 294, S. 107, S. 107 Amendment, and S.J. Res. 18 Before the Comm. on Interior and Insular Affairs*, 83rd Cong. 73 (1953) (statement of Sen. Spessard Holland) (reflecting that the legislation would "assure to all 20 of the coastal States their continued *control*, within their boundaries, *of the taking* of fish, oysters, shrimp, sponges, kelp, and other forms of marine life") (emphasis added).

b. Relators' passing reliance on the Magnuson-Stevens Fishery Conservation and Management Act is even less persuasive—even setting aside Relators' failure to allege that Defendants are engaged in fishing in federal waters. Through the Magnuson-Stevens Act, "the United States claims … sovereign rights and exclusive fishery management authority

44

over all fish … within the exclusive economic zone." 16 U.S.C. § 1811. The most salient part of that provision is the absence of any reference to even the legal fiction of title and ownership over wild animals. On its face, the Act does nothing more than declare the federal right to *regulate* fish within federal waters.

The Act's history is consistent with that understanding. As the Senate Commerce Committee acknowledged, "*no one* has property or ownership rights" in wild fish; "fishery resources are open to anyone." Senate Com. Comm., A Legis. Hist. of the Fishery Conservation and Mgmt. Act of 1976, at 686 (U.S. Gov. Printing Off. Oct. 1976); *see id.* at 1081 (reflecting that there is "no ownership" of fish); *id.* at iii (noting the purpose to create a "comprehensive management program for fisheries subject to U.S. jurisdiction").

### 4. The government does not own wild fish under the "bundle of rights" or partial-ownership theory.

Finally, Relators resort to a more amorphous conception of ownership or partial ownership—the "bundle of sticks"—to claim that the States and federal government must own wild fish, because they can exercise certain rights over fish in their respective waters. Br. 30-34, 42-45. But Relators cannot merely pretend that *Douglas*, *Hughes*, and their

45

progeny do not exist. The property question has already been adjudicated, and the answer is binding.

Moreover, every "stick" in the bundle reflects only the federal government's *regulatory* interest. The government does not harvest, possess, or sell wild fish. It regulates entry into the commercial fishing market. MARAD and the Coast Guard administer a "typical regulatory program" that "licenses, subject to certain conditions, engagement in pursuits that private actors may not undertake without official authorization." *Cleveland*, 531 U.S. at 21. Inherent in every licensing regime is the government's authority to exclude participants from the marketplace and to allocate finite resources. "But far from composing an interest that 'has long been recognized as property,' these intangible rights of allocation, exclusion, and control amount to no more and no less than [the government's] sovereign power to regulate." *Id.* at 23 (quoting and distinguishing *Carpenter v. United States*, 484 U.S. 19, 26 (1987)).

Relators and their *amici* get no further by positing that, even if a State does not technically "own" wild fish as it would other property, the State's interest in wildlife should still be characterized as a property interest. Br. 43. Citing Justice Rehnquist's concurrence in *Douglas*, they

look to the "common ownership" theory for support, claiming that the State has a "substantial proprietary interest" in wildlife because the State effectively holds property in common for the public benefit. *Id.* (quoting 431 U.S. at 287-88). But this theory is just another flavor of the outdated legal fiction. *See Hughes*, 441 U.S. at 327 n.6 (dismissing Justice Rehnquist's "common ownership" articulation and noting that it "has met the same fate as *Geer*'s primary rationale").

