# 25-0155-cv

## United States Court of Appeals
*for the*
## Second Circuit

———————◆———————

UNITED STATES ex rel. W. BENSON CHILES,
UNITED STATES ex rel. CHRIS MANTHEY,

*Plaintiffs-Appellants,*

ABC, UNITED STATES OF AMERICA, ex rel.,

*Plaintiffs,*

— v. —

COOKE INC., COOKE AQUACULTURE INC., COOKE OMEGA
INVESTMENTS INC., COOKE SEAFOOD USA INC., OMEGA PROTEIN
CORPORATION, OMEGA PROTEIN, INC., GLENN COOKE, BRET D.
SCHOLTES, BMO CAPITAL MARKETS CORP., ALPHA VESSELCO
HOLDINGS, INC., also known as Ocean Fleet Services, Inc., ALPHA
VESSELCO LLC., doing business as Ocean Harvesters, SETH GREGORY
DUNLOP, GREGORY LAWSON DUNLOP, MONTGOMERY DEIHL,

*Defendants-Appellees,*

DEF,

*Defendant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

BRENDON DEMAY
JACK L. MILLMAN
BRIAN T. GOLDMAN
DANIEL FAHRENTHOLD
HOLWELL SHUSTER & GOLDBERG LLP
*Attorneys for Plaintiffs-Appellants*
425 Lexington Avenue, 14th Floor
New York, New York 10017
(646) 837-5151

CP COUNSEL PRESS   (800) 4-APPEAL • (379196)

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT................................................................1

ARGUMENT .......................................................................................3

I.   Defendants' Fraud Caused the Government to Lose Property. ......................3

II.   Fish in Public Waters Are Public Property .......................................7

    A. The Submerged Lands Act Confirms Fish in State Waters Are State Property.................................................................................7

    B. Fish in Federal Waters Are Federal Property.............................14

    C. Fish Are Public Property Under the Common Law Also........................15

    D. The Government's Interest, Even if Not Ownership, Is Still a Property Interest. ..............................................................................20

III.  The Complaint Pleads a Reverse False Claim..............................21

IV.  In the Alternative, Defendants Converted Government Property. ...............26

    A. Under *Bengis*, the Government Has a Property Interest in Illegally Caught Fish.............................................................................26

    B. Relators Properly Sought Leave to Amend. .............................29

V.   BMO's Arguments Should Be Addressed on Remand..................................30

CONCLUSION .................................................................................31

i

# TABLE OF AUTHORITIES

**Cases**                                                     **Page(s)**

*Abbott v. BP Expl. & Prod. Inc.*,
781 F. Supp. 2d 453 (S.D. Tex. 2011) ..............................................7, 20

*Am. Textile Mfrs. Inst., Inc. v. Limited, Inc.*,
190 F.3d 729 (6th Cir. 1999)......................................................... 26, 27

*Berman v. City of N.Y.*,
796 F.3d 171 (2d Cir. 2015)..................................................................31

*Briscoe v. Bell*,
432 U.S. 404 (1977) ..............................................................................11

*Carpenter v. U.S.*,
484 U.S. 19 (1987) ................................................................................21

*Cleveland v. U.S.*,
531 U.S. 12 (2000) ................................................................................16

*Coastal Club v. Shell Oil Co.*,
45 F. Supp. 859 (W.D. La. 1942)..........................................................20

*Dookeran v. Mercy Hosp. of Pittsburgh*,
281 F.3d 105 (3d Cir. 2002)....................................................................6

*Douglas v. Seacoast Products, Inc.*,
431 U.S. 265 (1977) ..................................................................... 9-10, 17

*Harrison v. Westinghouse Savannah River Co.*,
176 F.3d 776 (4th Cir. 1999)..................................................................4

*Horne v. Dep't of Agriculture*,
576 U.S. 350 (2015) ....................................................................... 18, 19

*Hughes v. Oklahoma*,
441 U.S. 322 (1979) ..............................................................................22

*In re Deepwater Horizon*,
  753 F.3d 570 (5th Cir. 2014)..................................................................25

*Kokkonen v. Guardian Life Ins. Co.*,
  511 U.S. 375 (1994)...........................................................................17

*Lanahan v. County of Cook*,
  41 F.4th 854 (7th Cir. 2022) ................................................................28

*Leslie Salt Co. v. U.S.*,
  55 F.3d 1388 (9th Cir. 1995).................................................................25

*Loreley Fin. v. Wells Fargo Sec.*,
  797 F.3d 160 (2d Cir. 2015)............................................................ 30, 31

*Mandala v. NTT Data, Inc.*,
  88 F.4th 353 (2d Cir. 2023)...................................................................30

*Mountain States Legal Foundation v. Hodel*,
  799 F.2d 1423 (10th Cir. 1986)....................................................... 19, 20

*MSP Recovery v. Hereford Ins. Co.*,
  66 F.4th 77 (2d Cir. 2023).....................................................................31

*Nichols v. Prudential Ins.*,
  406 F.3d 98 (2d Cir. 2005)....................................................................28

*Pangburn v. Culbertson*,
  200 F.3d 65 (2d Cir. 1999)....................................................................21

*Pickens v. Kanawha River Towing*,
  916 F. Supp. 702 (S.D. Ohio 1996) ......................................................25

*Scarborough v. U.S.*,
  431 U.S. 563 (1977) .............................................................................11

*Smith v. U.S.*,
  508 U.S. 223 (1993) .............................................................................30

*Takahashi v. Fish & Game Comm'n*,
  334 U.S. 410 (1948) .............................................................................17

*Thunder Basin Coal Co. v. Reich*,
　510 U.S. 200 (1994) ...........................................................................25

*U.S. ex rel. Bahrani v. Conagra, Inc.*,
　465 F.3d 1189 (10th Cir. 2006)...........................................................26

*U.S. ex rel. Campie v. Gilead Scis., Inc.*,
　862 F.3d 890 (9th Cir. 2017)............................................................4, 5

*U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*,
　839 F.3d 242 (3d Cir. 2016)..................................................... 23, 26, 27

*U.S. ex rel. Hendow v. Univ. of Phoenix*,
　461 F.3d 1166 (9th Cir. 2006)..........................................................4, 6

*U.S. ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*,
　929 F.3d 721 (D.C. Cir. 2019) ............................................................24

*U.S. ex rel. Main v. Oakland City Univ.*,
　426 F.3d 914 (7th Cir. 2005)................................................................4