Both of Relators' not-quite-ownership theories would convert the government's regulatory interest in controlling the taking of wild fish into a property interest in those wild fish themselves. But the FCA imposes liability only where there has been a claim for government "property," full stop—not where the government has some collection of regulatory or property-adjacent interests in the object at issue. Tellingly, not a single decision that Relators cite for this theory arises under the FCA. This Court should not issue the first.[4]

---

[4] Even if the States had a property interest in wild fish, that property could not be the subject of a false claim for property to the federal government. *Cf.* Br. 28-29. To be sure, the FCA governs all claims submitted to the federal government for money or property, "whether or not the United States has title to the money or property." 31 U.S.C. § 3729(b)(2)(A). But that provision covers only situations where a party submits a claim either (1) to a private party funded by the

47

* * *

In sum, Relators have failed to articulate any viable presentment theory under the FCA or identify any error in the district court's dismissal of that theory. For that reason, Relators' conspiracy claim thus necessarily fails as well. To prove a conspiracy to violate the FCA, there must be an "underlying … violation." *Kasowitz Benson Torres*, 929 F.3d at 728 (quotation marks omitted); *accord* App. 282.

## II. The District Court Correctly Found that Relators Did Not Plead a Reverse False Claim.

The district court also correctly dismissed Relators' reverse-false-claim theory, because Relators have not sufficiently alleged any obligation to pay. For a reverse false claim, Relators must plausibly allege that Defendants knowingly "conceal[ed]," "avoid[ed,] or decrease[d] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Unlike a presentment claim, which applies to "payments *made* by the government," a reverse false

---

government, *see United States v. Wells Fargo & Co.*, 943 F.3d 588, 601-06 (2d Cir. 2019), or (2) to the government for money or property in its possession that it does not own. It does not cover circumstances where the federal government exercises only regulatory authority over state property not in its possession or in the possession of an agent or contractor. Relators cite no authority to the contrary.

48

claim "covers claims of money *owed* to the government." *Miller v. United States ex rel. Miller*, 110 F.4th 533, 542 (2d Cir. 2024) (quoting *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 119 (2d Cir. 2021)). Relators' theory is that certain Defendants made a reverse false claim by violating the AFA's citizenship requirement—incurring potential liability for civil penalties—and failing to inform the government, thus depriving the government of civil penalties owed to it. Br. 3, 45. That theory fails.

This Court recently rejected this exact theory in *Miller*, holding that potential civil penalties, like those at issue under the AFA, do not count as an obligation to pay under the FCA. 110 F.4th at 545-46. "Obligation," as defined in the FCA, means "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). This Court thus explained, "the existence of a cognizable 'obligation' turns on whether a duty is 'established.'" *Miller*, 110 F.4th at 543. A "duty to pay is 'established' only when it triggers an *immediate* and *self-executing* duty to pay." *Id.* at 545 (emphases added).

49

And civil-penalty provisions impose no such immediate and self-executing duty to pay. *Id.* at 545-46.

Civil penalties for violations of federal laws are, by their nature, "contingent" on the agency imposing those penalties; any obligation to pay "may or may not ultimately materialize." *United States ex rel. Schneider v. JPMorgan Chase Bank, N.A.*, 878 F.3d 309, 315 (D.C. Cir. 2017). Thus, "[t]here is no obligation to pay unless and until the government has determined that a fine must be paid." *Miller*, 110 F.4th at 545-46; *cf.* 19 U.S.C. § 1304(i) (providing that duties on imported goods "shall be levied, collected, and paid," the amount "hav[ing] accrued at the time of importation," with "payment" not "avoidable for any cause"). If it were otherwise, every provision for civil penalties in the U.S. Code could be the basis for a reverse false claim—allowing private parties to police complex statutory regimes through civil penalty provisions where Congress has chosen not to provide a private cause of action and the government has elected not to pursue any enforcement action or penalties. *See Miller*, 110 F.4th at 541.

Contrary to Relators' contention, the AFA's provision for civil penalties is not "mandatory" and so is not distinct from the one

50

considered in *Miller*. Br. 46. Like the scheme in *Miller*, the AFA's civil penalties are discretionary. The penalty provision provides that a violator of the citizenship requirements "is liable" for civil penalties. 46 U.S.C. § 12151(a)(1), (c). The U.S. Code is replete with such provisions. *See, e.g.,* 46 U.S.C. § 14702 (a vessel "is liable" for misstating its tonnage); *id.* § 11303 (a ship master "is liable" for not updating the ship's logbook); *id.* § 3318 (a vessel is "liable" for not meeting inspection requirements). But to be "liable" means only to be "[r]esponsible or answerable in law," or to be "[s]ubject to or *likely to incur* a fine, penalty, etc." *Liable* (defs. 1-2), *Black's Law Dictionary* (12th ed. 2024) (emphasis added). In other words, a party that is liable is legally exposed.