*U.S. ex rel. Moore & Co. v. Majestic Blue Fisheries*,
　196 F. Supp. 3d 436 (D. Del. 2016).....................................................26

*U.S. ex rel. Petras v. Simparel, Inc.*,
　857 F.3d 497 (3d Cir. 2017).................................................................24

*U.S. ex rel. Schneider v. JPMorgan Chase Bank*,
　878 F.3d 309 (D.C. Cir. 2017) .............................................................24

*U.S. ex rel. Simoneaux v. E.I. duPont deNemours & Co.*,
　843 F.3d 1033 (5th Cir. 2016)..............................................................24

*U.S. ex rel. Wheeler v. Acadia Healthcare Co.*,
　127 F.4th 472 (4th Cir. 2025) .................................................. 23, 26, 27

*U.S. v. Bengis*,
　631 F.3d 33 (2d Cir. 2011)...................................................................27

*U.S. v. L-C Commc'ns EOTech*,
　921 F.3d 11 (2d Cir. 2019)....................................................................3

*U.S. v. Lexington-Fayette Urb. Cnty. Gov't,*
   591 F.3d 484 (6th Cir. 2010).................................................................25

*U.S. v. Long Cove Seafood,*
   582 F.2d 159 (2d Cir. 1978)..................................................................13

*U.S. v. Moffitt, Zwerling & Kemler, P.C.,*
   875 F. Supp. 1190 (E.D. Va. 1995), *aff'd*, 83 F.3d 660 (4th Cir. 1996)..............29

*U.S. v. Pemco Aeroplex, Inc.,*
   195 F.3d 1234 (11th Cir. 1999)..............................................................25

*U.S. v. Quinones,*
   317 F.3d 86 (2d Cir. 2003)....................................................................14

*U.S. v. Rivera,*
   55 F.3d 703 (1st Cir. 1995)..................................................................4, 6

*U.S. v. Ron Pair Enters.,*
   489 U.S. 235 (1989).............................................................................7

*U.S. v. Strock,*
   982 F.3d 51 (2d Cir. 2020)......................................................................4

*U.S. v. Texas,*
   339 U.S. 707 (1950)............................................................................15

*U.S. v. Tomlinson,*
   574 F. Supp. 1531 (D. Wyo. 1983)......................................................14, 17

*U.S. v. Winkler,*
   2022 WL 17824064 (E.D.N.Y. Dec. 20, 2022).......................................29

*Ysleta Del Sur Pueblo v. Texas,*
   596 U.S. 685 (2022).............................................................................8

**Statutes**

16 U.S.C. § 1811(a)..................................................................................15

16 U.S.C. § 1811(b) ...................................................................15

16 U.S.C. § 742a ................................................................ 16, 21

30 U.S.C. § 820(a) ....................................................................25

31 U.S.C. § 3729(a) ................................................... 3, 22, 23, 29

31 U.S.C. § 3729(b) ......................................................... 3, 22, 24

33 U.S.C. § 1319(d) ..................................................................25

43 U.S.C. § 1311(a)............................................................. *passim*

**Regulations**

15 C.F.R. § 904.505 ..................................................................29

**Other Authorities**

18 Am. Jur. 2d Conversion § 2....................................................29

18 Am. Jur. 2d Conversion § 3....................................................29

*Conversion*, Black's Law Dictionary (12th ed. 2024) ...................... 28, 30

FCMA History, http://bit.ly/3YWE8d6 .........................................15

H.R. Rep. 111-97 (2009).................................................... 14, 26

H.R. Rep. 83-215 (1953)..........................................................8, 9

John S. Adams, *The Right of a Landowner to Oil and Gas in His Land*, 63 U. Pa.
  L. Rev. 471 (1915)...............................................................20

*Liable*, Black's Law Dictionary (12th ed. 2024) .....................................23

Restatement (Second) of Torts § 237, cmt. g........................................29

S. Rep. 111-10 (2009) ..............................................................................26

## PRELIMINARY STATEMENT

The statute means what it says.  Congress "confirmed" that States have "title to and ownership of" the "fish" in their waters.  43 U.S.C. § 1311(a)(1).  That resolves this appeal.

Defendants contend the grant of "title" and "ownership" refers solely to regulatory power.  That cannot be correct.  That is because a *separate clause*, § 1311(a)(2), says States also have regulatory control over fish in their waters.  Because "ownership" and "control" are addressed in separate provisions, they are not the same.  The statutory structure reinforces the plain meaning of "title" and "ownership" in § 1311(a)(1).

Hypothetically, suppose Congress learned about the ruling below and wanted to abrogate it by statute.  All Congress would need to do is enact the Submerged Lands Act *exactly as it is already written*.

This analysis of the statute's text and structure was Relators' lead argument.  Defendants do not respond to it *at all*.  Defendants do not acknowledge the statute until midway through their brief, and even then they do not attempt to explain why this analysis of text and structure is incorrect.  Instead, Defendants say the Supreme Court held that § 1311(a)(1) does not mean what it says.  Not true.  To the contrary, the Court has *agreed* that § 1311(a)(1) grants States ownership of fish.  The out-of-context language Defendants cite does not mention the Submerged

1

Lands Act at all, and it does not apply any tools of statutory interpretation; it discusses cases that *pre-date* the statute and which Congress passed the Act to undo. The only way Defendants can prevail on this appeal is under some version of "the statute does not mean what it says."

Instead of confronting the statute, Defendants lead with an argument the district court did not address. And that argument is plainly wrong; it has been rejected by every circuit to address it, including in one of the cases Defendants cite.

Defendants rely on federalism cases referencing ownership of animals, but (a) those authorities are irrelevant given the clear text and structure of the Submerged Lands Act, and (b) the language Defendants cite is obvious dicta.

Moreover, Defendants' cases mention only "ownership," but the Supreme Court and this Court hold that the concept of "property" is broader than "ownership." Many courts squarely hold that even if States do not "own" their animals, they nevertheless hold a "property interest." Defendants do not respond.

Valuable natural resources are public property. Fish are our "national wealth." Congress decided they should be reserved for Americans. The gatekeepers protecting our "national wealth" were defrauded by foreigners pretending to be Americans. The FCA applies to this fraud. Defendants say the AFA has no private right of action, but the FCA's *qui tam* provisions remedy fraud

2

perpetrated against the government by "incentiviz[ing] private persons to uncover, report, and prosecute FCA claims for the benefit of the United States." *U.S. v. L-3 Commc'ns EOTech, Inc.*, 921 F.3d 11, 14 (2d Cir. 2019).