"[P]otential exposure to penalties" is not the same as having those penalties actually imposed. *Schneider*, 878 F.3d at 315 (explaining that such exposure is "nothing more than a contingent possibility"); *Kasowitz Benson Torres*, 929 F.3d at 726 n.4 (recognizing the difference between "when a defendant becomes *liable* for a … penalty" and "when a defendant becomes obligated to *pay* a … penalty"). By providing that a violator "is liable" for the civil penalties, the AFA means only that the violator must pay those penalties *if MARAD chooses to impose them*. It

51

does not create an unprecedented immediate and self-executing duty for a party to pay regulatory penalties prior to the agency finding a violation and imposing penalties.

Importantly, MARAD—like other federal agencies—retains the "prosecutorial discretion" whether to find such a violation and impose such penalties. *Am. Textile Mfrs. Institute, Inc. v. The Limited, Inc.*, 190 F.3d 729, 738 (6th Cir. 1999). And that discretion is vast. In exercising it, an agency "must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action ... best fits the agency's overall policies, and indeed, whether the agency has enough resources to undertake the action at all." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). For that reason, "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.*

The rest of the AFA confirms that those principles fully apply here. The AFA provides, for example, that MARAD "*may* conduct investigations and inspections regarding compliance." 46 U.S.C.

52

§ 12140(a) (emphasis added). And it "*may* require owners … of documented vessels to submit reports" "[t]o ensure compliance" with "the qualifications of vessels." *Id.* § 12139(a) (emphasis added). MARAD's regulations, in turn, implement this discretion, providing that if a vessel owner "knowingly" submits a false citizenship affidavit, "penalties *may* apply," the license "*may* be revoked," and "[a] fine … *may* be assessed." 46 C.F.R. § 356.49 (emphases added); *see Miller*, 110 F.4th at 547 (explaining that "[t]he repeated use of the term 'may' implies discretion").

Once MARAD has found a violation, moreover, it retains the discretion to impose no penalties at all for a violation, as the district court recognized. App. 296. In particular, the AFA provides that MARAD may impose a fine "of *not more* than $15,000" for negligent violations or "*not more* than $100,000" for falsified eligibility. 46 U.S.C. § 12151(a)(1), (c) (emphases added). In setting a "ceiling" but not a "floor," the AFA granted MARAD the discretion to impose no fine at all. App. 296; *see Miller*, 110 F.4th at 547 (finding penalties discretionary where the agency "has the discretion *not* to impose a penalty"). This discretion directly refutes any "theory of automatic civil penalty liability" now offered by Relators to avoid *Miller*. *Kasowitz Benson*, 929 F.3d at 726.

53

Relators misconstrue the AFA when they claim that MARAD's discretion extends only to the amount of the penalty, not its existence. Br. 48. The AFA is not a statute that requires a penalty but offers a range within which that penalty can be set—like, for example, the FCA itself, which allows a court to impose an inflation-adjusted "civil penalty of *not less* than $5,000 and *not more than* $10,000." 31 U.S.C. § 3729(a) (emphasis added); *cf.* 46 U.S.C. § 12151(a)(2) (imposing a floor of $25,000 for "[a]ctivities involving mobile offshore drilling units"). Rather, the AFA gives MARAD the option to impose a penalty between $15,000 (or, depending on the nature of the violation, $100,000) *and $0.* And that discretion to impose no fine at all reinforces that no civil penalty is mandatory. *See United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 196 F. Supp. 3d 436, 447 (D. Del. 2016) (coming to this same conclusion in the only other case to consider a reverse false claim brought under the AFA).