## ARGUMENT

## I. Defendants' Fraud Caused the Government to Lose Property.

Recognizing that the district court's ruling on property is wrong, Defendants' lead argument focuses on their backup argument below, which the district court didn't address. And when making the argument below, Defendants relied on a decision that was reversed on appeal. SA-378. Defendants make the argument again, but it is still wrong.

The FCA imposes liability for submitting a "fraudulent claim for … approval," where "claim" is "any request … for … property." 31 U.S.C. §§ 3729(a)(1)(A), (b)(2).

Defendants' submissions are a "request" to take fish from U.S. waters; the government "approved" the request; and Defendants took fish. Defendants say they submitted a "request" for a mere piece of paper authorizing them to take fish, resulting in them obtaining fish. Joint Br. 23. Defendants argue that because that chain involves two steps rather than one, the FCA does not apply. That argument is meritless.

The Courts of Appeals have widely held that the test is whether "a false statement is integral to a causal chain leading to" obtaining property. *U.S. ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 895, 903 (9th Cir. 2017) (quoting *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006)); *U.S. ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) (Easterbrook, J.); *U.S. v. Neifert-White Co.*, 390 U.S. 228, 232 (1968) ("might result in"). Courts assess whether the fraud "has the practical purpose and effect" of obtaining property. *U.S. v. Rivera*, 55 F.3d 703, 709-10, 711 (1st Cir. 1995). "[T]he number of stages involved [in the causal chain leading to obtaining property] are immaterial." *Hendow*, 461 F.3d at 1174. "A number of courts in a variety of contexts have found" the FCA applies when defendants falsely certify "compliance with certain conditions as a prerequisite to a government benefit … in order to *induce* the government benefit." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786 (4th Cir. 1999) (emphasis added); A-104 (¶77). This Court holds "FCA liability attaches where a defendant's misrepresentations impact government decisions about eligibility" to obtain property, and the defendant then obtains it. *U.S. v. Strock*, 982 F.3d 51, 61 (2d Cir. 2020).

In *Campie*, the defendants fraudulently obtained FDA approval of their drugs and then used that approval to obtain Medicare reimbursement for those drugs. The defendants argued that although fraudulently obtaining FDA approval

4

enabled them to obtain Medicare funds, that causal link was indirect. The court rejected that argument, concluding the earlier fraudulent submission was "integral to a causal chain leading to" obtaining money or property. 862 F.3d at 895, 903.

Relators satisfy this "causal chain" test easily. Certifying compliance with the Control Rule is the strongest link in the causal chain that ends with Defendants obtaining fish. A-90-95 (¶¶34-44). Even Alpha agrees that prohibiting foreign control "was the clear objective of the AFA" (SA-202), and complying with the Control Rule is a crucial prerequisite of obtaining this valuable resource. Defendants' false certification that they had no illegal agreement regarding control is the overwhelmingly clear "cause" of their taking millions of dollars' worth of fish. A-77-82, A-123-28 (¶¶1, 11, 129, 136-38, 144).

Defendants argue that obtaining fish was far removed from their fraud because Cooke might decide not to take any fish. Joint Br. 23. The notion that Cooke would pay $500 million for a fishing company and its fleet of fishing vessels and then choose not to go fishing is not credible. Cooke's fishing was the foreseeable, intended, and natural next step in its business plan, and Cooke's fishing was the "practical purpose and effect" of Cooke's scheme. A-77-82, A-96-104 (¶¶1, 11, 51-77); *Rivera*, 55 F.3d at 709. Besides, hypotheticals aside, Cooke *in fact took* many millions of dollars' worth of fish. A-77 (¶1).

Defendants' case is inapposite. In *Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105 (3d Cir. 2002), the defendant submitted an allegedly fraudulent application to be considered for a government program, but the government *rejected the application*, meaning the defendant could *never possibly* have obtained any money or property. *Id.* at 109.

Defendants contend no "causal chain" test applies and that, instead, the chain must be one link long—supposedly the fraudulent submission must directly and immediately demand money. Joint Br. 21-22. That test is made up. The above cases reject it. Although Defendants insinuate the Supreme Court adopted an immediacy test, *Defendants' own case law specifically rejected that insinuation*. *Rivera*, 55 F.3d at 711-12, *cited in* Joint Br. 20.

Finally, Defendants propose a deliver-versus-take distinction, suggesting FCA liability attaches only if the government *delivers* property, but not if the government grants "approval" to *take* property. Joint Br. 22. This distinction is arbitrary, unsupported, and wrong. *Hendow*, 461 F.3d at 1177 (government induced to "forfeit" property); *Abbott v. BP Expl. & Prod. Inc.*, 781 F. Supp. 2d 453 (S.D. Tex. 2011) (fraudulent request for approval to take property).

## II. Fish in Public Waters Are Public Property.

### A. The Submerged Lands Act Confirms Fish in State Waters Are State Property.

#### 1. *The Statute's Text and Structure Are Unambiguous.*

The inquiry begins and ends with the statute's text. *U.S. v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989).

The SLA has two separate provisions, in separate clauses.

First, § 1311(a)(1) says States *own* the fish in their waters. States' "title to and ownership of" the "fish" in State waters is "recognized, confirmed, established, and vested." Relators' Br. 17-18.

Separately, § 1311(a)(2) says States have *regulatory power*: "the right and power to manage, administer, lease, develop, and use" the fish in their waters. Thus, the SLA says that in addition to having "title to and ownership of" fish, States also have regulatory power over fish. Relators' Br. 18-19.

Defendants argue that § 1311(a)(1) does not mean what it says. They say the plain text of § 1311(a)(1) "merely confirms the States' regulatory authority over wild fish within their waters." Joint Br. 38-39. That is obviously wrong. Section 1311(a)(1) establishes "title" and "ownership," while regulatory authority is addressed in a separate clause, § 1311(a)(2). Because those two issues appear in separate clauses, they have separate meaning. *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698-99 (2022). The plain meaning of § 1311(a)(1), and its interplay with

7

§ 1311(a)(2), were the centerpiece of Relators' brief. Relators' Br. 17-19. Defendants did not respond to those arguments *at all*.

To resolve this appeal, all this Court needs to do is apply § 1311(a)(1) exactly as written.

### 2. *The History Is Unequivocal.*

The statute's history confirms what is clear from the text. Relators' Br. 19-28. Since colonial times, U.S. courts applied the rule from English common law that the sovereign owns the fish within its waters. Congress enacted the SLA to undo *United States v. California*'s departure from that tradition, and to codify prior law. Relators' Br. 23-28.