Indeed, the discretionary nature of the AFA's penalties is thrown into even sharper relief in comparison to the penalties at issue in *Miller.* There, the statute provided that an offending bank "*shall forfeit and pay a civil penalty.*" 110 F.4th at 546 (quoting 12 U.S.C. § 1818(i)(2)(A)-(C))

54

(emphasis added). This Court recognized that this "language, by itself, could arguably be read to require immediate and mandatory penalties." *Id.* But the rest of the statute outweighed that mandatory-sounding language because the federal agency retained discretion in bringing charges, as it "*may* issue and serve upon the [bank] a notice of charges," *id.* at 546 (quoting 12 U.S.C. § 1818(b)(1)), and retained discretion in assessing penalties, as it "*may* compromise, modify, or remit any penalty," *id.* at 547 (quoting 12 U.S.C. § 1818(i)(2)(F)). The similar discretionary language in the AFA is more than enough to outweigh the "is liable" phrasing here, which itself is not mandatory.

Finally, Relators find no refuge in *United States v. Monsanto*, 491 U.S. 600 (1989). In *Monsanto*, the Supreme Court held that a criminal forfeiture provision was "mandatory" after conviction. 491 U.S. at 607 (interpreting 21 U.S.C. § 853(a)). The Court was addressing whether the provision included an atextual exception for fees needed to pay defense counsel, not distinguishing between discretionary and mandatory penalties under the FCA. Its reasoning therefore has little bearing here. Moreover, "[n]o discretionary language of the type present in the [AFA] modifies the 'shall forfeit' command in the criminal forfeiture statute."

55

*Miller*, 110 F.4th at 547 (rejecting reliance on *Monsanto*). "And forfeiting the ill-gotten gains of one's criminal conduct is distinguishable from *possibly* being subject to a discretionary civil penalty." *Id.* So even taking Relator's interpretation of *Monsanto*'s discussion of mandatory penalties at face value, the decision "does not support [Relators'] argument," as this Court has already held. *Id.*

Like "most regulatory statutes," the AFA "impose[s] only a duty to obey the law." *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1040 (5th Cir. 2016). "[T]he duty to *pay* regulatory penalties is not 'established' until the penalties are assessed" by the agency. *Id.* And here, MARAD has not assessed any civil penalties against Defendants. Thus, even assuming Relators could establish a violation of the AFA, Defendants had no obligation to pay the government anything. The district court, therefore, correctly dismissed the reverse-false-claim count.

## III. The District Court Rightly Denied Relators Leave to Amend Their Complaint Another Time.

Finally, the district court correctly denied Relators leave to amend their complaint for a second time to add yet another meritless claim under the FCA. Br. 50-51. The FCA prohibits "any person who … has

56

possession, custody, or control of property or money used, or to be used, by the Government" from "knowingly deliver[ing], or caus[ing] to be delivered, less than all of that money or property."  31 U.S.C. § 3729(a)(1)(D).  This is called a "conversion" claim.  *Foreman*, 19 F.4th at 120.  After Defendants moved to dismiss Relators' amended complaint, Relators sought to add a conversion claim alleging that Defendants knowingly failed to deliver unlawfully harvested fish to the government. Br. 50-51.

After a plaintiff has amended his complaint, he may do so again only with "the court's leave."  Fed. R. Civ. P. 15(a)(2).  "Leave to amend may be denied for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (internal quotation marks omitted).  Denial is reviewed "for abuse of discretion," with "legal conclusions" reviewed "*de novo*." *Miller*, 110 F.4th at 540.  The district court did not abuse its discretion in denying leave to amend for two independent reasons.

## A.  Relators offer no good reason for failing to raise their newest theory in the first or second complaint.

For one, Relators' fourth attempted FCA theory simply came too late.  As the district court explained, Relators already had one

opportunity to amend their complaint and correct any deficiencies with respect to their theory of the "property" and "claim" at issue. Plaintiffs are given an opportunity to amend their complaint as a matter of course, to "cure deficiencies," but they must provide good reason to warrant a second attempt to cure deficiencies where they are "'on the plainest notice of what was required' to avoid dismissal." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023) (citation omitted).