Congress specifically intended to create property rights. The statute's goal was to "confirm" "the traditional and long-accepted policy" that "all resources [within State boundaries] *belong in a proprietary sense* to the States." H.R. Rep. 83-215, at 1431. Congress found that "the public interest will be served by confirming the long-asserted rights of the States to the *property* in question." *Id.* at 1425. Congress established a property right, not merely regulatory authority; Congress was worried the Federal government would "take all of [States'] resources," including "fish." *Id.* at 1424.

Defendants say the Report's discussions of "property" refer only to power to regulate rather than property or ownership (Joint Br. 43-44), but that is not a

defensible reading of the Report. The Report explains the SLA "provides *in addition to but also distinct from title and ownership* that the rights and power to administer" natural resources are vested in the States as well. H.R. Rep. 83-215, at 1388-89. The statute's text was intended to mean exactly what it says. And the placement of ownership and control into separate sections was intended to reinforce that meaning.

3. Douglas *Confirms this Conclusion, and Certainly Does Not Reject It.*

Defendants argue that one paragraph in *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265 (1977) "squarely" held that the text of the SLA does not mean what it says. The Court held no such thing.

*Douglas* was a federalism case. The petitioner argued that "because the States 'own' the fish [in their waters], they can exclude federal licensees" from fishing. *Id.* at 283. To support the premise that States owned their fish, the petitioner pointed to two sources of law: "the Submerged Lands Act and a number of this Court's decisions." *Id.* The Court concluded that the petitioner's syllogism was a non-sequitur because State ownership did not imply a right to override federal licensing law.

First the Court addressed the argument that because the SLA grants ownership of fish in State waters, States could override federal fishing laws. The Court began that discussion of the SLA by acknowledging—just as Relators

9

assert—that "[t]he Submerged Lands Act *does give* the States 'title,' 'ownership,' and 'the right and power to manage, administer, lease, develop, and use'" the fish in their waters. *Id.* at 283-84 (emphasis added). "But," the Court continued, a different section of the SLA (§ 1314) said the United States "expressly retained" its own regulatory powers. *Id.* at 284. Accordingly, the SLA was "of no avail" to the petitioner's federalism argument, because the ownership granted under the SLA did not include a power to override Federal authority. The Court did not hold that § 1311(a)(1) does not mean what it says—quite the contrary.

Defendants cite the next paragraph in *Douglas* (Joint Br. 39), but that paragraph does not mention the SLA at all. Instead, having previously addressed the SLA, the Court turned to the petitioner's *second* argument—that "because" "a *number of this Court's decisions* recognize that the States have a title or ownership interest in the fish," States can "exclude federal licensees." 431 U.S. at 283-84 (emphasis added). This paragraph discusses only earlier federalism "cases such as those cited by appellant." *Id.* at 284. *This paragraph does not quote, cite, or discuss the SLA.* Defendants are simply wrong that this paragraph "squarely" interprets § 1311(a)(1). Rather, the Court was discussing its earlier cases. The Court is of course free to recharacterize its earlier precedents. But the Court will not lightly declare that the clear text of an act of Congress does not mean what it says, and in *Douglas* that is not what the Court was doing.

10

This paragraph also does not cite or employ any methods of statutory construction. When the Supreme Court sets forth a precedential interpretation of a statute, it does so clearly, using the traditional tools of statutory interpretation taught in the first year of law school. That was just as true when Justice Marshall authored *Douglas* in 1977 as it is today. When interpreting the Licensing Act—the statute at the core of *Douglas*—Justice Marshall first addressed the text, then "legislative history," and then precedents shedding light on its "intended meaning." 431 U.S. at 272-82. When Justice Marshall authored two other statutory-interpretation decisions within weeks of authoring *Douglas*, he "turn[ed] first to the text of the statute," then to Congressional findings, and then to the "legislative history in its entirety." *Scarborough v. U.S.*, 431 U.S. 563, 570-75 (1977); *Briscoe v. Bell*, 432 U.S. 404, 409-11 (1977). Justice Marshall did not do any of that in the paragraph that Defendants claim "squarely" held that the SLA does not mean what it says. That is because, in the cited paragraph, the Court was not interpreting § 1311(a)(1).

Defendants' only explanation for why this paragraph supposedly interprets the SLA sub silentio is that it comes "after" the discussion of the SLA. Joint Br. 39-40. But that is exactly the point. It is the paragraph *after* the paragraph dissecting the SLA, in which the Court acknowledged the statute "does give the States 'title' [and] 'ownership,'" while holding that paramount federal powers

11

codified in the SLA supersede State title and ownership. 431 U.S. at 283-84. The cited paragraph discusses only the "cases such as those cited by appellant," with no mention of the SLA. *Id.* at 284.

At least one other court interpreting *Douglas* shortly after it was decided agrees with Relators, holding that the majority "conceded" the SLA granted States title to and ownership of fish in their waters. Relators' Br. 35. Defendants do not respond.

Defendants cite Justice Rehnquist's opinion (Joint Br. 40), but he *dissented* from the section that Defendants say interpreted the SLA. 431 U.S. at 287. Moreover, Justice Rehnquist *agreed with Relators' reading of the majority opinion*; he interpreted the majority as "recognizing the Act as effecting a conveyance to the State of primary ownership" of fish in State waters. *Id.* at 289. Then, *dissenting* from that conclusion, he said he would interpret the SLA differently (the way Defendants do) and explains that—if the SLA were to be interpreted that way—the preemption analysis at the heart of the case would look very different. *Id.* at 289-90. That is the point: *the majority did not adopt his reading of the SLA*. Finally, his opinion directly supports Relators' alternative argument, which cites his opinion. Relators' Br. 42-45; *infra* II.D. So if the law is what is stated in Justice Rehnquist's opinion, then this Court must decide this appeal in favor of Relators.

Although Defendants rely on *U.S. v. Long Cove Seafood*, that opinion did not mention the SLA, so it is not on point. Joint Br. 40 (citing 582 F.2d 159 (2d Cir. 1978)). Here, the issue is the meaning of § 1311(a)(1) given its plain text, its placement separate from § 1311(a)(2), the drive to undo *California*, and the legislative history making clear that Congress specifically intended to create property interests.[1]

Moreover, *Long Cove* did not even purport to address the issue here, which is whether "public property" includes fish in *public waters*. *Long Cove* was solely about whether the state owns fish that are *not* in public waters and instead are owned *privately*. The statute at issue answered that question unambiguously; it said the state owned wild animals "except" those "held in private ownership." It also specifically said that, for animals held privately, the state's only interest is regulatory. The instant appeal has nothing to do with the theory from *Long Cove* that the state somehow owns animals that are *already owned privately*. At least one court has held the government has a property interest in wildlife on *public lands*, distinguishing *Long Cove* for the reasons above. *U.S. v. Tomlinson*, 574 F. Supp. 1531, 1534 (D. Wyo. 1983).