Here, after Defendants moved to dismiss Relators' first complaint, arguing that Relators had failed to identify a "claim" for "property," the district court authorized Relators to file an amended complaint, and explained that "Relators will not be given any further opportunity to amend the complaint to address issues raised by the motions to dismiss." App. 75. Relators amended the complaint—and added a reverse-false-claim theory—but did not add a conversion theory. Having already been given "one opportunity" to amend their complaint to cure its deficiencies, Relators were not entitled to a second opportunity to do so. *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986).

Relators' excuses for why they did not add this conversion claim to the amended complaint are unpersuasive. First, Relators say that they

58

brainstormed this claim only after Defendants argued that fish did not count as "property" under the FCA. Br. 56-57. Second, Relators explain, they initially chose to frame their theory only as a reverse false claim before this Court decided *Miller*. With that door closed, Relators decided that a conversion claim "would be a better fit" for this theory. Br. 57.

Neither is a valid ground not to have raised this claim earlier. In joining the uniform consensus of its sister circuits, *Miller* may have closed a door that had been left the tiniest bit ajar, but it did not open any. *See* 110 F.4th at 545 ("[O]ur sister circuits have concluded that potential or contingent exposure to penalties does not create an 'established' duty to pay and, accordingly, an obligation does not exist by the mere fact of a violation.") (collecting cases). There is no reason Relators could not have asserted their conversion claim from the outset of this case or at least by the filing of their amended complaint. And complaints are not the opening offer in a negotiation, to be modified only in response to push back from the other side. Plaintiffs must put forth their best efforts in the complaint, identifying the universe of possible claims that they intend to bring and sufficiently bolstering those claims to survive a challenge from the defendant. Relators may have regrets

59

about their original efforts, but they cannot complain that they have not been given a third chance to raise even more creative and baseless theories.

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160 (2d Cir. 2015), does not help Relators. The district court there held a conference *before* the filing of any motion to dismiss and required the parties to submit three-page letters previewing their arguments. *Id.* at 169. The district court offered the plaintiffs an opportunity to amend, and plaintiffs chose not to. *Id.* Later, after full briefing of the motion to dismiss, the plaintiffs requested leave to amend, and the district court denied that opportunity. *Id.* This Court held that "exceeded the bounds of [the district court's] discretion" because the district court had required the plaintiffs to decide whether to amend their complaint—for the first time—based on "deficiencies *not fully briefed.*" *Id.* at 190 (emphasis added). Here, in sharp contrast, Relators received 90-plus pages of briefing from Defendants about deficiencies in the complaint, amended their complaint, and then—after they saw the writing on the wall—requested a second opportunity to add a claim that

60

they could have raised earlier. The district court did not abuse its discretion in denying that request.

### B.   Relators' further amendment would be futile.

In any event, as the district court recognized, further amendment would be futile. Relators' new conversion claim "would fail for the same reason as" their other claims—"namely, the lack of 'property or money' within the meaning of the FCA." App. 299.

For a conversion claim, Relators must plead that Defendants "possessed [property] that rightfully belonged to the government." *Lanahan v. County of Cook*, 41 F.4th 854, 864 (7th Cir. 2022); *see Foreman*, 19 F.4th at 122 (dismissing conversion claim where Relator "fail[ed] to identify any specific excess or recoverable item or property that [defendant] possessed but failed to deliver to the government"). And just as fish do not count as government "property" for a presentment claim, they do not count as "property" for a conversion claim. *Kasowitz Benson*, 929 F.3d at 728.