---

[1] The Court did not hold that any "general rule" that animals are owned by no one supersedes the plain text of a statute that was not before it. And as Relators and Amici explained, the "owned by no one" language refers to ownership by individuals, whereas the sovereign *does* own wild animals. Relators' Br. 20; Amici Br. 25. Defendants do not respond.

13

### 4. *The FCA Applies to Fish in State Waters.*

The FCA applies to property owned by States and administered by the Federal government.  Relators' Br. 28-30.  Defendants respond in a footnote, so the argument is waived.  *U.S. v. Quinones*, 317 F.3d 86, 90 (2d Cir. 2003).  And this waived argument is incorrect.  Defendants say the FCA does not apply if the United States administers the property of another.  Joint Br. 47 n.4.  The statute's plain text is capacious and contains no such limitation.  The clause was intended to cover property "administered by, but not owned by, the Government" because false claims against such property "harm Government interests."  H.R. Rep. 111-97 at *6.  Defendants do not dispute that the Government administers the property here.

## B. **Fish in Federal Waters Are Federal Property.**

The Federal government has property rights in fish in Federal waters. Relators' Br. 20.  The "United States claims … sovereign rights and exclusive fishery management authority over all fish" in Federal waters.  16 U.S.C. § 1811(a) (1976).  This statute refers to more than regulatory power, as "sovereign rights" must mean something more than "exclusive fishery management authority." Indeed, in certain non-U.S. waters, the United States claims only "exclusive fishery management authority."  § 1811(b).  "Sovereign rights" has a well-established meaning; it includes "property rights" plus "political rights."  *U.S. v. Texas*, 339 U.S. 707, 717, 719 (1950) (holding that Texas held both "ownership" and control

14

over its marine resources, but when it joined the Union, its "property rights" "coalesce[d] and unite[d] in the national sovereign"). Defendants do not respond.

Defendants improperly cut off their quotations from the statute's legislative history. Joint Br. 45 (citing FCMA History (http://bit.ly/3YWE8d6) at 686, 1081). The full quotations confirm fish are "owned by the American society as a whole" as "common property." *Id.* Defendants mischaracterize language about "no ownership" of fish; in context, it refers to fish not being owned by *any particular person*, which causes overfishing in a tragedy of the commons. *Id.* The question here is *sovereign* ownership, not *private* ownership. Congress further found that fishing by foreigners "result[ed] in serious economic consequences" for Americans; the loss of "invaluable fishery resources" endangers American fishermen's ability to "mak[e] their living from resources produced in American waters." *Id.* at 1087, 1093. American resources in American waters belong to Americans.

### C. Fish Are Public Property Under the Common Law Also.

#### 1. *The Government Holds All Sticks in the Bundle of Rights.*

Relators separately prevail under the common-law method of identifying property interests by analyzing sticks in a bundle of rights. Relators' Br. 30-34.

15

Defendants say the sticks reflect only regulatory interests because the government does not take fish. *Id.* 46. That is wrong. The government routinely takes fish from public waters. Relators' Br. 32-33.

Defendants' argument also proves too much. *Every* government decision about its property, including deciding which treatments deserve reimbursement under Medicare, is by definition also a regulatory decision about how to allocate property in pursuit of policy goals. Because the government is allocating its own property, *Cleveland v. United States*, 531 U.S. 12 (2000) is irrelevant. That case involved a law that told Americans what they could and couldn't do with their own property; the government's interest was purely regulatory. That is obviously not the situation here, where the government manages our "national wealth." 16 U.S.C. § 742a.

> 2. *Courts Continue to Recognize Fish in Public Waters As Public Property.*

**1.** Apart from the SLA, the common law has long recognized fish in public waters as public property. Relators' Br. 20-23, 25, 37-40. One modern court squarely held the federal government has a property interest in wild animals on federal lands, not merely a police power. *Tomlinson*, 574 F. Supp. at 1534-35. Defendants' responses are unpersuasive.

**2.** *Douglas*'s "pure fantasy" language is pure dicta. Whether the State's interest was proprietary versus regulatory was immaterial. Relators' Br. 34, 38.

16

Defendants say rejecting state ownership was "critical" to *Douglas*'s holding, but they do not explain how.  Joint Br. 30.  To the contrary, *Douglas* relied on *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948), which held that *even if* States own their wildlife, States cannot exercise their property rights in a way that offends the Constitution.  431 U.S. at 284.  A blanket dismissal of *any* state ownership or property interest in animals, in *any* context, would be dictum because it was not essential to the federalism questions.  *Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 379 (1994) ("It is … the holdings of our cases, rather than their dicta," that govern).  This understanding of *Douglas* is the scholarly consensus. Amici Br. 13-19.  Defendants do not explain why this consensus is wrong.

**3.** *Horne v. Dep't of Agriculture*, 576 U.S. 350 (2015) illustrates why Relators must be correct.  Relators' Br. 38.  *Horne* endorsed decisions saying oysters taken from State waters were "property" that "belonged to the State" and were "public things" taken from "the state, as owner." *Id.* at 366-67.

Defendants say "[t]he Supreme Court's passing reference to oysters as state property did not implicitly overturn *Douglas*, *Toomer*, *Baldwin*, and *Hughes*." Joint Br. 32.  Exactly right.  *Horne* is consistent with those cases: *Douglas* and *Hughes* did not overrule prior law regarding State ownership of animals, so *Horne* correctly acknowledged that States own their animals.

17

Defendants claim the Court in *Horne* didn't really mean it when it said oysters are State "property," because the Court supposedly used property as a "stand-in" for regulatory power. Joint Br. 32-33. That gets *Horne* exactly backwards. It was *crucial* to *Horne* that the State's interest was proprietary, *not* regulatory. *Horne* addressed whether a law requiring raisin farmers to give part of their harvest to the government effected a physical taking. The government argued it was not a taking, pointing to precedent holding that a Maryland law requiring oyster harvesters to return 10% of the used shells to the State was not a taking. 576 U.S. at 366. *Horne* held that although the oyster law was *not* a taking, the raisin law *was*. The difference, in the Court's view, was that the Maryland law merely let the State keep some of its own "property" that "belonged to the State," as "owner," and of course a law that retains the State's own property cannot effect a taking. *Id.* By contrast, the raisin law effected a pure physical taking of the farmer's raisins. If the Maryland law were about mere regulatory power, as Defendants posit, the law would be a physical taking of property that belonged to the oystermen as soon as they took oysters from Maryland waters; the law would be just like the raisin law that effected a physical taking. Thus, the *entire basis* for this discussion in *Horne* was that animals are treated *specifically* as State property and *not* merely the subject of regulation.