Relators rely on this Court's decision in *United States v. Bengis*, 631 F.3d 33 (2d Cir. 2011), to suggest that even if wild fish did not count as government property *before* they are caught, they count as government

61

property "the *moment* they are caught" because they were illegally harvested and so are "subject to seizure and sale by the government." Br. 51 (emphasis added). But Relators take *Bengis* out of context. *Bengis* involved a claim for restitution under the Mandatory Victims Restitution Act (MVRA), following a criminal conviction for smuggling poached South African rock lobsters. 631 F.3d at 36. This Court concluded that the crime counted as an "offense against property" under the MVRA based on South Africa's particular legal regime authorizing the foreign government to seize poached lobsters, sell them at market price, and retain the proceeds. *Id.* at 39-40.

*Bengis* thus did not concern the FCA at all. And it did not hold, as Relators would have it, that illegally harvested fish are government property for all purposes. That a defendant may have an obligation to forfeit wild fish and crustaceans to a foreign government after a criminal violation says nothing about whether those fish and crustaceans "rightfully belonged" to the federal government for purposes of the FCA. *Lanahan*, 41 F.4th at 864. As the district court explained, "[v]irtually all fruits of unlawful activity can be forfeited under federal law." App. 292. Thus, like Relators' reverse-false-claim theory, their conversion theory

62

"would mean that virtually every regulatory violation" that could result in seizure or forfeiture of some sort "would give rise to a FCA claim, despite the Supreme Court's admonition that the statute is not a 'vehicle for punishing garden-variety … regulatory violations.'"  *Id.* (quoting *Escobar*, 579 U.S. at 194).

Beyond failing to identify government "property," this new conversion claim also has three additional flaws.  *First*, even if unlawfully harvested fish are property, there is no obligation for such fish to be "delivered" to the government.  Relators offer no explanation of where unlawfully harvested fish are supposed to be delivered or to whom.  *See Lanahan*, 41 F.4th at 865 (rejecting conversion claim where complaint was "entirely bare of allegations regarding when, how, and under what circumstances [the defendant] had an obligation to return th[e] funds to the government").  At most, Relators again posit that, because the government could initiate proceedings to "seize" unlawfully harvested fish, Defendants were under an obligation to proactively forfeit the fish themselves.  Br. 52-53.  But like the government's authority to impose civil penalties, the government's power to seize unlawfully caught fish and initiate a forfeiture proceeding to retrieve them creates no obligation

63

for vessels to "deliver" such fish to the government on their own accord. *See* pp. 49-56, *supra*; *see, e.g., United States ex rel. Grynberg Prod. Corp. v. Kinder Morgan CO2 Company, L.P.*, 491 F. Supp. 3d 220, 228-29 (N.D. Tex. 2020) (concluding that even though federal law provided that federal government owned any helium extracted from gas field, relators failed to state claim because they could point to no statute or regulation requiring gas company to physically extract the commingled helium from its gas stream or to compensate the government for that unextracted helium).

None of the cases cited by Relators is to the contrary. No doubt, the federal government has tools at its disposal to seize and forfeit unlawfully harvested fish. *See, e.g., Bengis*, 631 F.3d at 35 (restitution under the MVRA, 18 U.S.C. § 3663A, and the Victim Witness Protection Act, *id.* § 3663); *United States v. Oceanpro Indus., Ltd.*, 674 F.3d 323, 332 (4th Cir. 2012) (forfeiture under the Lacey Act, 16 U.S.C. § 3374). But similar to civil penalties, before any obligation arises to "deliver" forfeited property in the criminal context, the government has to file charges, those charges have to result in a conviction, the government has to exercise its discretion to seek forfeiture or restitution, and the court has to order it. 28 U.S.C. § 2461(c); *see* 16 U.S.C. §§ 1860, 3374 (laying out

64

similar, multi-step processes for civil forfeiture of fishing vessels and fish).  Even assuming that the government's interest in the fish "vested at the moment the fish were caught," Br. 51, there is no obligation to deliver those fish to the government unless and until the government actually completes those steps.