18

**4.**  Many cases show that *Douglas* is limited to its holding.  Br. 38-40. Defendants fail to address most of those precedents.  And Defendants' efforts to avoid the others fail.

Defendants cannot avoid a circuit split with *Mountain States Legal Foundation v. Hodel*, 799 F.2d 1423 (10th Cir. 1986) (*en banc*).  *Hodel* says the discussions of State ownership in *Douglas* and *Hughes* are dicta; *Hodel* states *Geer* was "overruled on other grounds" and that only *Geer*'s "narrow holding" regarding the "Commerce Clause" was overruled.  *Id.* at 1426 & n.5.  Defendants insist that is wrong, which opens a circuit split.  Further, although *Hodel* described "technical 'ownership'" as a legal fiction, *Hodel* nevertheless rejected Defendants' more extreme contention that States do not have any *property interest* in animals.  *Id.* at 1426.  Animals might not be formally owned by the State as a private owner "but are instead a sort of *common property*.'"  *Id.* (emphasis added).  Defendants want this Court to conclude that animals on public lands are not "common property," creating another split.

Defendants fail to distinguish *Abbott*, 781 F. Supp. 2d at 462, an FCA case where a valuable natural resource (oil) obtained by fraud was "property." Defendants say *Abbott* doesn't apply because oil, "unlike wildlife, [is] considered the property of the owner of the land."  Joint Br. 35.  But Defendants rely on an article that in fact says *the opposite*: "the landowner, who has not sunk a well has

19

no right *of property* in any oil or gas in or under his land." John S. Adams, *The Right of a Landowner to Oil and Gas in His Land*, 63 U. Pa. L. Rev. 471, 472-73 (1915); *Coastal Club v. Shell Oil Co.*, 45 F. Supp. 859, 863 (W.D. La. 1942). That the government takes royalties on oil but not fish is true but irrelevant, *Tomlinson*, 574 F. Supp. at 1534-35, as the government can always decide to demand royalties from businesses who profit from this valuable resource. (That is one lesson of *Horne*.) If taking valuable oil by fraud states an FCA claim—even if the government does not technically "own" undrilled oil—then so does taking valuable fish by fraud. When fraudsters take valuable natural resources, the FCA applies.

### D. The Government's Interest, Even if Not Ownership, Is Still a Property Interest.

Although many authorities addressing animals discuss "ownership," the question here is "property." Both the Supreme Court and this Court have held that a valuable item can be property even if it is not "susceptible of ownership and dominion in the absolute sense." *Carpenter v. U.S.*, 484 U.S. 19, 26 (1987). For property interests, "case law makes clear that no formal title ownership is necessary." *Pangburn v. Culbertson*, 200 F.3d 65, 69-70 (2d Cir. 1999).

The plain meaning and common-law meaning of "property" is far broader than "ownership"; it includes "the rights in a valued resource" and "extends to every species of valuable right and interest." Relators' Br. 42. Defendants have no

20

response.  Property, as distinct from ownership, comfortably includes a valuable resource that Congress deemed a "form of national wealth."  16 U.S.C. § 742a.

Many cases have squarely addressed whether States have a "property" interest in animals even if States lack "ownership," and they squarely hold the answer is yes.  Relators' Br. 43-44, 39-40.  Defendants do not respond.[2]  Instead, Defendants ask this Court to announce a new rule, without support, that the concepts of ownership and property are identical.  They are not.

## III.   The Complaint Pleads a Reverse False Claim.

The AFA imposes mandatory statutory penalties for Defendants' fraudulent submissions made in 2017.  Defendants thus had, as of 2017, "an established duty, whether or not fixed, arising from [a statute]" to pay that penalty.  31 U.S.C. § 3729(b)(3).  But the government didn't know Defendants' submissions were fraudulent, so the penalty wasn't imposed.  From 2018 to now, Defendants' annual certifications covered up that earlier fraud and avoided the mandatory penalties.  Those certifications therefore "conceal[ed]," "avoid[ed] or decrease[d] an obligation to pay" the penalties.  § 3729(a)(1)(G).  Defendants' attempts to avoid this straightforward application of the statute are wrong.

---

[2] The footnote Defendants cite from *Hughes v. Oklahoma* has nothing to do with the distinction between "property" and "ownership."  Joint Br. 47.  That footnote disagreed that a State's interest in a "food supply" was a special need that should allow States to regulate interstate commerce.  441 U.S. 322, 327 n.6 (1979).

*First*, Defendants argue they were never "obligated" to pay penalties, even though the statute says the maker of a false statement "is liable" for a penalty. Defendants suggest the word "liable" means only potentially liable, not "obligated." Joint Br. 51. Defendants cite Black's Law Dictionary but cut off the definition. The full definition, with bold showing Defendants' omission, says "liable" means "Responsible or answerable in law; **legally obligated**." *Liable*, Black's Law Dictionary (12th ed. 2024).

Relators could not have said it better themselves. Using Black's definition of "liable," Defendants had an "obligation" to pay a penalty because the AFA says they are "legally obligated" to pay one. Defendants' submissions since 2018 "conceal[ed]" or "avoid[ed]" that "obligation."

*Second*, Defendants argue the mandatory penalties are discretionary because agencies might not impose them. That ignores the distinction between penalties that are mandatory by statute and penalties that are discretionary by statute. Relators' Br. 46-47. When a statute says a penalty is discretionary, the FCA does not apply, but when a penalty is *mandatory by statute*, the FCA does apply. *Id.*

Other circuits agree that when a payment obligation is mandatory by statute, the reverse-false-claim provision applies to a fraudulent attempt to conceal the obligation. *U.S. ex rel. Wheeler v. Acadia Healthcare Co.*, 127 F.4th 472, 496-97

22

(4th Cir. 2025); *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 255-56 (3d Cir. 2016).