*Second*, wild fish are not property "used, or to be used" by the federal government.  31 U.S.C. § 3729(a)(1)(D).  The government does not harvest wild menhaden to sell, to feed other fish, or to produce any commercial products like fish oil.  The federal government regulates the fishing of menhaden, but it has no "use" for menhaden in its own economic activities or otherwise, and Relators do not identify any such use.  Instead, Relators merely suggest that the government *could* have some use for the fish, as it could sell the harvested fish if it seized them.  Br. 52.  But the government's possible remedies once it has seized property say nothing about whether that property was "used" or planned "to be used" by the government in the first place.  *See Kasowitz Benson Torres*, 929 F.3d at 728.

*Third*, Defendants could not have "knowingly" failed to deliver property to the government.  31 U.S.C. § 3729(a)(1)(D); *see SuperValu*,

598 U.S. at 751-52 (discussing required knowledge). Relators have pointed to no case that has ever held a defendant liable for failing to affirmatively forfeit property prior to the entry of a court order directing forfeiture. In the absence of even a single prior example—much less clearly established law on the issue—Relators have no basis to allege that Defendants plausibly knew of this hypothesized obligation to self-forfeit. *See Lanahan*, 41 F.4th at 864-65 (rejecting claim because Relator "fail[ed] to plead any facts suggesting [defendant] knew it was in possession of government funds to which it was not entitled" and had to move to a different account).

At bottom, Relators' proposed conversion claim is simply another repackaging of their assertion that Defendants failed to impose on themselves a penalty for an alleged regulatory violation—except in this version, the withheld property is fish, not civil penalties. Both theories, in other words, are simply more ways that Relators are seeking to evade Congress's decision not to provide a private right of action under the AFA. *See United States ex rel. Solano v. Barton & Assocs., Inc.*, No. 20-cv-11231, 2024 WL 1346532, at *3 n.3 (D. Mass. Mar. 29, 2024) (noting that one of the problems that "plague[d]" the complaint was that the

66

"conversion and reverse false claims theories" only "repeat and incorporate earlier allegations" and "lack any facts as to the receipt of government funds or property or failure to return such funds or property"). This last attempt is no more successful than their first three, and the district court properly declined to grant Relators yet another opportunity to attempt to distort the AFA and the FCA.

## CONCLUSION

For the foregoing reasons, the district court's dismissal with prejudice should be affirmed.

Dated: April 17, 2025

Respectfully submitted,

*/s/ Jonathan Y. Ellis*

Robert Silverblatt
Andrew McCanse Wright
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
T: (202) 778-9132
T: (202) 778-9387
rob.silverblatt@klgates.com
andrew.wright@klgates.com

*Counsel for Alpha VesselCo LLC,*
*Alpha VesselCo Holdings, Inc., Seth*
*Gregory Dunlop, Gregory Lawson*
*Dunlop, and Montgomery Deihl*

Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27601
(919) 755-6688
jellis@mcguirewoods.com

Michael J. Podberesky
Grace Greene Simmons
MCGUIREWOODS LLP
888 16th Street N.W.
Suite 500
Washington, D.C. 20006
T: (202) 857-1700

67

mpodberesky@mcguirewood.com
gsimmons@mcguirewoods.com

David J. Pivnick
MᴄGᴜɪʀᴇWᴏᴏᴅꜱ LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601
T: (312) 750-3585
dpivnick@mcguirewoods.com

*Counsel for Cooke Inc., Cooke Aquaculture Inc., Cooke Omega Investments Inc., Cooke Seafood USA Inc., Omega Protein Corporation, Omega Protein, Inc., Glenn Cooke, and Bret D. Scholtes*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit L. R. 32.1(a)(4)(A) because it contains 13,672 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced 14-point Century Schoolbook font using Microsoft Word.

*/s/ Jonathan Y. Ellis*
Jonathan Y. Ellis

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2025, the foregoing was filed with the Clerk of the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ Jonathan Y. Ellis*
Jonathan Y. Ellis