In Defendants' cases, the statute specifically said the penalty was discretionary. Relators' Br. 46-47; *U.S. ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 725 (D.C. Cir. 2019) (statute "expressly grants" agency discretion to not impose penalty); *U.S. ex rel. Simoneaux v. E.I. duPont deNemours & Co.*, 843 F.3d 1033 (5th Cir. 2016) (same statute); *U.S. ex rel. Schneider v. JPMorgan Chase Bank*, 878 F.3d 309, 315 (D.C. Cir. 2017) (penalties "may" apply).[3]

*Third*, Defendants argue they had no obligation because the amount of the mandatory fine is not fixed. The plain text of the FCA forecloses this argument. Congress amended the FCA in 2009 to specify that the reverse-false-claim provision applies even when the amount of the obligation is "not fixed." Relators' Br. 48; 31 U.S.C. § 3729(b)(3). The rule is clear: if the *existence* of the penalty is established by statute, the FCA applies even though the *amount* of the penalty is "not fixed."

Other circuits agree, including the Fifth Circuit case Defendants rely on. *Simoneaux*, 843 F.3d at 1036 (amendment "resolved uncertainty regarding whether

---

[3] As Relators explained (Relators' Br. 47 n.7), Defendants' citations to *regulations* are legally irrelevant. Defendants cite no authority to the contrary.

the *amount* of an obligation needs to be fixed"); *U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 506 (3d Cir. 2017); *see U.S. v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999). Defendants ignore this point and do not give meaning to the statutory text "whether or not fixed."

Defendants argue that because the AFA imposes penalties of "'*not more* than $100,000' for falsified eligibility," the penalty is discretionary, not mandatory. Joint Br. 53. That is wrong. For example, the Mine Safety and Health Act says mine operators "shall be assessed a civil penalty … not more than $50,000." 30 U.S.C. § 820(a)(1). The Supreme Court explained that language establishes "mandatory civil penalties." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 204 & n.4 (1994).[4] Similarly, the Clean Water Act says violators "shall be subject to a civil penalty not to exceed $25,000." 33 U.S.C. § 1319(d). Five circuits agree that means the "penalties are mandatory." *Leslie Salt Co. v. U.S.*, 55 F.3d 1388, 1397 (9th Cir. 1995); *U.S. v. Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d 484, 488 (6th Cir. 2010) (collecting cases); *In re Deepwater Horizon*, 753 F.3d 570, 575 (5th Cir. 2014). Fraudulently concealing penalties can create reverse-false-claim liability. *Pickens v. Kanawha River Towing*, 916 F. Supp. 702, 705-08 (S.D. Ohio 1996) (Clean Water Act fines).

---

[4] Congress later added minimum penalties. 30 U.S.C. § 820(a)(3).

*Fourth*, Defendants say "prosecutorial discretion" makes a mandatory obligation discretionary (Joint Br. 52), but the Fourth, Tenth, and Eleventh Circuits reject that theory. "That the government may exercise discretion regarding whether to charge the authorized fee does not render an obligation 'contingent' in the context of a reverse false claim." *Wheeler*, 127 F.4th at 496-97; *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1204 (10th Cir. 2006); *see Pemco*, 195 F.3d at 1237; *U.S. ex rel. Boise v. Cephalon, Inc.*, 2015 WL 4461793, at *7 (E.D. Pa. July 21, 2015).

Defendants instead rely on a case that *Congress abrogated*. Joint Br. 52 (citing *Am. Textile Mfrs. Inst. v. Limited, Inc.*, 190 F.3d 729, 738 (6th Cir. 1999) ("*ATMI*")). Congress specifically abrogated that decision when enacting the 2009 FCA amendment ("FERA") adding the "whether or not fixed" clause. *Victaulic*, 839 F.3d at 253 (detailing FERA's rejection of *ATMI*). Congress's reports specifically called out *ATMI*'s interpretation of "obligation" as requiring correction. S. Rep. 111-10 at n.9; H.R. Rep. 111-97 at n.30. FERA defined "obligation" to include an "established duty, whether fixed or not fixed," that exists by "statute," undoing *ATMI*'s holding and reasoning.

Defendants' other citation relies on pre-2009 cases that Congress corrected. *U.S. ex rel. Moore & Co. v. Majestic Blue Fisheries*, 196 F. Supp. 3d 436, 446-47 (D. Del. 2016). And it got the holdings of the cases it relied on backwards: the

court said *Bahrani* and *Cephalon* accepted the prosecutorial-discretion theory, but the opposite is true. *Id.* The opinion further relied on a decision from the District of the Virgin Islands that similarly got the holding of *Cephalon* wrong. *Id.*

*Finally*, Defendants argue that because their fraud worked, penalties were never imposed, so no obligation to pay mandatory penalties existed. Joint Br. 51-52. Other circuits reject this argument. *Wheeler*, 127 F.4th at 497; *Victaulic*, 839 F.3d at 255-56. Relators explained why this argument turns the statute on its head; Defendants failed to respond. Relators' Br. 49. Defendants' policy argument—that reverse-false-claim liability should be limited (Joint Br. 50)—comes from *ATMI*, which Congress abrogated. 190 F.3d at 740-41. Liability here serves the FCA's important goals: defendants "have an incentive" to conceal their obligations because they know the government cannot catch everything on its own, so "[r]everse-false-claims liability changes that value proposition because a finding of deception" leads to worse penalties. *Victaulic*, 839 F.3d at 255-56.

## IV. In the Alternative, Defendants Converted Government Property.

### A. Under *Bengis*, the Government Has a Property Interest in Illegally Caught Fish.

**1.** As every court to consider the question (including this one) holds, illegally caught fish are government "property." Relators' Br. 51-55; *U.S. v. Bengis*, 631 F.3d 33, 38-40 (2d Cir. 2011).

26

Defendants barely respond to this wall of precedent, saying they're not FCA cases. Joint Br. 62. So what? Defendants nowhere explain why "property" has a narrower meaning in the FCA than in the wire-fraud statute or the other statutes in *Bengis* and its progeny.

Defendants cite cases like *Lanahan v. County of Cook*, where the conversion claims failed because there was no conversion at all; the defendant "was permitted to retain" the property. 41 F.4th 854, 864-65 (7th Cir. 2022).

*Bengis* holds simply that when a private party extracts a public resource by fraud, the government's property interest is implicated even if there is no technical "ownership" until the moment of extraction. That does not imply, much less require, that every regulatory violation creates FCA liability. Relators further explained why Defendants' hyperbole on that point is incorrect. Relators' Br. 53-55. Defendants do not respond.

**2.** Because they cannot defend the district court's failure to follow *Bengis*, Defendants offer new supposed "flaws" in the conversion claim. Joint Br. 63. Defendants never raised those points below, so they are waived. *Nichols v. Prudential Ins.*, 406 F.3d 98, 106 (2d Cir. 2005).

**3.** Although the issue is insufficiently developed, Defendants' waived arguments are wrong.

*First*, Defendants suggest conversion depends on a separate "obligation" to "deliver [the] fish" that Defendants illegally retained.  Joint Br. 63-64.  But conversion is simply the "wrongful possession or disposition of another's property as if it were one's own."  *Conversion*, Black's Law Dictionary.  The wrongful act is the *possession* of the property, not breach of a delivery obligation.  Rest. 2d Torts, § 237, cmt. g; 18 Am. Jur. 2d Conversion §§ 2, 3.

Defendants suggest they cannot convert property until the government prosecutes them.  Joint Br. 64-65.  *Bengis* and its progeny reject this argument.  *See U.S. v. Winkler*, 2022 WL 17824064, at *2 (E.D.N.Y. Dec. 20, 2022); *U.S. v. Moffitt, Zwerling & Kemler, P.C.*, 875 F. Supp. 1190, 1202-03 (E.D. Va. 1995) (defendant liable to government for conversion), *aff'd*, 83 F.3d 660, 670 (4th Cir. 1996).  And the government's property interest arises before prosecution; "[i]n view of the perishable nature of fish," fish may be seized and sold before court-ordered forfeiture.  15 C.F.R. § 904.505(a)-(d).

Whereas other FCA provisions specifically require a preexisting "obligation" (§ 3729(a)(1)(G)), the plain text of § 3729(a)(1)(D) does not.  That is consistent with the common law of conversion.  Any theoretically required obligation to "deliver" converted property is created by § 3729(a)(1)(D) itself, which imposes liability for failure to "deliver[]" the property.

28

Defendants complain it is unfair to hold them liable because they did not know how to turn themselves in. Joint Br. 63. That is not a defense to conversion, and it is inconsistent with the criminal cases under *Bengis* that send fishing violators to **prison**. *Winkler*, 2022 WL 17824064, at *2.

*Second*, Defendants argue the government does not "use" seized fish. Joint Br. 65. But the government sells seized fish, and the plain meaning of "using" property includes selling it. *Smith v. U.S.*, 508 U.S. 223, 229-32 (1993).

*Third*, Defendants say they didn't know they held government property because no court order said so. Joint Br. 65-66. "Willful" conversion (*Conversion*, Black's Law Dictionary) doesn't require a court order. And Cooke is a multibillion-dollar fishing conglomerate that knew, or should have known, that it cannot keep fish taken illegally.

## B. Relators Properly Sought Leave to Amend.

The district court's incorrect futility analysis tainted the denial of leave to amend. It is not clear the court denied leave on any ground other than futility, but if so, that was wrong. *Loreley Fin. v. Wells Fargo Sec.*, 797 F.3d 160, 189-90 (2d Cir. 2015).

Relators' request to amend was based on (i) a new decision on a question of first impression in this circuit, and (ii) Defendants' new admission that fish become property once caught. Relators' Br. 56-58 & n.10. The claim is not futile, so it

should proceed.  Defendants do not claim bad faith or that they were prejudiced because the claim was not pled earlier.  *Mandala v. NTT Data, Inc.*, 88 F.4th 353, 363-65 (2d Cir. 2023) (leave to amend warranted where no bad faith or prejudice).  Demonstrating the point, the case Defendants cite concerned a bad-faith plaintiff that filed seventeen parallel lawsuits without curing defects the court identified.  *MSP Recovery v. Hereford Ins. Co.*, 66 F.4th 77, 90-91 (2d Cir. 2023).

The timeline shows that the district court did not follow the terms of its own order regarding amending the complaint.  Relators' Br. 55-59.  That resulted in the district court prospectively ordering forfeiture of all future amendments in response to new legal developments or new concessions by an adversary.  *Loreley* forecloses that unprecedented order.  There, this Court reversed when the district court prospectively denied leave to amend "in the critical absence of a definitive ruling," concluding it imposed an improper "forfeiture."  797 F.3d at 190.  Here, not only was there no "definitive ruling" as of the deadline to amend, the circumstances giving rise to the amendment did not exist yet.

## V.     BMO's Arguments Should Be Addressed on Remand.

BMO seeks affirmance on fact-intensive issues the district court never addressed.  This Court should leave them for remand.  *Berman v. City of N.Y.*, 796 F.3d 171, 176 (2d Cir. 2015).

If this Court were to consider BMO's arguments, the Complaint sufficiently alleges BMO took affirmative acts to further the conspiracy. BMO funded Cooke's acquisition of the vessels, purchasing $330 million in Cooke notes to resell. A-83-100, ¶¶16-29, 63. BMO took significant risk that MARAD would learn Alpha was a front, decimating the notes' value. A-100, ¶63. BMO prepared marketing materials boasting "Seth Dunlop is Glenn Cooke's nephew and a U.S. citizen," winking to investors that he was a figurehead controlled by the notes' guarantor. A-106-07, A-129, ¶¶83-86, 149. These facts, and others, plausibly show BMO knew of the scheme and the plan to conceal it, and had motive and opportunity. A-125-30, ¶¶135-36, 149-50, 155-56. At minimum, BMO furthered a conspiracy. A-134-35, ¶¶168-72. As BMO's cases demonstrate, these allegations suffice.

## CONCLUSION

The Court should vacate, reverse, and remand.


Date: May 1, 2025

                Respectfully submitted,

                */s/ Brendon DeMay*

                Brendon DeMay
                Jack L. Millman
                Brian T. Goldman
                Daniel Fahrenthold
                HOLWELL SHUSTER & GOLDBERG LLP
                425 Lexington Ave
                New York, New York

T: 646-837-5167
E: bdemay@hsgllp.com

*Attorneys for Plaintiffs-Appellants*

## **CERTIFICATE OF SERVICE**

I, Brendon DeMay, hereby certify that on May 1, 2025, I caused the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF System. I further certify that the above document was served on all parties by the Court's CM/ECF system.

**Signature:** _/s/ Brendon DeMay_          **Date:** May 1, 2025

# <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) as modified by this Court's Local Rule 32.1(a)(4)(A) because this brief contains 6,975 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2016, in Times New Roman style, 14 point font.

**Signature:** /s/ *Brendon DeMay*          **Date:** May 1, 2025